FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO
2022 NOV 21 AM 11:32
JEFFREY P. COLWELL
CLERK
BY_______DEP. CLK

**IN THE UNITED STATE DISTRICT COURT**

**FOR THE DISTRICT OF COLORADO**

Civil Action No. ______________________________ (to be supplied by the court)

Jason R. Clark

Plaintiff,

v.

Charles Schwab & Co., Inc.

Defendant.

MOTION FOR/TO: VACATE FINRA Award and Judgement for FINRA Arbitration Case #21-02439 Jason R. Clark/Clark Brothers Investments/CBI v. Charles Schwab & Co., Inc. Date of FINRA Arbitration Hearing September 8-9, 2022, DENVER, CO with FINRA Award issued September 19, 2022, DENVER, CO.

I confirm that I have conferred with the opposing counsel in good faith regarding this motion, as required under local rule D.C.COLO.LCivR7.1(a)2

s/ Jason R. Clark/ Pro Se Plaintiff

Jason R. Clark

Owner & Founder

Clark Brothers Investments/CBI

19580 Victorian Drive #306

Parker, CO 80138

Telephone: (720) 255.5711

Email: jason@clarkbrothersinvestments.com

Date of Signing: 11/21/2022

Signature of Plaintiff: Jason R. Clark

Pro Se Plaintiff Jason R. Clark

MOTION TO VACATE Award and Judgement

FINRA Case #21-02439 (Award issued 9/19/2022)

Clark Brothers Investments – Claimant (CBI Statement of Claim served 9/28/21)

vs.

Charles Schwab & Co., Inc. – Respondent (STJ Statement of Response 12/14/21)

DATE OF FINRA Arbitration Hearing September 8-9, 2022, DENVER, CO

Gravamen of the claims in FINRA award/judgement page 3 of 7 paragraph 3

1. Schwab wrongfully terminated CBI IASA.
2. Schwab wrongfully communicated that decision to CBI clients.
3. Schwab attempted to poach CBI clients.

Gravamen of CBI Motion to Vacate is opposing counsel Steptoe Johnson (STJ) representing Charles Schwab & CO., Inc. NEVER gave CBI any requested discovery, documents, or witnesses despite CBI/Jason Clark's NUMEROUS requests to do so. Furthermore, FINRA Head Arbitrator, Langden T. Owen, Jr. issued a Protective Order PROTECTING Schwab/STJ from providing CBI with the requested discovery, documents, and witnesses. Lastly, FINRA arbitration panel then blatantly lied about CBI/Jason Clark "waiving" discovery and that I/Jason Clark "stated" that I/Jason Clark/CBI "could prove its case without any discovery materials" – completely made up and untrue. I/Jason Clark/CBI also DID NOT agree or infer in any way that I/Jason Clark/CBI would "waive" discovery in lieu of postponing the hearing as requested by STJ/Schwab – this too is untrue.

**FINRA Mission Statement:** FINRA is dedicated to protecting investors and **safeguarding market integrity** in a manner that facilitates vibrant capital markets.

**Welcome to the Colorado Division of Securities: The Division of Securities exists to protect investors** and maintain confidence in the securities market, while **avoiding unreasonable burdens** on the marketplace by licensing securities professionals, enforcing securities law violations, and **helping Coloradans become more informed investors.**

**14th Amendment to The United States Constitution;** No **State** shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, **without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.**

**5th Amendment;** Although the amendment contains several provisions, four elements protect a person accused of a crime: the right against compelled self-incrimination, the right to a grand jury, the right of protection against double jeopardy **and the right to due process.**

**"Due process may also require an opportunity for confrontation and cross-examination, and for discovery**; that a decision be made based on the record, and that a party be allowed to be represented by counsel." Mullane v. Central Hanover Bank & Trust Co. 339 U.S. 306 313(1950).

Charles Schwab & Co, Inc. terminated CBI/Clark Brothers Investments/Jason Clark Investment Advisor Services Agreement (IASA) because Schwab incorrectly AND pre-emptively without ANY regard for Jason Clark/CBI presumption of innocence (INNOCENT till proven guilty) because Schwab thought CBI/Jason Clark was "wiring money" "writing checks" and "borrowing money" "missing money" from customer accounts without said customers knowledge and consent. All of the above was found to be 100% factually false at the FINRA Arbitration hearing (its innocent till proven GUILTY not the other way around). Schwab NEVER waited for the RESULTS of DORA/CDS investigation that found no wrongdoing by CBI/Jason Clark and that Jason Clark/CBI did nothing dishonest or dishonorable. This **FINDING OF FACT** was stated in the FINRA Award and Judgement: **"As stated earlier in this Award, there is no evidence that Mr. Clark did anything dishonest or dishonorable." AND "There is no indication, however, that any improprieties were ultimately actually found by the SEC or the CDS and no disciplinary action of any kind was brought by these agencies."** In addition to this **FACT**, none of the above could have occurred because NONE of the Limited Power of Attorneys (LPOA) on file with Schwab authorized CBI/Jason Clark to move money from any customer accounts. Schwab's LPOAs for CBI clients only authorized trading and fee deduction. Schwab learned all of the above as fact AFTER (not BEFORE) the head investigator at Schwab, Lisa Matlock, submitted the internal FALSE report to Bernie Clark, Head of RIA at Schwab (again reference CBI/Jason Clarks' presumption of innocence). No other employees at Schwab to include Bernie Clark himself reviewed or did any due diligence at all into the FALSE report that Lisa Matlock submitted. This was proven as **FACT** at the FINRA trial on September 8-9, 2022. The above FALSE reasons for terminating CBI IASA could be ascertained in the case files that Schwab purposefully hide from FINRA arb panel by use of a protective order. FINRA arb panel played along allowing Schwab to hide this material and relevant facts to Schwab's incompetence, negligence, carelessness, and inadequate due diligence required in the IASA contract and under securities laws BEFORE terminating CBI IASA. All of the above gravamen claims could be disproven with discovery, documents, and witnesses. However, Schwab NEVER provided any discovery, documents, or witnesses to CBI and FINRA "PROTECTED" Schwab by issuing a "Protective" Order stating Schwab didn't have to give CBI any discovery, documents, or witnesses. Then, in the FINRA arbitration panel Award and Judgement statement claimed without merit or evidence or proof that CBI waived discovery which is a factual, intentional, and strategic lie by FINRA and FINRA arb panel (specifically the Head Arbitrator Mr. Langden Owen) to "PROTECT" Charles Schwab & Co., Inc. In addition to all of the above falsities, untruths, negligence, carelessness, inadequate due diligence, deceitful lawyering tactics, undue means, manifest disregard of the law, bias, evident partiality, and FRAUD - during this entire process Schwab/STJ has been caught in more than 19 LIES (ALL documented) and broken 7 FINRA rules (13207 Extensions, 13501 pre hearing conferences, 13503 motions to compel DISCOVERY, 13601 postponement of hearings, 12505 cooperation in DISCOVERY, 13512 Subpoenas for DISCOVERY, and 13513 DISCOVERY without Subpoenas). All along FINRA and the FINRA arbitration panel disregarded all the FACTS and continually PROTECTED Schwab resulting in no truth or justice being served for pro se claimant myself/Jason Clark/CBI. Nobody can get a fair, just, and honest trial with no discovery, no documents, and no witnesses provided. This is the tantamount singular doctrine of Law in every

court in every state throughout the United States of America. **Specific excerpt In *Jefferies LLC v Gegenheimer*, Second Circuit Court "...such that the court finds that: (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case."**

During Trial Schwab employees gave the following completely foolish and irrelevant reasons for terminating CBI IASA which were:

1. **CBI didn't update their ADV**. This is factually and totally incorrect. CBI ADV is 100% updated and in compliance with Colorado Division of Securities/DORA State of Colorado, and there are no regulatory red dots (industry jargon for wrongdoing) on CBI FINRA broker check or Jason R. Clark FINRA broker check. NONE. This FACT was also affirmed at trial. In the 26+ years in the investment advisory business CBI/Jason Clark has No customer complaints, No FINRA regulatory red dots, No fines, No penalties, No disciplinary actions of any kind, and No discrepancies with regulators at DORA/CDS State of Colorado or FINRA. All of the aforementioned facts were affirmed at the FINRA arbitration hearing on September -89, 2022, in Denver, CO. This **FINDING OF FACT** was stated in the FINRA Award and Judgement: **"There is no indication, however, that any improprieties were ultimately actually found by the SEC or the CDS and no disciplinary action of any kind was brought by these agencies."**
2. **Changing fee structure** from paper checks for annual fee structure to the industry standard fee structure of 1% AUM. This literally occurs every day all the time in the industry. It is also common sense that businesses change fees, structure, billing cycles and procedures. Nothing to do with this process is illegal, wrong, or violates any laws, rules, or securities statues. **This FACT was also affirmed at trial.**
3. **A singular sentence on CBI web site** that was literally available to the public view for less than 24-48 hours that stated, "Examined and Approved by the SEC dated 3/5/21". CBI immediately within 24-48 hours removed this one sentence from CBI website at the request of the SEC. No fines, no penalties, and no disciplinary action was taken by the SEC against CBI/Jason Clark. Furthermore, that sentence of fact is NOT illegal. There is no statute that states CBI can not tell customers this fact. This was only done to verify and confirm the validity of CBI Returns which was affirmed by Schwab, STJ, and Arb panel as 100% true, 100% accurate, and 100% correct at trial. CBI had no intent to deceive or misled investors. **This FACT was also confirmed at trial.** This **FINDING OF FACT** was stated in the FINRA Award and Judgement: **"As stated earlier in this Award, there is no evidence that Mr. Clark did anything dishonest or dishonorable."**
4. Schwab testified at trial that **"CBI returns were so far in excess of the S&P 500 index that it caused concern and raised a red flag."** Testimony from Max Levine and Christian Valoria on Day 1 September 8, 2022. At trial CBI proved for a FACT that CBI returns on CBI web page are 100% fact, 100% correct, and 100% accurate. CBI returns

do rank in the Top 1% of all registered investment advisors in the country for the individual investor. **This FACT was also confirmed at trial!**

No Registered Investment Advisor (RIA) at any firm in the country including Charles Schwab & Co, Inc. has ever been removed/terminated from an RIA platform (IASA) because of any of the aforementioned reasons. **This too is a 100% FACT**. All are from "wiring money" "writing checks" "borrowing money" "missing money" "losing money" or "fraud". 100%. Schwab WOULD NOT give CBI any discovery, documents, or witnesses to testify (and NEVER did) for this reason. NONE. That reason being it shows Schwab screwed up and pre-emptively terminated CBI IASA based on false and erroneous information that NEVER existed (missing money, wire transfers, checks, and loans from customer accounts to CBI). Had the singular action of Schwab terminating CBI IASA NOT occurred Jason Clark would not have suffered damages, loss of clients, loss of revenue, defamation, or emotional distress. Further to this point, Schwab knew that CBI customers knew all of the accusations because Schwab, the SEC, and the CDS/DORA all acted in concert behind CBI/Jason Clark back to include calling NUMEROUS clients and asking CBI clients questions like, Has Jason Clark ever borrowed money from your accounts? Has Jason Clark ever wired money from your accounts? Has Jason Clark ever misappropriated funds from your accounts? No person on planet earth would ever invest with a Registered Investment Advisor who was being INVESTIGATED/accused of such things by the SEC, CDS, AND DORA State of Colorado; AND THEN REMOVED from Charles Schwab's RIA platform (by far the largest, most powerful, and most widely known securities firm in the country). Nothing Jason Clark/CBI did caused any of the aforementioned events or outcomes. This is stated as fact in the FINRA arb award page 5 of 7 paragraph 2 "there is no evidence that Mr. Clark did anything dishonest or dishonorable". All of CBI/Jason Clark damages were caused by Schwab's actions, carelessness, negligence, and lack of due diligence into the erroneous and false allegations against Jason Clark/CBI that culminated in Schwab's decision to terminate CBI IASA. Had Schwab NOT terminated CBI IASA there would be no implied defamation, no poaching of CBI customers, no lose of CBI clients, no arbitration hearing, no trial, and no vacate of award. Thus, it was Schwab's decision to terminate CBI IASA that is 100% the cause for all of the damages suffered by Jason Clark/CBI.

As one can already ascertain from the above FACTS already proven at trial there is no way Jason Clark/CBI/Clark Brothers Investments was judged fairly, under the law, or equally under the eyes of the law which ALL point to **Fraud (19 Lies in total and 7 FINRA rules violated), CORRUPTION (Bribery), Biasness, Evident Partiality, Undue means, and Manifest Disregard of the Law by the arbitration panel in favor of Charles Schwab, the largest and most powerful securities firm in the country; being represented by the largest and most powerful securities litigation firm in the country, Steptoe Johnson/STJ.** For the record, here are additional documented specific examples of fraud (lies), biasness, evident partiality, undue means, and manifest disregard of the law by FINRA and the FINRA arbitration panel in favor of Schwab/STJ throughout this entire process to include the 2-day arbitration trial in Denver, CO on September 8-9, 2022.

**FINRA Web site under: Challenges to an Arbitration Award**

FINRA does not have an appeals process through which a party may challenge an award. This means that FINRA does not hear appeals on arbitration awards.
However, under federal and state laws, there are limited grounds on which a court may hear a party's appeal on an award. Specifically, the law permits a district court to vacate or overturn an arbitration award if it finds that:

- the award was procured by **corruption, fraud**, or **undue means;**
- there was **evident partiality** or corruption in the arbitrators;
- the arbitrators were guilty of misconduct in refusing to postpone the hearing, even in light of sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy, or of any other misbehavior by which the rights of any party have been prejudiced;
- **the arbitrators exceeded their powers**, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made;
- **the arbitrators disregarded a clearly defined law or legal principle applicable to the case before them (Manifest Disregard of the Law)**; or
- there is no factual or reasonable basis for the award (Complete Irrationality).

**Here are 30 Specific Examples of Fraud (19 Lies and 7 FINRA Rules violated), corruption (bribery), undue means (unfair and deceitful lawyering tactics), evident partiality (biasness), Manifest Disregard of the LAW (NOT giving opposing side discovery), and arbitrators exceeding their powers (issuing a PROTECTIVE Order to block CBI from receiving discovery, documents, and witnesses) during this FINRA Arbitration Hearing**

1, STJ/SCHWAB gave No discovery, No documents, and No witnesses to CBI. NONE. Despite numerous motions to compel filed, emails, and requests made to FINRA and through CBI Case Manager at FINRA, Cody Netfin. FINRA did nothing. Not only did FINRA do nothing FINRA arb panel chair, Langdon Owen, issued a Protective Order allowing Schwab to completely and totally bypass CBI legal right to discovery, documents, and witnesses. Furthermore, Mr. Owen then insinuated in the Award statement that it was CBI that abused the discovery process and refused Schwab/STJ requests or consideration for discovery. This is a lie. CBI/Jason Clark gave Schwab everything to include daily handwritten notes from the minute Schwab terminated CBI IASA on April 2, 2021. Schwab gave CBI no discovery, no documents, and no witnesses. NONE. Furthermore, Robyn Crowther of STJ wrote CBI/Jason Clark on numerous occasions via

email stating that even if CBI/Jason Clark signed the PO Schwab/STJ would not give CBI the requested discovery, documents, or witnesses (Specifically Bernie Clark, no relation, Head of RIA Services at Schwab and the Final Decision Maker in terminating CBI IASA). This is NOT truth and justice or fair or the Law. CBI/Jason Clark even after completion of the trial still doesn't really know what happened, how or why CBI was terminated, then defamed, and then customers poached. With discovery, documents, and witnesses CBI would know for 100% certainty. That's why it is the Law and in FINRA rules. See FINRA RULES 13513 (motions to compel discovery), 12505 (cooperation of parties in discovery), 13512 (subpoenas for discovery), and 13513 (discovery without use of subpoenas). There is no law or FINRA rule that because one side is pro se that opposing counsel does not have to obey and play by these same commonly known rules of law and the courts and FINRA's own rules. **Specific excerpt In *Jefferies LLC v Gegenheimer*, Second Circuit Court** **... such that the court finds that: (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case.**

2, CBI never waived discovery. See numerous emails CBI sent to everyone requesting discovery, documents, and witnesses. See last two motions filed by CBI less than two weeks before trial outlining requests for discovery, documents, and witnesses. See pretrial conference call between parties on August 23, 2022 (same date of FINRA Protective Order) titled: Discovery Pre-Hearing Conference (see letter imbedded below). CBI/Jason Clark even referenced MY MOM (Connie Clark) who knows the discovery doctrine in law but who only has a high school education. Most specific email requesting discovery, documents, and witnesses was last sent on September 6, 2022, less than 48 hours before trial on September 8-9, 2022, AGAIN requesting discovery, documents, and witnesses from Schwab/STJ. Further to this point, the first time that I/Jason Clark/CBI heard that I "waived" discovery was in reading the FINRA Award and Judgement on September 19, 2022. Not a single time was this ever mentioned, referenced, or inferred until "waiving" discovery magically appeared in the FINRA arb panel Award and Judgement.

Re: CBI v. Schwab arb case # 21-02439

| | |
|---|---|
| From | jason@clarkbrothersinvestments.com |
| To | Crowther, Robyn |
| Cc | kevin.lewis@schwab.com , Ogle, Nailah , Kundu, Surya |
| Date | 2022-09-06 16:16 |

Message Body

ALL,

YOU (Robyn Crowther) can arrange and schedule the Schwab employees (Kara Suro, Christian Valoria, Max Levine, Lisa Matlock) at anytime the first day, September 8, 2022. I think that is fair and reasonable, and hope you and your team agree. For times sake and best for everyone, ALL 4 of these employees can be on the "call" or "zoom" at the same time. This too is both fair and reasonable and benefits all sides including FINRA. **As for YOU, Steptoe Johnson, and Schwab NOT providing ANY discovery, documents, or witnesses (that CBI requested) AT ALL less than 48 hours prior to the start of the trial? That's first up on the docket for CBI opening statement. See You all in Denver in 2 days.** Thank You, Jason, pro se claimant CBI v. Schwab arb case # 21-02439.

3, Even if CBI/Jason Clark signed PO Schwab was NEVER going to give a pro se claimant requested (numerous times in writing, in emails, and over the phone) DISCOVERY. CBI/Jason Clark has numerous emails strings that support this claim by CBI. This is a FACT. FINRA and Head Arbitrator, Langden Owen, did NOTHING to corroborate the sharing of discovery, documents, and witnesses despite numerous FINRA rules requiring just that (see FINRA RULES 13503, 12505, 13512, and 13513). See this entire EMAIL string for evidence and proof of this FACT.

**FIRST EMAIL**

RE: CBI v. Schwab arb case # 21-02439

| | |
|---|---|
| From | Crowther, Robyn |
| To | jason@clarkbrothersinvestments.com |
| Cc | kevin.lewis@schwab.com , Ogle, Nailah , Kundu, Surya |
| Date | 2022-09-06 16:25 |

Message Body

Thank you for your response, and for your flexibility as to when the Schwab employees will be called. They will testify live, and I don't know that FINRA procedures allow them to testify as a group, so we will need to offer them one at a time. Please let me know how much time you want to spend with each witness and I will send you a schedule.
RE: CBI v. Schwab arb case # 21-02439

| | |
|---|---|
| From | Crowther, Robyn |
| To | jason@clarkbrothersinvestments.com |
| Cc | kevin.lewis@schwab.com , Ogle, Nailah , Kundu, Surya |
| Date | 2022-09-06 14:03 |

Message Body
Dear Mr. Clark,

Following FINRA's recent rulings, I wanted to check in with you on some logistical issues relating to the hearing beginning on Thursday.

First, we remain willing to share the documents with you if you confirm that you will follow the protective order and not disclose them outside of the arbitration hearing or in other filings made with FINRA. Please let me know your position on that issue.

Second, would you let me know which witnesses you intend to call, and in which order? Any Schwab witness who you will intend to call will need to make arrangements to be at the hearing site at the correct time, so I need to coordinate with their schedules today and tomorrow.

If you would like to discuss this by phone, let me know.

Thanks,
Robyn Crowther

-----Original Message-----
From: Crowther, Robyn
Sent: Wednesday, August 24, 2022 6:04 PM
To: 'jason@clarkbrothersinvestments.com' <jason@clarkbrothersinvestments.com>
Cc: kevin.lewis@schwab.com; Ogle, Nailah <nogle@Steptoe.com>; Kundu, Surya <skundu@Steptoe.com>; Quadrino, Leah <LQuadrino@steptoe.com>
Subject: RE: CBI v. Schwab arb case # 21-02439

**Hi Mr. Clark, as to your question below, we will send objections to your discovery requests that will show what we think is appropriate and what we**

**think is not appropriate.** However, I saw your filing with FINRA today and am still unclear as to whether you intend to comply with the protective order that was entered. Please let us know as that will impact what we can provide on Monday.

-----Original Message-----
From: jason@clarkbrothersinvestments.com <jason@clarkbrothersinvestments.com>
Sent: Wednesday, August 24, 2022 11:11 AM
To: Crowther, Robyn <rcrowther@Steptoe.com>
Cc: kevin.lewis@schwab.com; Ogle, Nailah <nogle@Steptoe.com>; Kundu, Surya <skundu@Steptoe.com>; Quadrino, Leah <LQuadrino@steptoe.com>
Subject: Re: CBI v. Schwab arb case # 21-02439

On 2022-08-24 11:37, Crowther, Robyn wrote:
Dear Mr. Clark,

**In reviewing this email string, I am concerned about your statement to Mr. Neftin that the Chair reiterated that you do not have to sign an NDA to get discovery and documents, and that the protective order only applies to your request to call certain high-ranking Schwab officials as witnesses in this action.** That is not correct. The protective order issued has the same confidentiality terms that we asked you to agree to, but they have now been imposed by the order of the Chair rather than pursuant to an agreement. If you disagree with that interpretation, please let me know at your earliest convenience so that we can ask the Chair to clarify the ruling. Schwab cannot produce confidential information to you if you are not going to comply with the order not to disseminate them, so we need to all be on the same page before we can give you the discovery you requested. If you confirm that you will abide by the terms of the protective order and not disclose confidential information, we will make our production to you by Monday.

**So that there is no misunderstanding, we do not believe that you are entitled to everything you have asked for below, and will make clear what we object to when we serve our documents and response.**

Some of your questions below are not appropriate, but I am going to answer some of them now because we will need to work together to get materials ready for the arbitration, and I hope that we can conduct ourselves cooperative as it will make everything go more smoothly.

Ms. Quadrino has another case she is working on where the trial date was continued, creating conflicts with the dates for the arbitration in this case. Rather than ask you to delay the hearing, we asked Ms. Kundu to step in and assist. This has nothing to do with your case,

it is just a scheduling conflict that happens all the time. We work as a team, and so when we have said in the past that proposals were made to you with compromises etc., we refer to communications sent by all of us. You have all of the correspondence and you might interpret it differently than we do, but that may be some of the confusion about statements we have made regarding proposals. We are not going to debate that with you, however, as in our view the issue has been resolved by the Chair who considered your position.

I do not think it is relevant any longer, but in the interest of trying to build some trust, here is one of the picture of my office where you can see some of the water on the floor. I took this picture at 12:16am on the morning of November 16, 2021 when I had come to the office in response to an emergency in the middle of the night. It just made it difficult to finalize the response to your claim when it was due so I requested a brief extension which the panel granted. I do not intend to engage any further on this topic unless the panel requests me to, but as you have accused me of lying about it, I hope that sharing this picture will put that concern at ease.

I have removed the people who are not relevant to this discussion, who include assistants at Steptoe, the chair of my firm, FINRA administrators and other attorneys at Schwab. These are not people who can help in getting this matter prepared for arbitration. We want to work with you to get this case presented and tried. If you think it would be useful to discuss any of this by telephone, we can arrange a call.

Sincerely,

Robyn Crowther

-----Original Message-----
From: jason@clarkbrothersinvestments.com
<jason@clarkbrothersinvestments.com>
Sent: Wednesday, August 24, 2022 4:50 AM
To: Crowther, Robyn <rcrowther@Steptoe.com>; kevin.lewis@schwab.com; Ogle, Nailah <nogle@Steptoe.com>; anavarette@steptoe.com; Kundu, Surya <skundu@Steptoe.com>; Quadrino, Leah <LQuadrino@steptoe.com>; greg.scanlon@schwab.com; chris.richie@schwab.com; Hillman, Aaron <ahillman@steptoe.com>; Renigar, Gwendolyn <grenigar@steptoe.com>
Cc: Cody.Neftin@finra.org; Ericka.Jeanvil@finra.org
Subject: CBI v. Schwab arb case # 21-02439

TO: Robyn Crowther, Kevin Lewis, Nailah Ogle, Andrea Navarette, Sunya Kundu, Leah Quadrino (not on the Call?), Greg Scanlon (Schwab), Chris

Richie (Schwab), Aaron Hillman (STJ), and Gwen Renigar (STJ).

See Cody Netfin email message below. I am doing as Cody (case manager for FINRA) suggested and contacting you to give CBI all discovery and documents that CBI has long ago requested. To summarize that request for discovery and documents here again is what CBI is requesting.

1. ALL case files/instances where Charles Schwab & Co. has terminated a RIA IASA under Schwab.

2. Why is Leah Quadrino suddenly not on any dockets after our Friday July 22, 2022 call?

3. Proof of flood that Robyn Crowther said occurred back in November of 2021? In accordance with FINRA rule 13207 said flood would have to have been "extraordinary circumstances." Seeing as Leah Quadrino (listed as a representative Attorney on STJ/Schwab original response to CBI statement of claim) is located in Washington DC and You/Robyn Crowther are located in Los Angeles, CA, please explain how it is possible to have a FLOOD that prevented your Firm, Steptoe Johnson, from filing STJ/Schwab response to CBI statement of claim on time?

4. Please provide ALL "proposals", "negotiations", and "compromises"

you/Robyn Crowther personally said you/Robyn Crowther made to CBI in regards to the NDA dispute CBI had with Leah Quadrino (STJ)? I have only spoken to Leah Quadrino once for less than 5 minutes on this topic on Friday July 22, 2022. I have NEVER once spoken to you/Robyn Crowther on this subject (NDA) or protective order for that matter.

5. Is Zach Carter the "mystery" customer so identified in STJ/Schwab original statement of response? If not Zach Carter, then who is this unidentified customer?

6. Please provide ALL related documentation, transcripts, phone calls, texts, emails, and any other forms of communication for the EXAM You/STJ/Schwab said occurred with Colorado Division of Securities and/or DORA state of Colorado and CBI on October 27, 2017? Please also provide a copy of ALL the "numerous" customer complaints on CBI that occurred after this EXAM.

7. Please provide copies, proof, evidence of "wire transfers"

you/STJ/Schwab/Robyn Crowther said occurred from CBI customer accounts to me/Jason Clark/CBI.

8. Please provide copies, proof, evidence of CBI "customer loans"

between me/Jason Clark/CBI and any CBI customer.

9. Please provide copies, proof, evidence of the Federal Tax Lien on Jason Ray Clark/Jason Clark/CBI/me?

10. Please provide copies, proof, evidence of ANY money missing from ANY CBI customer accounts custodian at Charles Schwab & Co?

11. Please provide copies of ALL the CBI LPOAs (limited power of

attorneys) on ALL CBI customer accounts custodian at Charles Schwab & Co.

12. Please show me/CBI/Jason Clark the "detailed reports on wire transfers, checks, and other disbursements from client accounts" so stated by you/Robyn Crowther/STJ/Schwab in response to CBI statement of claim.

13. Provide all communication written or verbal or otherwise (phone calls, text messages, emails) between Charles Schwab & Co./any employee of Charles Schwab & Co. AND the State of Colorado Division of Securities and/or DORA to include specifically Jason Gross and Jeff Eaby (both securities examiners at DORA). Specifically, ALL communication between Schwab and DORA that led to the "This is a for cause examination and there is heightened concern of this advisor's activities." - so stated and quoted in STJ/Schwab response to CBI original statement of claim.

14. Provide ALL documents relating to or pertaining to the $200,000,000 SEC Investigation into Charles Schwab over Intelligent Portfolio Robo Advisor fraud case, and subsequent settlement with the SEC.

Thank You, Jason R. Clark/CBI/pro se claimant, 720.255.5711

-------- Original Message --------

Subject: RE: meeting?

Date: 2022-08-23 19:14

From: "Neftin, Cody" <Cody.Neftin@finra.org>

To: "jason@clarkbrothersinvestments.com"

<jason@clarkbrothersinvestments.com>

Cc: "Jeanvil, Ericka" <Ericka.Jeanvil@finra.org>

Hi Jason,

The signed protective order is attached here for reference. This was published today after the pre-hearing conference. The protective order outlines the process for remaining discovery and handling of the confidential information. Your best bet is to contact Respondent to coordinate.

-Cody

-----Original Message-----

From: jason@clarkbrothersinvestments.com

<jason@clarkbrothersinvestments.com>

Sent: Tuesday, August 23, 2022 3:07 PM

To: Neftin, Cody <Cody.Neftin@finra.org>

Cc: Jeanvil, Ericka <Ericka.Jeanvil@finra.org>

Subject: Re: meeting?

WARNING: External Sender! Exercise caution with links, attachments and requests for login information.

Hi Cody,

no worries, went very well. Mr. Owen did reiterate that I do not have to sign an NDA to get discovery and documents. Once the protective order is issued for Mr. Schwab, Mr. Bettinger, and Mr. Bernie Clark, when do I get discovery and documents that I have already requested? Perhaps, I could also ask for your assistance and FINRA to NOT allow Schwab/STJ to wait until the night before to "dump" all discovery and documents on CBI. Again, it is my understanding from Mr. Owen during this conference call that Schwab/STJ is REQUIRED To give me discovery and documents requested and that I DO NOT have to sign an NDA to receive all documents and discovery. Thanks, Jason Clark

Confidentiality Notice:: Information contained in or attached to this

email may be non-public, privileged, or confidential. Do not use, save, or copy any of that information, and do not share it with anyone else, unless you are the intended recipient. The sender has not authorized you to save, copy, use, or share any information provided to you in error.

If the sender sent you this email or any attachment by mistake, please let the sender know by replying to this email and then deleting it.

In regards to this:

So that there is no misunderstanding, we do not believe that you are entitled to everything you have asked for below, and will make clear what we object to when we serve our documents and response.

What items am I/Jason Clark/CBI entitled to? As opposed to NOT entitled to. Is it normal procedure for Attorneys on one side to dictate to the other side what items are relevant and what items are not?
I am open to discussions on these matters.

## SECOND EMAIL

-----Original Message-----
From: jason@clarkbrothersinvestments.com <jason@clarkbrothersinvestments.com>
Sent: Tuesday, September 6, 2022 2:16 PM
To: Crowther, Robyn <rcrowther@Steptoe.com>
Cc: kevin.lewis@schwab.com; Ogle, Nailah <nogle@Steptoe.com>; Kundu, Surya <skundu@Steptoe.com>
Subject: Re: CBI v. Schwab arb case # 21-02439

ALL, YOU (Robyn Crowther) can arrange and schedule the Schwab employees (Kara Suro, Christian Valoria, Max Levine, Lisa Matlock) at anytime the first day, September 8, 2022. I think that is fair and reasonable, and hope you and your team agree. For times sake and best for everyone, ALL 4 of these employees can be on the "call" or "zoom" at the same time. This too is both fair and reasonable and benefits all sides including FINRA.
As for YOU, Steptoe Johnson, and Schwab NOT providing ANY discovery, documents, or witnesses (that CBI requested) AT ALL less than 48 hours prior to the start of the trial? That's first up on the docket for CBI opening statement. See You all in Denver in 2 days. Thank You, Jason, pro se claimant CBI v. Schwab arb case # 21-02439.

## TEXT of LETTER for Discovery Prehearing Conference CALL

To: Jason R. Clark Robyn C. Crowther Langdon Owen

From: Ericka Jeanvil Senior Case Coordinator Subject: FINRA Dispute Resolution Services Arbitration Number 21-02439 Clark Brothers Investments v. Charles Schwab & Co., Inc. Date: August 19, 2022.

This letter is to confirm that a Discovery Pre-Hearing Conference, with the chairperson of the arbitration panel, will be held by Zoom video conference on Tuesday, August 23, 2022 at 12:30 PM Pacific Time Zone to discuss Discovery Issues. Please go to the DR Portal for the information needed to join the conference. Because your conference is being held on the Zoom platform, you can click "Add to Calendar" to download a calendar file and click "Go to Zoom Meeting" to join the conference from your device. If you are a pro se customer who is not registered on the DR Portal, the information will be sent to you separately. Please join the conference approximately 5 minutes before the scheduled start time to avoid delays. Additional information about pre-hearing conferences on Zoom is available here: https://www.finra.org/arbitration-mediation/prehearing-conferences. Please note, for all cases filed on or after October 29, 2018, a party or parties who request cancellation of a pre-hearing conference within three business days of the scheduled conference will be charged a cancellation fee of $100 per arbitrator. This means the fee will be assessed unless there are at least three full business days between the date of cancellation and the date of the scheduled pre-hearing conference. The party or parties will only be charged this fee for arbitrators scheduled to attend the pre-hearing conference. Please see Customer Code Rules 12500 and 12501 or Industry Code Rules 13500 and 13501 for more information. If you have any questions, please do not hesitate to contact me at 213-613-2662 or by email at Ericka.Jeanvil@finra.org.

4, CBI/Jason Clark never "threatened" to publish any confidential, proprietary, or personal information obtained from Schwab during discovery. This is **Undue Means** by STJ/Schwab and a blatant, intentional LIE to protect Schwab and avoid truth and justice. And FINRA and FINRA arb panel specifically Mr. Owen played along never once asking me/Jason Clark about this incident, and completely and totally brushing over Ms. Leah Quadrino's **BRIBE** by saying it was just a statement (discovery pretrial conference call on 8/23/2022). In a conversation that I/Jason Clark had with Leah Quadrino on Friday July 22, 2022, 215-2.30 PM MST I/Jason Clark asked Ms. Quadrino a very simple straightforward question is the NDA a gag order? Ms. Quadrino would not answer. I asked her at least 5 times. She refused to answer. Then I said, let me state another way "If I sign the NDA, then can I tell my story to anyone who will listen?" Ms. Quadrino stated, we aren't going to let you defame our client. I said I am not defaming anyone; I have a first amendment right to tell my story. I then pointed out that indeed the NDA is a gag order and that I don't need to sign an NDA/PO/gag order to then receive discovery, documents, or depose witnesses. And reminded Ms. Quadrino again that there is no FINRA rule that requires claimant to sign NDA/PO to then obtain discovery. Furthermore, of relevance and material to this point and the case is immediately after this incident Ms. Quadrino was removed as STJ second chair despite being named on every STJ filing from Day 1 including STJ/Schwab initial response to CBI original statement of claim.

5, FINRA Arbitration panel Award and Judgement page 1 line 1-2 under CASE SUMMARY state CBI (Claimant) a cause of action as prima facie defamation of character. This is INCORRECT. CBI/Jason Clark/myself ALWAYS referred to Implied Defamation of Character in CBI original statement of claim, throughout this ENTIRE process, and NUMEROUS times during the arbitration hearing on September 8-9, 2022. This FACTUALLY disputes Gravamen claim #2 as the Arbitration panel (as stated in the FINRA Award and Judgement) incorrectly proclaims CBI claim against Schwab was Prima facie defamation of character when from the very beginning (second sentence in CBI Statement of Claim) CBI claim was IMPLIED DEFAMATION OF CHARACTER. The sole act of Schwab terminating CBI IASA and removing CBI/Jason Clark from the Schwab RIA platform CAUSED ALL DAMAGES TO CBI (this FACT also affirmed and found factually true in testimony by Jeff Clark, Connie Clark, Aaron Clark, and John Prann on Day 2 of the FINRA Arb case on September 8-9, 2022, in DENVER, CO.). All of the aforementioned (as well as more than 100 actual clients, prospects, referrals, and ex customers of CBI) also affirmed this FACT even though "time" would not permit testimony from over 100 witnesses during a two-day arbitration hearing.

6, Arb Panels gravamen claim #1 that Schwab did not wrongfully terminate CBI IASA is easily disproven with DISCOVERY. Discovery, documents, and Mr. Bernie Clark's own testimony will prove this statement factually WRONG. This can be disproven because no RIA at Schwab (30-50 cases per years according to testimony at trial) has been terminated based on the three reasons Schwab gave at trial – not updating ADV in timely enough manner, changing fee structure from paper checks to 1% AUM, and a singular sentence on a web page that was literally viewable to the public for less than 24-48 hours. All, 100%, of the 30-50 terminations are for "wired money" "writing checks" "missing money" "borrowing money" from customer accounts without customers knowledge and consent. Schwab prematurely assumed that was the case with CBI and used the accusations (found later at trial to all be FALSE) to make the decision to terminate CBI IASA. This could be found out viewing the case files at Schwab none of which are proprietary, confidential, or personal in nature which are the exact reasons Mr. Owen (Head Arbitrator) gave for granting Schwab/STJ a PO for CBI request for these exact items in discovery. **Specific excerpt In *Jefferies LLC v Gegenheimer*, Second Circuit Court** **... such that the court finds that: (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case.**

7, Nothing CBI requested in discovery were personal, confidential, or proprietary in nature. All, 100%, directly not indirectly relate to proving CBI claims. Most pertinent of all questioning

Bernie Clark as to why he made the FINAL and PERMANENT decision to terminate CBI IASA. Upon testimony on September 8-9, 2022 Lisa Matlock would not admit to there being NO "wire transfers" "checks" "borrowed money" and "missing money" from customer accounts. I/Jason Clark/CBI asked then where are all the aforementioned? She would NOT answer saying repeatedly "I don't recall" or "I don't remember". CBI/myself pressed her until she finally admitted there are NO wire transfers, checks, borrowed money, or missing money from any CBI accounts. If 1.5 years later under testimony Schwab's Head Investigator, Lisa Matlock, would NOT admit error, wrongdoing, carelessness, negligence, and inadequate due diligence, then certainly when ALL of the FALSE claims came across Bernie Clarks desk from the Schwab CRIMES and FRAUD unit, Mr. Bernie Clark, simply signed off with no due diligence done on this behalf at all. This last FACT was also affirmed at trial as testimony confirmed that Christian Valoria and Max Levine BOTH testified to stating that they themselves who are 7 layers down in the management chain from Bernie Clark DID NOT do any due diligence at all into the validity of Lisa Matlock's claims of "wiring money from customer accounts, writing checks from customer accounts, missing money from customer accounts". If 7 layers down from the top Executive EVERYONE rubber stamped without so much as checking the validity of the false, inaccurate and WRONG claims, then so too did Bernie Clark. This information would ALL be in the case files, conversations, and emails amongst all the aforementioned Schwab employees. Yet, FINRA issued a PROTECIVE ORDER in essence hiding all of the above pertinent, material, and relevant discovery, documents, and witnesses (Bernie Clark himself). This is against the Law and Schwab attorneys, STJ attorneys, and FINRA attorneys ALL know this. Everyone knows this. This shows manifest disregard of the law – providing requested discovery to opposing council. This shows bias and evident partiality on behalf of FINRA (to include FINRA CEO who ruled again in favor of Schwab and the FINRA arb panel) and FINRA arb panel (specifically Mr. Langden Owen Head Arbitrator). These actions in totality also show undue means. Manifest disregard of the law, evident partiality, and undue means are all each and separately grounds to vacate FINRA awards and judgements. CBI has evidence and proof of all three occurring during this entire arbitration process.

8, **There is no FINRA RULE that requires claimant to sign an NDA/PO/Gag Order TO THEN receive discovery. This is a <u>FACT</u>.** This fact was enumerated numerous times by CBI throughout this process to Schwab lawyers directly via email, STJ council via email, FINRA case Manager Cody Netfin via email and numerous phones calls, and lastly a pre trial conference call with ALL of the above and head arbitrator Langden Owen who simply refused to acknowledge this FACT issuing PROTECTION i.e. A PROTECTIVE ORDER for Schwab to NOT provide discovery – also clearly and blatantly against numerous FINRA rules requiring

cooperation and coordination between parties to provide each other with discovery, documents, and witnesses (See FINRA RULES 12505 Cooperation in Discovery, 13512 Subpoenas in Discovery, 13513 Discovery without Subpoenas, and 13503 Motions to Compel Discovery).

9, Even Arb Panel admitted CBI provided "not enough evidence" to prove CBI case. **No one whether a licensed attorney or pro se can win a case with no discovery, no documents, and no witnesses provided by opposing counsel.** All Jason Clark/CBI is asking is to give CBI discovery, documents, witnesses so CBI can provide evidence to prove CBI case. And no, CBI DID NOT waive discovery as proclaimed by Mr. Owen in the Award/Judgement. This is 100% factually false and a LIE. There is no other way to put it. I/Jason Clark/CBI have numerous emails and filed numerous motions and requests to compel discovery from Schwab up until with 48 hours of the hearing on September 8-9, 2022. CBI received NOTHING. And the FINRA arbitration panel PROTECTED Schwab from delivering relevant and material discovery, documents, and witnesses. This too is a **FACT** that cannot be interpreted any other way. As stated before, even my own Mother, Connie Clark, pointed this out and she barely graduated from High School (no college degree and certainly no law degree).

10, **BRIBE** issued by second chair at STJ Leah Quadrino for CBI to sign an NDA to then receive discovery in a phone call that took place on Friday July 22, 2022. Witnesses to this event after the fact were Jeff Clark (Dad), Connie Clark (Mom), and Aaron Clark (brother). This action was also immediately dismissed by Mr. Owen. Ms. Quadrino after this incident was removed from this case by STJ. STJ citing a conflict of scheduling. A schedule that had been in place 10 months prior and had not changed dates or locations September 8-9, 2022 in Denver, CO.

11, Wrong dates on Clark Family statements which FINRA arb panel indicated as gravamen #3 Poaching of CBI clients by Charles Schwab & Co., Inc. Dates were from July of 2022 not July of 2021. Further, the arb panel misconstrued the 4 accounts claiming that the one account with only $7.00 in it was the only account with Tom Murray (RIA at Schwab) name on it. This is factually incorrect as all 4 including primary accounts 1 (Jeff Clark IRA),2 (Connie Clark IRA), and 3 (Joint account Jeff & Connie Clark) have Tom Murray's (RIA at Schwab) name on them as the Registered Investment Advisor. In aggregate these accounts 1,2,3, are valued at over $4,000,000 not $7.00. Lastly, CBI/Jason Clark/myself personally pointed out the correct dates from July of 2022 NOT July of 2021 and the named accounts above (1,2,3) to ALL 3 Arbitrators on day two of the trial. This can be heard on the tape of trial. Yet, in the Award/Judgement the dates are WRONG stating 2021 not 2022 and the named accounts with Tom Murrays name on them are said to not have Tom Murray's name listed as the RIA when in fact all four account statements

have Tom Murray listed as the RIA on each account. That is poaching/stealing customers from CBI. **This is a FACT proven at trial.** In award/judgement FINRA arbitrators either completely ignored these **FACTS** or chose to cover them up by referencing the wrong dates and the wrong accounts – even after I/Jason Clark/CBI personally pointed out the correct dates and accounts to each arbitrator on day 2 of the hearing (again, this can be clearly heard on the trial recording).

12, During depositions and testimony and throughout trial legal counsel and investigators from Schwab blatantly lied, withheld information, and refused to answer questions. And the FINRA arb panel allowed Schwab's deceitful tactics with no attempt to hold Schwab accountable under the law, FINRA rules, guidelines, or statutes.

13, By terminating CBI IASA Schwab did know or should have known the implication or suggestion of wrongdoing it would give to CBI customers. Schwab was actively talking to CDS/DORA and the SEC. Schwab knew that CBI customers had been contacted, told CBI was accused of "wiring monies" "writing checks" "missing monies" "borrowing money" from customer accounts without customers knowledge or consent. Any reasonable person (any person really) would be concerned, very concerned given these "suggestions" of wrongdoing. CBI Clients were very concerned, and this was proven at trial. Yet, none of the above had occurred. Schwab DID NOT wait for the conclusions of the investigations. Schwab pre-emptively and prematurely and most importantly INCORRECTLY terminated CBI IASA under the wrongful assumption of wrongdoing by CBI. This was proven as fact at trial. The Arb panel stated CBI/Jason Clark did nothing "dishonest" or "dishonorable". Had Schwab not terminated (wrongfully, incorrectly, prematurely, pre-emptively, carelessly, negligently, with incorrect and inaccurate due diligence) CBI IASA none of the above would be relevant or material and none of CBI customers (NONE) would have left. This Fact was proven at trial by CBI top 4 Clients (Jeff and Connie Clark, Aaron Clark, and John Prann). **This is textbook IMPLIED DEFAMATION OF CHARACTER.**

The **presumption of innocence** until proven guilty means that the burden of proof is always on the government to satisfy you that [defendant] is guilty of the crime with which [he/she] is charged beyond a **reasonable** doubt.

Does the US Constitution say innocent until proven guilty?

Most people believe the phrase "innocent until proven guilty" is found in the U.S. Constitution when, in fact, this is not the case. However, the concept does originate

from the constitutional **due process** protections found in the **5th**, 6th, 8th, and **14th Amendments!**

14, Under oath and on tape Schwab Investigators admitted that CBI returns were so far in excess of the S&P 500 index that it "caused concern" and "raised a red flag". There has never been any RIA Firm terminated by Charles Schwab (or any other Firm in the industry) for having fantastic A+ investment returns. NONE. **This is a FACT that could easily be proven with the 30-50 case files Schwab has but would not give to CBI for discovery!** The reason being is it proves CBI case as Fact (evidence). Meanwhile FINRA and the FINRA arb panel rubber stamped this guise by issuing a PO to CBI/Jason Clark so CBI could not obtain these files and documents to use as evidence to prove this fact.

15, All the lies (19 total) and FINRA rules broken (7 total). Not once ever addressed by FINRA or the FINRA arb panel. Despite CBI continued requests throughout this process to do so. At trial these lies, deceitful lawyering tactics, and dismissal by the FIRNA arb panel (especially Mr. Owen himself) precluded CBI from receiving relevant and material information that was denied by Schwab/STJ for discovery on behalf of CBI. Even at trial the lies unchecked and completely and totally ignored by FINRA/FINRA arb panel continued. Robyn Crowther, lead attorney for STJ, accused me/Jason Clark of calling Kevin Lewis (Schwab attorney) a "liar". I/Jason Clark have never once spoken a single word to Kevin Lewis. Fact.

16, It is virtually and realistically impossible for FINRA arbitrators to be impartial in this type of trial. Had the Arb panel ruled in favor of CBI none of these arbitrators would ever sit on any of the thousands of arb cases Schwab and other large Wall Street banks have filed against them each, and every year. CBI will never have another case like this, ever.

17, During entire trial Schwab/STJ never cited a single precedent case. CBI sited two both material and relevant to CBI claims. Young v Young (2005) in regard to implied defamation. And Stephen B. Sawtelle v. Waddell & Reed reference poaching/stealing customers. And a third in this Motion to Vacate Award/Judgment reference Jefferies LLC v Gegenheimer, Second Circuit.

18, No one, as opposing council STJ/Schwab and the arb panel tried to do at trial, can put a "PRICE TAG" on one's reputation or Health. This is especially true in the investment advisory business. Every regulator knows this, TRUST is #1. Every investor knows this, TRUST is #1. And every Investment Manager/Fiduciary knows this, TRUST is #1. There is nothing exorbitant or incorrect or inaccurate about CBI's claim for $112,500,000. Its MATH. Prepared and

calculated by me/Jason Clark/CBI who graduated in the top 5% of my class of 1992 from the BEST Engineering school in the country, The United States Military Academy at WEST POINT, with a dual degree in this very subject matter area – Financial & Systems Engineering.

19, Spreadsheets provided are proof that CBI claim amount of $112,500,000 is justified by math. The math or logic was NOT refuted at trial. I/Jason Clark/CBI have a Mathematical Financial Engineering degree from the top engineering school in the country The United States Military Academy at WEST POINT. I/Jason Clark graduated with honors in the top 5% of my class. I/Jason Clark/CBI have the technical and mathematical expertise and knowledge to calculate damages in awards. Math is Math. It does not change with one's profession, or job title, or business stature or pedigree or being a licensed practicing attorney v. pro se.

20, Nobody ever gave CBI the reports from the SEC and DORA/CDS despite numerous requests and attempts by CBI to obtain these relevant and material documents. See Schwab NOT providing discovery, documents, and witnesses to CBI. Nobody gave CBI/Jason Clark/myself any of these requested reports either. Not the SEC. Not the CDS/DORA state of Colorado. And certainly NOT Schwab, as previously mentioned.

21, The 4 Schwab employees that testified at trial ALL admitted that Managing Directors and VP DID NOT review any findings by Chief Investigator (Lisa Matlock) but simply just "signed off" on Ms. Matlock's findings. Findings that were ALL, 100%, proven WRONG at trial. Bernie Clark on down the chain of command just "signed off" never doing any due diligence at all. This shows carelessness, negligence, and inadequate due diligence in the eyes of the Law and meets the legal standard of proof for defamation of character by implication. Yet, the FINRA arbitration panel ignored all of the above **FACTS.**

22, FINRA Arbitrators completely and totally ignored CBI point of how did this case get "referred" to the Schwab Crimes and Fraud division in the first place. Because underling investigators (primarily Lisa Matlock) did NOT do their due diligence and wrongly assumed "wire transfers" "move money authority" "check writing from customer accounts" "missing monies" ALL existed when in fact NONE ever did. Further, CBI couldn't because ALL LPOAs do NOT have move money authority and never have at CBI (not at Schwab and not currently at IBKR). There has never been a RIA on Schwab's platform that have been referred to the Crimes and Fraud division at Schwab who were a little late updating form ADV. This is a fact proven at trial. There has never been an RIA on Schwab's platform that changed their fee structure to the industry standard (1% AUM) referred to the Crimes and Fraud unit at Schwab. **This FACT was**

**proven at trial.** And lastly, there has never been an RIA on Schwab's platform with a singular sentence on their web page that regulators didn't agree with that only appeared to the public for less than 24-48 hours that was referred to the Crimes and Fraud unit at Schwab. **This <u>FACT</u> was proven at trial.** There has never been an RIA on Schwab's platform with really good grade A top notch investment returns that has been referred to the Crimes and Fraud unit at Schwab. **This <u>FACT</u> was proven at trial.** All RIA on Schwab's platform are referred to the Crimes and Fraud unit at Schwab for "wiring monies" "writing checks" "missing monies" from customer accounts without said customers knowledge or consent. This could be proven as **<u>FACT</u>** if Schwab would give CBI discovery, documents, and witnesses. Schwab, specifically Lisa Matlock, botched this investigation of CBI and then gave 4 bogus reasons for CBI IASA being terminated. This last statement of fact could be easily proven with discovery, documents, and witnesses. FINRA by issue of a PROTECTIVE Order PROTECTED Schwab from having to divulge discovery, documents, and witnesses that would prove with evidence CBI claims – a **<u>FACT</u>** that FINRA arbitrators stated in the Award/Judgement issued on this case.

23, When Bernie Clark received this case file from the "Schwab Crimes and Fraud unit", he himself did no due diligence (proven at trial and testified to numerous times by Schwab employees), with red flags highlighting "wire transfers, checks, loans, and money missing from customer accounts" **(ALL PROVEN <u>FACTUALLY</u> FALSE AT TRIAL)** of course Mr. Bernie Clark came to the immediate and as it turned out 100% factually WRONG conclusion that Jason Clark/CBI was committing wrongdoing. Again, the law says, innocent till proven guilty, and accused have a legal, moral, and ethical right to presumption of innocence.

24, Tom Murray (the poacher of CBI Clients Jeff and Connie Clark, CBI father and mother, as well as CBI largest customers $5M+ in assets) does exactly what Jason Clark does at CBI. Tom Murray just works internally <u>FOR</u> Schwab. Another FACT ignored AND brushed over as irrelevant by FINRA and the FINRA arb panel. When in fact, Tom Murray is the very RIA at Schwab who "tried" unsuccessfully to poach/steal CBI largest and most valuable customers (who also happen to be Jason Clark's immediate Family).

25, On this gravamen point #3, poaching/stealing of CBI customers Mr. Owen (head arbitrator) never mentions Schwab attempting to switch CBI customers Jeff and Connie Clark into Schwab's intelligent portfolios without the customers knowledge or consent. Jeff Clark testified to this at trial. The SEC sued Schwab for this very action at the very same time is occurred to CBI customers. Schwab paid a fine of $187,500,000 to the SEC over these exact same charges.

Yet, the Arb Panel completely and totally ignored this **FACT** which is NOT included at all in the Award/Judgement/Findings in this arb hearing.

26, FINRA arb panel ignored FINRA's own rules, guidelines, and procedures clearly laid out and identified by CBI throughout this entire process. Yet, FINRA/FINRA arb panel did NOTHING to address, remedy, or provide fair and equitable solutions. Despite these very terms "fairness" "integrity" "vibrant market for EVERYONE" being displayed all over FINRA web page, literature, and marketing material.

27, The IASA states Schwab can terminate IASA's (CBI) at any time for any reason. But the Law, numerous securities statutes, rules, and guidelines, numerous case precedence (see Stephen B. Sawtelle v. Waddell & Reed), numerous general business laws, statutes, and guidelines, as well as numerous FINRA regulations, practices, rules, and guidelines (See good faith, fair dealings, and full disclosure) states that Schwab CAN NOT in the process defame CBI/Jason Clark and poach CBI customers. Schwab's egregious, negligent, and careless actions which could easily be proven with discovery, documents, and witnesses validate CBI legal argument of breach of IASA contract, implied defamation of character, and poaching/stealing CBI customers. All three listed as gravamen characteristics of this case by the FINRA Arb panel in the award/judgment. FINRA and the FINRA arb panel rubber stamped all of the above FOR Schwab while at the same time completely and totally ignoring the contractual and legal rights of CBI. CBI/Jason Clark DOES NOT work for Schwab. This is in the contract. Schwab completely and carelessly/negligently overstepped their own contractual obligation to CBI. Schwab ONLY provides custodian services to CBI. Schwab is NOT allowed to poach and steal CBI customers. Schwab's actions are not allowed to defame Jason Clark/CBI in upholding the IASA contract. Contracts are bilateral and CBI has rights too. Schwab's actions ignored all those contractual rights by simply saying we can do whatever we want whenever we want to whomever we want. That is NOT what the IASA contract states. That is NOT what the Law states. That is not what securities laws, statutes, and guidelines state. And that is NOT what FINRAs own rules, statutes, and guidelines state.

28, Jason Clark/CBI never inferred or called Mr. Kevin Lewis of Schwab a "liar". I/Jason Clark have never once spoken a single word to Mr. Lewis. Not even A "Hi" or "Goodbye".

29, Lying over and over and over again is **FRAUD**. In the most recent securities fraud case against Nikola Founder Trevor Milton on Friday October 14, 2022, here is what US Attorney for the Southern District of NY had to say, **"Trevor Milton lied to Nikola's investors – over and**

**over and over again. That's fraud, plain and simple." Damien Williams, US Attorney for the Southern District of NY.** Trevor Milton was convicted of fraud on 3 out of 4 counts. Ms. Robyn Crowther and her TEAM lied over and over and over again to obtain a FRAUDULENT, unjust, unfair, biased, impartial, and CORRUPT award and judgement by an equally fraudulent, biased, corrupt, impartial FINRA arbitration panel. Ms. Crowther and her TEAM also used undue means, deceitful and downright dirty lawyering tactics to dupe the FINRA arbitration panel. All of the above are FACTS and can be confirmed throughout the FINRA arbitration hearing on Sept 8-9, 2022, In DENVER, CO as well as throughout the entire preparation leading up to the trial itself (see Manifest disregard of the Law NOT PROVIDING ANY discovery, ANY documents, or ANY witnesses).

30, BEFORE this process even started Ms. Robyn Crowther lied about a "FLOOD" to get an emergency extension from FINRA (under FINRA RULE 13207 Extensions). There indeed was a flood in the LA offices of STJ. However, second chair, Leah Quadrino works in the DC and NY offices of STJ. STJ has 18 offices nationwide. Ms. Crowther and Ms. Quadrino have numerous assistants. All of the aforementioned licensed attorneys have laptop computers and the ability to work from home as well as brick and mortar offices, especially during COVID as everyone knows. Yet, FINRA granted Ms. Crowther/STJ/Schwab the unwarranted extension. CBI opposed in writing citing the above indisputable FACTS to no avail.

## Monetary AWARD Justification for Federal District Court

Average life expectancy of a Male in US = 78 years old.

$10,000,000 Assets Under Management "lost" (proved as FACT in FINRA arb case) at 1% industry standard AUM fee and 20% annual returns (CBI returns are 23.5% annualized proven as FACT in FINRA arb case).

= **$81,922,331** total revenue "lost" by Jason Clark/CBI thru age 78.

\+

CBI business value "lost" times 3.5X revenue valuation (industry standard).

= **$286,728,158** total CBI business value "lost".

= **$368,650,490** TOTAL damages to CBI/Jason Clark.

X3 Treble damages.

= **$1,110,595,147**

X 20% Taxes

**= $1,332,714,176 Total Damages to Jason Clark/CBI/myself.**

**CLOSING ARGUMENT**

**FINDING OF FACT** FINRA Award and Judgement for Arbitration case #21-02439 between Clark Brothers Investments/CBI/Jason Clark vs. Charles Schwab & Co., Inc. dated 9/19/2022: **"As stated earlier in this Award, there is no evidence that Mr. Clark did anything dishonest or dishonorable." AND "There is no indication, however, that any improprieties were ultimately actually found by the SEC or the CDS and no disciplinary action of any kind was brought by these agencies."** Schwab DID NOT provide CBI any discovery, any documents, or any witnesses. NONE. Despite CBI numerous requests via phone, email, and preconference hearings to provide relevant and material discovery, documents, and witnesses. The arbitrators knew ALL of this (as does everyone who aren't even licensed experienced attorneys who graduated from the best law schools in the country). Arb Chair Mr. Owen further ignored this fact (admitted to in pretrial conference call) and then proceeded to PROTECT Schwab from giving discovery, documents, or witnesses to CBI (requested numerous times in emails, motions, and during a pretrial conference call) by issuing a PROTECTIVE Order in favor of Schwab against CBI obtaining ANY discovery, documents, or witnesses. **There is no FINRA Rule stating that claimants have to sign an NDA/PO/gag order or anything TO THEN receive discovery, documents, and witnesses from opposing council. This is a FACT. There is no LAW stating that claimants have to sign an NDA/PO/gag order or anything TO THEN receive discovery, documents, and witnesses from opposing council. This is a FACT!** This fact was also pointed out by CBI in numerous motions, a pretrial conference call with Schwab/STJ and Mr. Owen (Head Arbitrator), as well as numerous iterations throughout trial with absolutely no acknowledgement or reference by any of the 3 FINRA arbitrators that NOT providing ANY discovery, documents, or witnesses to CBI is a clearly defined Law known by all especially attorneys for the Largest Securities firm in the country (Charles Schwab & Co., Inc.) being represented by the Largest Securities litigation firm in the country (Steptoe Johnson) – Both of whom knew for 100% certainty that the aforementioned discovery, documents, and witnesses are well-defined, explicit laws and legal principles as well as directly applicable to CBI entire case. **Clearly, not providing ANY discovery, documents, or witnesses at all stands against the 5th and 14th Amendments to the United States Constitution specifically concerning DUE PROCESS of which DISCOVERY is considered part of. NOT providing ANY discovery, documents, or witnesses is ALSO a manifest disregard of the law, as well**

**as undue means, bias and impartiality by FINRA/FINRA arbitration panel PROTECTING through the use of a PROTECTIVE ORDER the Largest FINRA MEMBER FIRM (Charles Schwab & Co., Inc.) being represented by the Largest Securities Litigation Firm in the Country (Steptoe Johnson) VERSUS a very small pro se claimant FINRA NON-MEMBER FIRM (CBI/Jason Clark). Specific excerpt In *Jefferies LLC v Gegenheimer*, Second Circuit Court .... such that the court finds that: (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case.** Furthermore, to then claim CBI/Jason Clark "waived discovery" is an outright lie and an outright injustice that must be rectified by this Court. There is no **REASONABLE** argument that this level of lying (19 lies to date), rule breaking (7 FINRA RULES in total), deceitful tactics, bad faith dealings, not acting in good faith, not fully disclosing information, biasness, evident partiality, undue means, FRAUD & CORRUPTION & BRIBERY, and manifest disregard of the law (NOT PROVIDING DISCOVERY) is normal, just, or fair. CBI/Jason Clark deserves to have answers. CBI deserves to have the truth. CBI deserves to have justice. Truth and Justice are the bedrock principles of the Judiciary system and the bedrock principles of The United States of America. **CBI/Jason Clark/me has provided this court with an overwhelming preponderance of EVIDENCE and FACT-BASED FINDINGS in a Court of Law (FINRA Arbitration Hearing on September 8-9, 2022, in DENVER, CO) TO grant CBI/Jason Clark a VACATION of the FINRA Arbitration Award & Judgement between Clark Brothers Investments/CBI/Jason Clark v. Charles Schwab & Co., Inc. Arbitration Case #21-02439 dated September 19, 2022, in DENVER, CO AND A NEW TRIAL IN THIS COURT.**

Thank You. Jason R. Clark, pro se claimant, Founder & CIO of Clark Brothers Investments/CBI.

## Colorado Bar Association and California Bar Association on Lawyers Lying with Case Precedence specific examples:

7:32

cobar.org

CBA
Colorado Bar Association.

# Rule 4.1. Truthfulness In Statements To Others

Colorado Court Rules
Colorado Rules of Professional Conduct

Transactions with Persons Other Than Clients

*As amended through Rule Change 2018(6), effective April 12, 2018*

In the course of representing a client a lawyer shall not knowingly:

(a) make a false statement of material fact or law to a third person; or

(b) fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited by Rule 1.6.

Cite as RPC 4.1

History. Entire Appendix repealed and readopted

7:33 5G

COMMENT

False Statements

[1] A lawyer is required to be truthful when dealing with others on a client's behalf, but generally has no affirmative duty to inform an opposing party of relevant facts. A false statement can occur if the lawyer incorporates or affirms a statement of another person that the lawyer knows is false. Omissions or partially true but misleading statements can be the equivalent of affirmative false statements. For dishonest conduct generally see Rule 8.4.

Statements of Fact

[2] This Rule refers to statements of fact. Whether a particular statement should be regarded as one of fact can depend on the circumstances. Under generally accepted conventions in negotiation, certain types of statements ordinarily are not taken as statements of fact. Estimates of price or value placed on the subject of a transaction and a party's intentions as to an acceptable settlement of a claim are ordinarily in this category, and so is the existence of an undisclosed principal except where nondisclosure of the principal would constitute fraud. Lawyers should be mindful of their obligations under applicable law to avoid criminal and tortious misrepresentation.

Crime or Fraud by Client

[3] Under Rule 1.2(d), a lawyer is prohibited from counseling or assisting a client in conduct that the lawyer knows is criminal or fraudulent. Paragraph (b) states a specific application of the principle set forth in Rule 1.2(d) and addresses the situation where a client's crime or fraud takes the form of a lie or

7:34 5G

ST FRANCIS SCHOOL of LAW

# Can Lawyers Lie in Negotiations?

Jun 17, 2015 | Uncategorized | 0 comments



What are the ethical duties of lawyers engaged in negotiations? Are lawyers expected to lie on behalf of their clients in the course of negotiation of a deal? How far may a lawyer go in zealously advocating for the interests of the client without crossing the ethical boundaries?

In California, the Rules of Professional Conduct govern a lawyer's ethical duties. The law prohibits lawyers from engagi in dishonesty. Cal. Bus. & Prof. Code § 6

Privacy - Terms

Lawyers may only employ such means as

7:34 5G

ST FRANCIS SCHOOL of LAW

In California, the Rules of Professional Conduct govern a lawyer's ethical duties. The law prohibits lawyers from engaging in dishonesty. Cal. Bus. & Prof. Code § 6106. Lawyers may only employ such means as are "consistent with the truth." Cal. Bus. & Prof. Code § 6068(d). This is also true when a lawyer is engaged in a matter that is before the court. Cal. Rules of Prof. Conduct, rule 5-200.

Applicable provisions outside California are similar. The American Bar Association Model Rules of Professional Conduct prohibit lawyers from making false statements of material fact or law to third parties, and from failing to disclose material facts when necessary to avoid assisting criminal or fraudulent conduct by a client. ABA Model Rules of Professional Conduct, rule 4.2. The ABA Model Rules also prohibit dishonesty, fraud, deceit or misrepresentation. ABA Model Rules of Prof. Conduct, rule 8.4.

Privacy - Terms

Attorneys ~~owe the highest duty~~ of loyalty

7:34

ST FRANCIS SCHOOL of LAW

Attorneys owe the highest duty of loyalty to their clients, and generally do not have a duty to opposing counsel or third party non-clients. *Cal. State Bar Formal Opn. No. 2013-189.* At the same time, lawyers cannot commit fraud or deceit and lawyers may not make false statements of material facts to non-clients. Id., citing Vega v. Jones, Day, Reavis & Pogue (2004) 121 Cal.App.4th 282, 291. Lawyers owe a duty to other attorneys with whom they are negotiating at arms' length not to commit fraud. Cicone v. URS Corp. (1986) 183 Cal.App.3d 194, 202.

A further complicating factor in negotiations is the instructions that a lawyer may be given by the client. A lawyer's ethical duty of confidentiality may prohibit disclosure of information without the consent of the client. While a lawyer is obligated to follow instructions from the client regarding what to disclose, if the client directs the lawyer to make statements that constitute fraud, the lawyer must counsel the client against

Privacy - Terms

**Case Precedence Providing DISCOVERY Specific Example:**

https://www.jdsupra.com/legalnews/securities-industry-arbitrations-and-2210612/

https://www.jdsupra.com/legalnews/securities-industry-arbitrations-and-2210612/

**Specific excerpt In *Jefferies LLC v Gegenheimer*, Second Circuit Court**

**….such that the court finds that: (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case.**

# Supporting Document

# Clark Brothers Investments Statement of Claim

**Clark Brothers Investments/Clark Brothers, Inc./CBI**

**Firm CRD#143777**

2851 S. Parker Road #510 Aurora, CO 80014

V.

**The Charles Schwab Corporation/Charles Schwab & Co, Inc.**
**Broker Dealer CRD#5393**

9800 Schwab Way Lone Tree, CO 90124

# Arbitration Statement of Claim with Legal Arguments

## 1 Year Statute of Limitation April 2, 2022

1, Prima facie Defamation of Character/Defamation of Character by Implication
2, Emotional Distress
$10,000,000 in presumed damages, compensatory damages, and punitive damages x3 (treble damages) = $30,000,000

## 3 Year Statute Limitation April 2, 2024

3, Breach of Contract
4, Breach of Fiduciary Duty
5, Tortious interference with Contract
$10,000,000 in opportunity cost damages, compensatory damages, and punitive damages x3 (treble damages) = $30,000,000

## 4 Year Statute Limitation April 2, 2025

6, Competition Laws
7, Antitrust Laws
$10,000,000 in compensatory damages, opportunity cost damages, and punitive damages x3 (treble damages) = $30,000,000

**$90,000,000** Total Damages sought plus taxes owed of 20% = **$112,500,000** – compensatory damages, opportunity cost damages, presumed damages, and punitive damages. Please see attached spreadsheet for mathematical and financial justification of damages. In addition to the above damages, CBI requests the following relief in this matter; ***CBI would like to see for ourselves all of the due diligence conducted by Charles Schwab on CBI that led to Charles Schwab terminating CBI IASA contract on April 2, 2021 per the IASA contract due diligence clause specifically stated in The IASA on Page 1, #3, paragraph 2 (see attached copy of the IASA).***

This letter serves as notice to Charles Schwab of Clark Brothers Investments intent to arbitrate Charles Schwab's decision to terminate the Investment Advisor Service Agreement with Clark Brothers Investments effective July 6, 2021. Clark Brothers Investments is aware that Charles Schwab can terminate the IASA at any time for any reason. That said, ***Charles Schwab breached the IASA by not providing Clark Brothers Investments with the due diligence conducted by Schwab on CBI upon request by CBI.*** The conclusions of the due diligence process is absolutely material to the breach of contract, breach of fiduciary duty, tortious interference with the right to contract, anticipatory repudiation of a contract, ***as well as breach of good faith, fair dealings, and full disclosure (the later added 6/28/2022***); all actions of which were unjustified, intentional, willful, and negligent. In addition, these breaches of contract and fiduciary duty are directly (not indirectly) related to the following claims of defamation of character by implication to include both libel and slander, and emotional distress. Schwab themselves acted like anticompetitive big firm bullies with no regard for antitrust laws despite having been allowed by The United States Government to grow into the gargantuan mess that Schwab currently is. How did this work out for the US financial system the last time we allowed financial powerhouses to get "too big to fail"? The US taxpayer bailed these massive bloated over leveraged poorly run bankrupt companies out of the very mess that they themselves created by hubris, overconfidence, and fraudulent garbage bin investments. Here we go again. Outside of the constructs of the legal system and laws of the securities industry, SEC, DORA, FINRA, the state of Colorado, and the United States of America in general; Schwab's behavior and corporate actions are deplorable, unprofessional, unethical, immoral, unscrupulous, and straight up dirty mob like business tactics – willfully intentional and with gross negligence removing an RIA (who does not work "for" The Charles Schwab Corporation) from your investment platform, then immediately aggressively purposefully and intentionally soliciting poaching stealing that RIA (i.e. CBI) Clients; while those Clients are still current active paying customers of CBI – including said RIAs Family. Absolutely disgusting actions for a once reputable brand. These actions define The Charles Schwab Corporation as Crooks – an organization that is dishonest. ***For reference, the due diligence clause is specifically stated in The IASA on Page 1, #3, paragraph 2 (see attached copy of the IASA).*** In addition to the material breach of contract, breach of fiduciary duty, and tortious interference with said contract, ergo the IASA, this arbitration also has to do with "the manner" at which Charles Schwab terminated the agreement. More Specifically, Letter**'s** Schwab sent to my clients without my knowledge or consent infers wrongdoing and incompetence and is equally defamatory and libelous. This includes the initial Termination Letter dated April 2, 2021; as well as subsequent letters thereafter attempting to directly solicit, steal and/or poach Clark Brothers

Investments customers. **Two**, at least Four customers (Jeff Clark, John Horodyski, John Prann, and Aaron Bushong) voluntarily called into Schwab, and Schwab told my customers "Your advisor should know what he did to cause the termination"; which also infers wrongdoing incompetence is defamatory and slanderous, and further ads to even further defamation of my/Jason R. Clark's character! **Thirdly**, eliminating advisors from the Schwab platform solely on the purpose of size is anti-competitive and breaks numerous antitrust laws of which I am certain the US Justice Department as well as The Securities & Exchange Commission will most likely want to inquire about, and possibly investigate. To help start the dialogue, there are three primary antitrust anticompetition laws in the U.S.:
1, The Sherman Act;
2, The Clayton Act;
3, The Federal Trade Commission Act (FTCA).
Areas of interest in regard to Charles Schwab's monopolistic actions against small firms like CBI for no reason or merit only to intentionally, purposefully, with premeditation drive the little guy out of business; and/or drastically damage the ongoing business operations and sustainability of these businesses to unfairly, illegally, using mob like tactics solicit poach and/or steal these small firms clients for enormous future profits. ***Please see attached excel spreadsheets for exact dollar amounts.*** Sounds like – Schwab is using their market power unfairly to drive competitors (like CBI) out of business. Anti-trust? Anti-competition? Free, fair, and open markets? Competitive markets? Ha! This is NOT, and Charles Schwab knows this. Charles Schwab knows exactly what they are doing. The Charles Schwab Corporation lacks integrity by definition. The Charles Schwab Corporation are thieves by definition. The Charles Schwab Corporation are crooks by definition. Isn't this the very behavior and actions that anti-trust and anti-competition laws are meant to prevent? Further, see reference below to CBI largest clients who are also immediate family (Father, Mother, and Brother) who were steered towards without their knowledge, without their consent or desire to purchase and/or use Schwab's Intelligent Portfolios. Sounds like requiring customers (Jeff Clark, Connie Clark, Jim Ruterbories, for example) to purchase unwanted items (Schwab Intelligent Portfolios) in order to stay with Schwab while ***The Charles Schwab Corporation is taking a $200,000,000 charge for SEC Robo Advisor probe (July 2021). Note here, Schwab just settled this claim with the SEC on June 13, 2022 for $187,000,000!*** Well, either use Schwab's Intelligent portfolios, or use one of Schwab's sales trained not investment trained RIAs. In this specific example (My Parents, Jeff & Connie Clark), Schwab would charge them 10X what I charge my family members. With no track record of investment success v. CBI track record of investment results that rank in the Top 1% of the entire investment industry. See aspects of this statement of claim referencing

fiduciary breach of contract #5,18,19,20. For further reference and details see also # 18,19,20 in this statement of claim. To note here, Charles Schwab grew into the gargantuan monopolistic mess they are today after acquiring:

1, US TRUST; Y2000

2, USAA investment management business; May 2020

3, TD 4, Ameritrade; October 2020 after which TD and Ameritrade merged in 2006. Also in 2020 the US Justice Department allowed the acquisition of E trade by Morgan Stanley (a Major Wall Street Powerhouse Firm); February 2020. Let's not fail to mention US taxpayers bailed out these financial behemoths in 2008 only to have them, what? Snuff out the little Guy? With the little guys' money (ergo US taxpayers / ergo me / ergo CBI)? I wonder how that will play out in front of a jury of 12 little guys? My guess? I am willing to bet the Farm to find out. Which brings up another point. ***The same Charles Schwab we are referencing in this deposition is the same Charles Schwab that is currently as we speak (July 15, 2021) being investigated and charged $200,000,000 by the SEC over Charles Schwab's Robo Advisor service called Schwab Intelligent Portfolios. Note here, Schwab just settled this claim with the SEC on June 13, 2022 for $187,000,000.*** Note here, in going after CBI current active paying customers (including my/Jason R. Clark's own family – My Mom, My Dad, and My Brother) Charles Schwab has been pitching this same garbage product – Schwab Intelligent Portfolio service. In addition, please reference #3 above as well for this factual data point. **Four**, I AM 100% certain it is immoral and unethical to remove an RIA from your platform who has done nothing wrong, and then immediately attempt to directly POACH, solicit, i.e. STEAL that Advisors Clients. This very action occurred with Jeff & Connie Clark $3.8M with Schwab, Aaron J. Clark $2.2M+ with Schwab, John Horodyski and Family $3M+ with Schwab, Joan Maranville $1.8M+ with Schwab, and Eric & Mary Crawford $800,000 account (that I built from $150,000 inheritance 5-6 years ago). More specifically, in regard to Eric & Mary Crawford, on June 22, 2021 in a phone conversation with Eric & Mary Crawford, the Crawford's stated, "the letter Schwab sent us states they are eliminating Advisors like you"; and, "looking to establish investment advisor relationships with Schwab instead of Clark Brothers Investments." Quotes directly from active paying clients, Mary & Eric Crawford. These actions are most certainly unprofessional, unethical, immoral, unscrupulous, anti-competitive, exhibit unfair business practices and general business courtesies, and most certainly meet the requisite legal elements and criteria for the intentional, calculated, and purposeful tortious interference with contract, breach of contract, and breach of fiduciary duty. **Five**, there are securities laws in the State of Colorado, and the United States of America, that protect ALL firms even small ones like Clark Brothers Investments. Specifically, 11-51-4.8 (IA) to start the conversation. Certainly, the arbitration board knows more than

me/Jason R. Clark/CBI/Clark Brothers Investments about securities laws, why these securities laws exist, as well as specific legal claims for this arbitration statement of claim to include: defamation of character, defamation of character by implication, emotional distress, breach of contract, breach of fiduciary duty, tortious interference with contract, anti-competition laws, and anti-trust laws; all of the aforementioned laws and statutes carry total damages as outlined in this statement of $90,000,000 broken down into the following areas under each of the above legal claims to include: compensatory damages, opportunity cost damages, presumed damages, and lastly punitive damages. **Six**, the actions and behavior outlined in this statement of claim by The Charles Schwab Corporation occurred almost immediately after the US Justice Department approved the merger of TD Ameritrade with Charles Schwab in circa 2020. To note here, TD and Ameritrade merged in 2006, to become TD Ameritrade. Also, to note, all of the aforementioned mega mergers occurred after Charles Schwab bought US TRUST in the year 2000. Then, also to note, in 2008 US taxpayers bailed out these failed poorly run financial powerhouses only to have the very behaviors and actions that caused their collapse continue to this day. Not only are these financial behemoths still doing what they did to cause the systemic collapse of the entire US & World financial systems; apparently, they have also undertaken a new rogue despicable business practice – unfairly snuffing out smaller and better run firms like CBI/Clark Brothers Investments. **Seven**, reputation, trust, and confidence are the pillars of the client/advisor relationship. The manner in which Schwab handled this termination, not the actual termination itself, maliciously, **negligently** (legal requirement for defamation), wrongfully, and inaccurately targeted Clark Brothers Investments and Jason R. Clark as wrong doers, when in fact, we have done absolutely nothing wrong. CBI is already seeing the effects of this falsely created lack of trust, confidence, and reputation caused by the manner in which Schwab terminated the IASA. Specifically, on July 1, 2021, John and Jamie Cook, informed me/CBI that they will not be moving to IBKR. The Cooks are the first customers who have openly stated they will not be making the move to IBKR. John has been a client for 20+ years, a friend for more than 30+ years, and together The Cooks have made a lot of money with CBI. Starting with maybe $5,000 adding maybe another $10-$20,000 over the years. Prior to taking money out to pay taxes and pay off his family home account was valued near $900,000. People don't "fire" RIAs for making them a lot of money. They fire RIAs most commonly for a breach of trust and/or confidence. This fact is well documented and has been proven time and time again. **Eight,** Schwab prematurely (Within days of April 2, 2021) prohibited Clark Brothers Investments from opening any new accounts prior to the ***"Effective Date"*** of termination of Clark Brothers Investments dated July 6, 2021 even though Schwab also states these actions will be taken Effective

immediately. Then what is the point of the Effective Date of the termination of the IASA contract, July 6, 2021? In addition, ***Charles Schwab breached the IASA contract between CBI and Charles Schwab on April 8, 2021 by not providing CBI with the due diligence report (upon written request via email) on CBI that led Schwab to terminate the IASA agreement.*** In essence, Charles Schwab blocked Clark Brothers Investments from ongoing business operations, then immediately attempted to "steal" (CBI own customers words) and "poach" Clark Brothers Investments clients. These fully intentional, malicious, negligent, and completely unprofessional tortious interference with a contract actions and behaviors has already cost CBI two major customers (Corina and Derek Smith $1M+ in assets and Troy Tinberg $2M+ inheritance) who during this time decided to all of a sudden invest elsewhere. CBI has had to delay or postpone more than 19 customer payments for John Horodyski, Shoddie Dean, Ashley Horodyski, Kristen Horodyski, Jeff Clark, Connie Clark, Aaron Clark, Ted Gill, Susan Gill, John Cook, Jaime Cook, Randy Williams, Malcolm Griffin, Shawna Clark, Brian Clark, and Michael Euperio & Family primarily due to the egregious and reprehensible actions taken by Charles Schwab to abruptly and without any merit or discern terminate CBI IASA. More specific details on the aforementioned accounts; on April 8, 2021 client Randy Williams was told by Schwab that no new accounts can be opened under Clark Brothers Investments master account #0808-0955. Further, in a call to Schwab on April 9, 2021 8 AM MST, Schwab representative Scott Cummins informed me of the same noting in his notes on Clark Brothers Investments "don't open anymore accounts under Clark Brothers Investments" and those pending will be marked "in error" and declined. After hearing of this information, I immediately informed John Horodyski that ROTH IRAs in the process of being opened for his daughters Ashley and Kristen would not be processed. This despite my contract with John Horodyski that my fees are all inclusive. Another customer, Malcolm Griffin, was also unable to open his ROTH ROLLOVER, for apparently the same/similar reasons. A fourth and fifth customer, Corina and Derek Smith, on May 13, 2021 abruptly ceased their multiple account transfers. A sixth customer, Troy Tinberg, had to be informed of the situation as he was in the process of opening an account. Troy has yet to proceed with opening an account as of May 13, 2021. A seventh and eighth customer, Shawna and Brian Clark, have also put their business on hold with Clark Brothers Investments because of this. All of the aforementioned account delays/rejections/declinations occurred because Schwab prematurely breached our contract by not allowing Clark Brothers Investments to open any new accounts despite the "effective date" of termination to be July 6, 2021. In doing so, Schwab also breached their fiduciary duty to Clark Brothers Investments, as well as all of the aforementioned Clark Brothers customers. Again, these actions are most certainly unprofessional,

unethical, immoral, unscrupulous, anti-competitive, exhibit unfair business practices and the interference of the right of contract, as well as straightforward simple and generally accepted business practices and courtesies. **Nine**, actively running advertisements for Schwab Investment Advisors on CBI Client homepages prior to the ***"effective date"*** of the termination of the IASA contract. These customers are CBI customers and 100% have agreed to move to another platform. 100%. Terminating an advisor's contract who is in good standing with the SEC, FINRA, and DORA (CO), has done nothing wrong, has Top 1% investment returns in the industry, immediately blocking (tortious interference with the right to contract) said advisor from business operations (again prior to ***"effective date"*** of contract); then immediately, actively, and aggressively pursuing CBI clients goes far beyond breaching of fiduciary duty. Such tortious actions and behaviors are defamatory, slanderous, libelous, garbage bin business practices, untrustworthy, dishonest, unethical, unscrupulous, malicious, negligent, and incredibly poor judgement in character and morals; yet that is exactly what Charles Schwab has done. This is a 100% factual statement backed up by mountains of evidence – in writing, in emails, in taped phone conversations with Clients, direct mailings, and internet pop up ads on actual and current CBI customer accounts (digital online). **Ten**, the fiduciary rule is a regulation underpinning fiduciary duty, or the legal requirement for financial advisors to work in their customers' best interest. Schwab is a Fiduciary to CBI as well as each and every customer of CBI. Do the above fact-based acclamations meet the definition of fiduciary? How are the above actions in the best interests of CBI? And/or Jason R. Clark (me)? How are the above actions in the best interests of any of CBI Clients? No Jury will conclude any of the above fact-based actions benefited or were in the best interest of CBI, Jason R. Clark, and/or CBI Clients. **Eleven**, ***by not providing CBI the requested due diligence conducted by Charles Schwab on CBI, Charles Schwab breached the IASA contract on April 8, 2021, rendering the IASA contract between Clark Brothers Investments (CBI) and Charles Schwab null and void.*** Requests and correspondence for the due diligence report in accordance with the IASA on Page 1, #3, paragraph 2 (see attached copy of the IASA) was made by CBI during the week of April 5-9, 2021, to the following personnel at Charles Schwab: Kevin Lewis, Managing Director, Legal; Chris Richie, VP, Legal; Evan Soso, Managing Director, Alliance; Lori Walters, CBI Internal Rep Alliance; Jennifer Lowry, Jennifer Brice-Garcia, and Matthew Curry. Attempts for a copy of the due diligence conducted by Charles Schwab per the IASA contract page 1, #3, paragraph 2 as well as a "reason" for CBI termination were also made to the following people at Charles Schwab by Jason R. Clark (CBI), Jeffrey R. Clark, and John Horodyski. No one from any of the below offices returned phone calls or answered any correspondence requests to this matter. Ian Muir, VP Alliance;

Bernie Clark (no-relation whatsoever), CEO of Schwab Advisor Services, as well as Bernie Clark's personal managing director, Ann Fisher. **Twelve**, how did Charles Schwab get Clark Brothers Investments customer list? CBI "gave" it to Charles Schwab. Schwab would not have pertinent, valuable, and easily accessible data (contact information, knowledge of securities owned, account values, net worth, professional designations, professions, income, investing and trading patterns and behavior, and so on ....) on each and every CBI customer if it were not for the contractual obligation of both Charles Schwab and Clark Brothers Investments. In addition, and most importantly in regards to this aspect, these accounts are already at Charles Schwab. No hassle of transferring accounts, assets, or securities, it's all right there for the taking; and, that's exactly what Schwab has been attempting to do – "take", steal, poach, CBI customer base/client list. Therefore, ***Charles Schwab intentionally and unjustifiably induced a breach of the IASA contract on April 2, 2021.*** All of the aforementioned fact-based actions prove beyond any reasonable doubt that Clark Brothers Investments is right, and Charles Schwab is wrong – ethically, morally, and of course most importantly, legally. Here is an excerpt from a widely followed and credible investment resource, ***Investopedia: Poaching [insert Charles Schwab] clients [insert CBI clients] from an advisor [insert CBI] you haven't worked with in the past is a much more difficult proposition: Unless you have access to the client list, there's no way to directly target the clients. Getting access to the client list usually requires unethical or illegal behavior. Such actions would certainly open you up to a lawsuit.*** Charles Schwab would not have access to Clark Brothers Investments client list/customer base if CBI did not custodian assets with Charles Schwab. Further, Schwab utilized their access to CBI customer list/client base to "directly" solicit, market to, sell to CBI customer list/base to get them to switch over to Charles Schwab's internal advisor services (see letters sent to ALL CBI clients, see brochures sent to ALL CBI clients, see pop up ads on active client web access pages – specifically CBI second biggest customer, John Horodyski, and direct targeted emails to CBI largest customers, Aaron J. Clark to name the first on Wednesday July 7, 2021). **Thirteen**, Is Clark Brothers Investments the only one? Or are there others that Charles Schwab has and will continue to do this to? This is a widely known unethical, immoral, unscrupulous, and dirty way of doing business within the investment and financial services industries; that is to fire, remove, get rid of, discard smaller or junior brokers (in this case a much much much smaller firm, Clark Brothers Investments) and "give" the customer base/customer lists to larger more established advisory firms (in this case a much much much bigger firm, Charles Schwab). This is exactly what Charles Schwab attempted to do with CBI largest customer who are also my Mom and Dad (Connie and Jeff Clark). Jeffrey Ray Clark & Constance Jean Clark Ten/Com #3863-5704

**Your Consultant** Thomas J Murray VP, Sr Financial Consultant tel: 1 720-895-3407 email: Thomas.J.Murray@schwab.com statement period June 1-30, 2021. Charles Schwab is actively and aggressively expanding into the advisory segment of the investment advisory business. Schwab is running national TV ads numerous times a day on CNBC to this point which is marketing Schwab's investment advisory services to individual investors (primarily the exact same job function and description as I do, ergo Jason R. Clark, at CBI for my/our Customers), and apparently, removing small advisory firms with no justification and then intentionally and purposefully going after these firms customers and client base – as previously noted Schwab is doing this through direct mailings to Clark Brothers current and existing Clients and prospects; as well as digital pop up ads on Clark Brothers Investments customers personal login page to Charles Schwab. Ridding smaller firms from the Charles Schwab platform purely based on size is anti-competitive and over the lifetime of an Investment Advisor firm like Clark Brothers Investments is anticipatory repudiation of a contractual obligation between both Charles Schwab and Clark Brothers Investments. For a specific detailed example of anticipatory damages over the lifetime of Clark Brothers Investments please see attached excel file. From Wikipedia – "Another rationale for the doctrine of repudiation is based on the breach of an implied term not rendering future performance futile: [O]ne essential promise which is implied in every contract is that neither party will without just cause repudiate his obligations under the contract, whether the time for performance has arrived or not." Specifically, in regards to CBI Charles Schwab has given CBI no cause at all? Certainly, no just cause? No explanation? No rationale? And no reason? Despite CBI repeated and well documented requests to do so. Further, by ***Charles Schwab not providing CBI the requested due diligence conducted by Charles Schwab on CBI, Charles Schwab breached the IASA contract on April 8, 2021, rendering the IASA contract between Clark Brothers Investments (CBI) and Charles Schwab, null and void.*** Requests and correspondence for the due diligence report in accordance with the IASA on Page 1, #3, paragraph 2 (see attached copy of the IASA) was made by CBI during the week of April 5-9, 2021. **Fourteen**, Charles Schwab's actions and behaviors have far more of an economic and financial impact than meets the eye "today". The reason for this is because of the nature of the business we are both in, Investment Management. The reason why this business is unique has to do with several factors. One, compound interest. Two, not only does CBI and Charles Schwab earn compound interest over the years, both firms earn more by gathering more assets. The combination of these two, growing the business (adding new customers, existing customers adding or investing more money, referrals, etc.) and compound interest is mathematically staggering (***see attached excel file using real, actual, and factual numbers, and growth rates***

***[20% annual growth is industry standard for a Small Businesses like CBI], and compound interest rates [23% annualized net for CBI]).*** And or, you could study Warren Buffett, as CBI has/Jason R. Clark has for 35 years, to learn the astronomical effects of compound interest. Warren Buffett used compound interest to amass a fortune of $100,000,000,000 billion dollars. Did Buffett start out rich? Nope. Did Buffett have a lot of investors when he started? Nope. Warren Buffett and Jason R. Clark profiles up to Age 50 are oddly and virtually identical – including where we were both born, Omaha, Nebraska. Point is, this argument is absolutely relevant to CBI/Jason R. Clark legal claims. Also to note here, don't forget about inflation. Today's dollars are not the same as dollars in 46 years from now (generally accepted assumption is 2% for inflation). The damages to Clark Brothers Investments "today" is nowhere close to the damages CBI will suffer into perpetuity (***again see attached excel spreadsheet for detailed numerical calculations***). Charles Schwab, Charles Schwab Executives, and Vice Presidents know this. This is their line of work, their profession, their area of expertise. Schwab knows exactly what they are doing. Schwab knows about building their own investment advisory business that directly competes with small firms like CBI. These actions and behaviors are well thought out, intentional, negligent, and in this specific case, against numerous Laws that have made America what it is Today. ****Please see attached Excel file in support of this claim which proves the devastating long lasting damages to CBI (and our clients) of Schwab's actions in mathematical detail using actual numbers, performance figures, and industry accepted financial ratios and calculation methods.*** **Fifteen**, beyond the financial and economic impact of damages to Clark Brothers Investments are the defamation of character of CBI Founder and patriarch, Jason R. Clark, which has led to immense emotional distress. Over the course of this deplorable action taken by Charles Schwab, From April 2, 2021 – July 6, 2021 and continuing thereafter, Jason has experienced the very symptoms of being a victim of defamation of character and emotional distress. These include: **A**, mental harm consisting of desperate feelings of anguish, humiliation, torment, anxiety, insomnia, nightmares, feelings of guilt, shame, depression, and embarrassment. **B**, uncharacteristically lashing out at friends over text messages for no apparent reason, unprovoked defensiveness of CBI status, legitimacy, and success, out of the blue random texts extremely agitated, rambling, repetitive, obsessive, crass, laced with profanity, insults, and personal attacks. Completely and totally uncharacteristic of Jason, who he is, and how he has treated his friends prior to April 2, 2021. All friends named and on the receiving end of the aforementioned texts are still friends of Jason's to this day – Teddy Rogers, Ryan Tritschler, Greg Sarakatsannis, John Miller, and my brother, Aaron Clark. **C**, Alcohol consumption far beyond normal or past behaviors. **D**, Lost interest in conducting business activities at CBI. Low energy,

fatigue, enthusiasm for pursuing CBI Vision, Mission, and Goals. Never before have I/Jason R. Clark had these feelings of loss, desperation, low energy, insomnia, guilt, fatigue, sadness, anguish, shame, humiliation, depression, and embarrassment. **E**, Loss of sleep, can't sleep, insomnia never experienced before, nightmarish outbursts where Jason has awoken in sweat, tremors, puke in the mouth, and immediately upon consciousness thoughts and feelings of despair, ruin, loss, depression, guilt, remorse, worry, anxiety, shame, torment, humiliation all stemming from Charles Schwab's termination of the IASA contract for no reason valid or not. **F**, Loss of appetite, never before experienced, skipping meals sometimes even Dinner, never ever done prior to this experience. **G**, feelings of loneliness, isolation, and despair, not wanting to interact with Friends and Family, and when doing so not enjoying these times as I have in the past, never ever had these feelings before. I have always looked forward to and enjoyed being with friends and family. **H**, feelings of pure sadness, sad eyes, sadness in the face, never have I EVER had these symptoms and feelings before this experience. **I**, feeling like I had done something wrong or illegal or not in the best interest of my clients. Questioning myself, my skills, my confidence, my craft. None of the Above are True. I have done nothing wrong, nothing illegal, and have always upheld my fiduciary obligation to my customers which is "Rule #1 Never Lose Money and Rule #2 Never forget Rule #1." Warren Buffett. **J**, for first time in my entire Life (age 51) this situation and the stress has given me hemorrhoids. My Dad, Dr. Jeffrey R. Clark, the same Dad that is also my client and my Doctor, is a retired General Surgeon with 40+ years of practice has also affirmed that the Schwab situation (causing immense stress) is most likely the culprit for my hemorrhoids. **K**, more herpes outbreaks (which I contracted 20 years ago) in the past 6 months than the previous decade combined; theoretically, ending my dating life, and as you can presume causing more depression, sadness, loneliness, desperation, insomnia, and fatigue. **Sixteen**, all growth and investment plans have had to be placed on indefinite hold because of the egregious, intentionally, negligent, and purposefully (malicious) damaging lifelong actions taken by Charles Schwab against CBI for no valid or implied reason whatsoever. CBI has had to delay our mutual fund launch, The Clark Brothers Global Leadership Fund [BRKLX]; our customizable all digital robo advisor app [GISI]; and our US and Global Franchise system launch for RIAs. These three parallel lines of revenue streams are what substantiates CBI 20% annual revenue growth claims, but not our 23% annualized ROI calculations as those are factual, actual, and real life returns up to 6/30/2021. No other Firm in the Country is doing what Clark Brothers Investments is doing. Our strategies and business plans are all over CBI website, specifically Careers Page via the link: Clark Brothers Investments Franchise Disclosure Document; social media posts, newsletters to Clients, Prospects, Ex customers, and so on and

so forth. What better way to snuff out the competition than to illegally remove that company (CBI) from being able to efficiently and effectively operate their business model and execute their business plans. Legally speaking, that would be tortious interference with contract. This also goes against the fabric of America; free, fair, and open markets, is grossly anti-trust, and wreaks of anti-competitive bullying by Charles Schwab. **Seventeen**, Wednesday July 7, 2021 Castle Rock, CO lunch with Parents, Jeff & Connie Clark, Santiago's Mexican Restaurant. Dad suggested not using small claims, go straight to big boy court. This after I showed Dad an email from Aaron (his other son) that Schwab sent Aaron just this morning (the day after the effective date of the IASA contract termination July 6, 2021). Mom also remarked after seeing email, "well, now you know what Schwab's intent was from the beginning." (both negligent and malicious). **Eighteen**, on Sunday July 11, 2021, Dad (and CBI largest customer) calls me because he cannot access his Schwab account any longer. Dad informs me he has been trying to have Schwab call him text him email him to allow him access to his account, but nothing has worked. He finally decided to call Schwab and they walked him through the process to regain access to his account. On each occasion after this to login to his Schwab account Dad would have to call Schwab and have them walk him through the cumbersome process of logging back in. Then, on Monday July 12, 2021, Dad calls me to say this, "I couldn't get into my account because Schwab was automatically (without my permission consent or knowledge – summing up in my own words) pushing me into some place called .... Schwab Intelligent Portfolios. I told them no I don't want that, I do this with my Son Jason who is an RIA. So, I don't want Schwab's Intelligent Portfolio. I just want to be able to log in to my Schwab account the way I currently have it set up." Immediately, after hearing this from Dad, I told him to absolutely not switch anything to Schwab Intelligent Portfolios as they are garbage bin underperforming terrible products with terrible service and an even worse track record. Dad said, Ok. After this conversation no problems at all with account access for Jeffrey R. Clark and Constance Jean Clark – my Parents and biggest and most loyal customers. This is repulsive to me personally, professionally, and it would be to any Jury or anyone in the financial services and/or investment management business. Intolerable behavior and actions from a once well-respected institution with a well-regarded brand. Whoever is making these corporate moves at Schwab should be fired, yesterday. Reprehensible, disgusting, deplorable. I can not believe Schwab would use gangster like, dirty, filthy, third world country tactics to gain market share and customers. Yet, that is exactly what Charles Schwab is doing. ***And the SEC agrees with me/CBI, as of this writing, The Charles Schwab Corporation is taking a $200,000,000 charge for SEC Robo Advisor probe (July 2021). Note here! Schwab just settled this claim with the SEC on June 13, 2022 for $187,000,000!***

**Nineteen**, Tuesday July 13, 2021 lunch meeting at Piccolos Restaurant with Jim Ruterbories who I have known since high school, and who is also a licensed attorney in the state of Colorado. After recapping an explanation and affirming no tax consequences with moving from Schwab to IBKR, Jim stated that a Representative at Schwab had also been in contact with him – calling him, emailing him, sending him literature, brochures, customer profile forms, and investment offerings specifically from Schwab. This same sales & marketing tactic has been confirmed by virtually all of my CBI "existing" customer base. **Twenty**, Tuesday July 13, 2021 prior to lunch meeting with Jim Ruterbories, my Mom dropped off two envelopes Schwab mailed to her. Envelope 1 contained information regarding "What does the Charles Schwab Corporation do with your personal information?" Well, apparently, Schwab lets Independent RIA's (CBI) onto the Schwab platform, then out of the blue for no reason at all, removes that RIA (CBI) and then directly (not indirectly) goes after that RIA (CBI) customer base (in this specific example, My Mom, Connie Clark) using the very information that the RIA Firm (CBI) has given to Schwab. Envelope 2, contained direct solicitations, marketing material, and advertising for Schwab specific products (most notably The Schwab Intelligent Portfolio, among others). In this brochure Schwab outlines Schwab's Broker Dealer Relationship, Schwab's Investment Advisory Relationship, Schwab's Best Interest Disclosure, all of which includes the fiduciary requirement (by Law); as well as numerous references that Schwab always acts in the customers best interest when recommending to buy, sell, or hold any investment, and what investment strategy to pursue. When doing so Schwab states "we will do so in your best interest and not put our interest ahead of yours." In this brochure Schwab also lists The Charles Schwab Corporations business practices. How is it not willful or merely negligent conduct that Schwab is recommending one of my Clients, Connie Clark (My Own Mother), switch to Schwab and specifically to <u>Schwab's Intelligent Portfolio</u> offering when the Schwab investment product has terrible investment results (bottom 50%) from a lifelong trusted advisor, Jason R. Clark (who is also Clients Son), who has Top 1% investment results, and charges .1% versus the industry standard 1% which is what Schwab would charge or close to that or mathematically 10X what Connie Clark is being charged with Clark Brothers Investments. How is that acting in the Clients best interest? How is that NOT putting Schwab's best interest first? How is this not an intentional, willful, and negligent breach of Schwab's fiduciary duty? It is. Period. End of subject. Furthermore, this is one very specific documented very detailed example of Schwab's Breach of Fiduciary Duty to Schwab Clients/CBI Clients. ***Schwab with $3.2 trillion in assets equivalent to 128,000 X the size of CBI has pursued these exact same business practices, tactics, solicitation, sales/marketing/advertising to each and every one of CBI customers (estimated***

***to be around 75 Clients with Assets totaling $25,000,000).*** **Twenty One**, July 19, 2021 between 8.30-9 AM MST, John Horodyski, CBI largest customer, again called into Schwab to inquire why his large taxable account 4094 has been restricted from trading. Answer being the account is in the process of being transferred to IBKR. John informed me that he again inquired to the Schwab Rep why CBI was removed from the Schwab platform. The Schwab rep told him once again your advisor should know why and has been informed of why by Schwab. This once again is false and breaches the IASA between CBI and Charles Schwab (see reference points above to this). The Schwab Rep then stated that RIA are informed when they sign on with Schwab that they have to bring in a certain amount of assets or they will be terminated by Schwab. I have never heard of this. I was never informed of this. This ascertain is not in the IASA? This also begs to so many questions. First of all, how is this not removing smaller Advisors solely based on size? Aren't these actions the very reason for antitrust laws? ***Schwab has $3.2 Trillion to CBI $25,000,000 making Schwab 128,000X larger than CBI.*** To put that into perspective that disparity is so large it cannot be calculated with a HP financial calculator specifically designed for these types of financial calculations (I/Jason R. Clark calculated by hand). Next question is, ok, that's understood, where then does it state in the IASA that once Schwab does this Schwab can then immediately solicit, prospect, market and sell to the terminated advisors entire customer base? Further, the manner by which Schwab terminated the IASA between CBI and Schwab implied to all of CBI clients and prospective client's wrongdoing, incompetence, and untrustworthiness which are all the pillars of an advisor-client relationship as everyone knows. These actions combined with all of the other aforementioned specific documented detailed examples are both slanderous and libelous in nature and meet the legal definition of defamation of character by implication. How are these answers and actions not anticompetitive behavior by Charles Schwab? **Twenty Two**, On Monday July 26, 2021, my long time customer and lifelong friend, Mike Cuka, called me. He received a letter from Schwab dated July 7, 2021 informing him of Schwab's advisory services, Schwab's Client Relationship, and Schwab's best interest disclosure. This is Charles Schwab's attempt (more than once by the way) to steal, poach, recruit, solicit CBI Clients away from CBI after removing CBI from the Schwab platform without merit, without a reason, or any justification whatsoever. Also to note in the letter Schwab claims to be transparent and trustworthy. Literally, the very definition of transparency and trust are completely and totally opposite of how Schwab has handled this matter – not a single person at Schwab (referenced throughout this letter) has given CBI a reason for terminating the IASA nor has any of the numerous persons at Charles Schwab (also referenced in this letter above) returned a single phone call or email from CBI in regards to this matter.

These actions by Schwab are literally the complete and total opposite of transparency and trust. (see attached letter dated 7/26/2021 addressed to Michael John Cuka 110 E 22nd Ave Tyndall, SD 57066). In telling this story to my brother, Aaron J. Clark (who is also a customer), Aaron stated that he too had received this letter from Charles Schwab on or around July 7, 2021. **Twenty three**, for the months of July/August 2021 CBI lost billing of at least $21,000 due to the transfer process and prorated monthly billing used by IBKR. Regardless of when the account transfer process was planned, started, and finished this absentee non recoupable monthly credit to CBI would have occurred as it takes 14 days to more than a month for the entire account transfer process to occur mainly due to delays by customers, frustration with the transfer process by customers, customers being unable to complete the transfer process in a timely manner, customers on Vacation; all of the above occurred because Charles Schwab terminated the IASA with CBI. **Twenty four**, Zach Carter. Zach Carter is NOT a licensed RIA. Zach Carter is NOT a professional investor. Zach Carter DOES NOT have any sort of investment track record, success record, experience and/or expertise in the area of investing. Zach Carter has not studied investment theory and/or Warren Buffett and Charlie Munger of Berkshire Hathaway for more than 35+ years. Zach Carter did NOT invent his own investment model. Zach Carter is a common laborer, Rancher, Handy man type. Compare and Contrast to Jason R. Clark's resume, there is no comparison whatsoever. Jason R. Clark has been studying Warren Buffett and Charlie Munger since he was 16 years old; so 35+ years. Jason graduated with degrees in Business Management (major) and Systems Engineering (minor) from one of the #1 rated Schools in America and the World, The United States Military Academy at WEST POINT. Jason graduated on the Dean's List as a wreath recipient indicating top 5% in his class of 1992 for Academics, Physical, and Military. Jason has been investing and trading since he was 16 years old, professionally since age 25, when Jason got out of the US Army; so more than 26+ years of investing and trading experience and expertise. Over this time Jason developed his own investment method based off of #TheBuffettWay which is The Clark Brothers Way = The Buffett Way + Leadership. Jason's investment results are in the top 1% of the entire investment industry, and #1 in many categories commonly looked at by individual investors. Why then did Charles Schwab listen to Zach Carter over Jason Clark? This is gross negligence by Charles Schwab. Zach Carter is equally guilty of negligence; as well as malice/malicious intent because Zach Carter took it personal with slanderous, libelous, defamatory actions and behavior far beyond a client/advisor relationship. More specifically, Zach Carter attacked Jason Clark personally with name calling, insults, derogatory and inflammatory false remarks and accusations; to include sending Jason Clark instructional videos on how to behave and live one's life. This is not only

laughable, this is by the legal definition negligent, as well as malicious intent, deliberate and false attacks with false uneducated claims of unprofessional conduct, lack of investing knowledge and expertise. This dialogue occurred on the phone (slander), as well as numerous emails (libel) which were then turned over to third parties both Charles Schwab and some 'dude' Zach Carter knew or knew of in Washington DC named Kevin Hulbert President of XK Group. One can also reference attached emails as proof that Zach Carter took his actions and behavior far beyond a Client / Advisor relationship and hurled personal attack after personal attack against Jason Clark with no evidence, no proof, no professional experience or expertise, but with absolute malice and intent to harm Jason Clark's impeccable reputation and status both with his own clients and with the overall investment community (ergo passing along all of the above erroneous and false claims to Charles Schwab). These actions are totally reckless, negligent, without any merit, and malicious. This after the fact that Zach Carter made far above average, exceptional, A+ investment returns as a CBI client. The result of all of this was Schwab's abrupt, incorrect, and wrongful termination of CBI IASA. Charles Schwab's decision was based on false unverified information and claims. Schwab did NOTHING to counter or hear CBI/Jason R. Clarks' version of the story, or even inform CBI/Jason Clark of the due diligence conducted to reach the conclusion to terminate CBI IASA despite being required to do so by the very contract Schwab wrote (see IASA Page 1, #3, paragraph 2). In both of these instances, both Zach Carter and Charles Schwab took defamatory actions against Jason R. Clark. These actions easily pass the threshold of defamation of character, which are:

To prove prima facie defamation, a plaintiff must show four things: 1) a false statement purporting to be fact; 2) publication or communication of that statement to a third person; 3) fault amounting to at least negligence; and 4) damages, or some harm caused to the person or entity who is the subject of the statement.

**Twenty five**, at the time of holding BP, CHL, and CASH this was meant only to be temporary and it was only temporary. What extended the timeline for the temporary holding period of BP, CHL, and CASH, was an executive order by an outgoing President in regards to CHL. So, what would have been 1-2 weeks turned into 2-3-4 months for portfolio rebalancing. Still almost all of our customers made money in the 2-4 month time period (CHL 27.50-33.50 = 22% gain). See account set up today August 1, 2021 and CBI is 90% - 95% complete with structure positions and percentages of the overall model portfolio rebalance. This is the Clark Brothers Model Portfolio as of August 1, 2021: BP 45%; OXY 17% ; XOM 9%; TTE 9%; CVX 8%; NIO 6%; JMIA 3%; DIDI 2..5%; OXYWS .5%. Portfolio rebalancing is a normal, common, and widely accepted practice within the investment industry. Furthermore, CBI was dead on correct in our overall strategy

change (BABA corrected -44%, NIO -56%, JMIA -75%). And what CBI bought was the Energy sector which during this time period was the #1 sector in the S&P 500 from January 1-June 30, 2021. This decision was also dead on correct. Strategy, philosophy, and portfolio rebalancing changes take time and normally people (even many professionals) forget how long. For example, it was 2 years 9 months from the top of the NASDAQ bubble in 2000 to the ultimate bottom of the NASDAQ index. I am a BUFFETT disciple, its all over my web page, I follow Warren Buffett and Charlie Munger business and investing philosophies and principles because they work. Portfolio concentration is central to the Buffett Way. This is widely known and specific examples abound so no need to list any more details. To note here, Berkshire Hathaway was the ONLY stock Warren Buffett owned for the first 15-20 years of his investing career. Even after this time period Buffett owned but three: Berkshire Hathaway a textile company, a chain of department stores, and a stamp company; all three of which turned out to be very bad investments that "lost" Berkshire Hathaway money and credibility. These poor investments by Warren and Charlie's own words led them to reorganize Berkshire Hathaway into the company everyone knows today. Point is, CBI was dead on about as accurate as could be expected in our portfolio adjustments and rebalancing; and it's only been 6-9 months. CBI timeline from day 1 (again well documented all over CBI web page, emails, and social media posts) is the widely acknowledged and accepted timelines of 3,5,7,10+ years. Matter of further fact, from Day 1 on CBI website our timeline has been "Your Lifetime". Further to the point here is the fact that all of the people (including many professionals at Schwab, regulators at the SEC, State of CO DORA) do not have anywhere close to the investment results as Jason R. Clark. Why then is everyone listening to them? All of them should be listening to me – I have the results, they do not. This is not my personal opinion, this is a fact backed up by mountains of data, evidence, math, and RESULTS. No thank you, and there is no law, statute, or governing principle or body that requires me to listen to people who have never done investment management (this would also include Zach Carter by the way) over Warren Buffett and Charlie Munger widely considered the best at investment management and stock picking the world has ever seen. Additionally, CBI results are factually documented and relevant over an extended period of time proving Jason R. Clark was 100% absolutely correct to follow the guiding principles and strategies of the Buffett way over any other source. Here is another relevant aspect to this that should be pointed out (see documented time stamped photo on Schwab's web site August 1, 2021). Schwab is telling their customers to buy slices of hyperbolic ascending stocks of McDonalds, Amazon, Apple, Dominoes, and Tesla? This is the worst advice anyone could ever give. Talk about incompetence and lack of fiduciary responsibility? And you want CBI clients to listen to Charles Schwab's

investment advice? No thank you. No way. Not with my own money, not with my family's money, or my clients money who have all chosen CBI over any other company they could chose to invest with. There is no law, statute, or regulation prohibiting CBI from doing exactly what CBI has been doing from Day 1 - which is making CBI customers superior investment results ranking in the top 1% of the entire investment industry. **Twenty six**, this article is self-explanatory regards #TheBuffettWay. This is also an example of and is in support of CBI investment philosophies, principles, strategies, and returns. CBI and CBI patriarch founder are Warren Buffett/Berkshire Hathaway disciples, not Charles Schwab or Zach Carter disciples. Ditto for the SEC or CO DORA or FINRA or any other regulatory or government agency. There is zero chance that CBI/Jason R. Clark is going to listen to, follow, or adhere to the aforementioned entities over the World's Greatest Investor, Warren Buffett/Berkshire Hathaway. Here is specific example of what I am talking about referencing as it pertains to stock picking, portfolio management, risk management, asset allocation and diversification – As for diversification google: Warren Buffett quotes on diversification this is what pops up: Warren Buffett (Trades, Portfolio) has famously said he is against diversification. "**Diversification is a protection against ignorance**," Buffett once said. "[It] makes very little sense for those who know what they're doing." Sep 9, 2020. Furthermore, watch attached video of Warren Buffett proclaiming his two lieutenant's Todd Combs and Ted Weschler have full and total discretion over the $10,000,000,000 they both separately manage for Berkshire Hathaway even going so far as to say they could put the entire portfolio in **1 stock**, 10 stocks, or 100 stocks. Also, covered in this interview which is relevant to this examination is Buffett's explanation of why Ted and Todd rarely do interviews. And, when they do its very non-specific. As Buffett himself explains he doesn't want to educate or inform others of how Berkshire Hathaway invests, and/or give away too many talents and Berkshire trade secrets. And, again, there is no law, statute, or regulation in the United States Constitution, SEC, State of Colorado DORA, FINRA, or any other statute of any kind that says Jason R. Clark/Clark Brothers Investments/CBI cannot follow and adhere to the world's most successful and greatest investor, Warren Buffett. This is a fact, not an opinion.

https://markets.businessinsider.com/news/stocks/warren-buffett-marc-andreessen-investing-philosophy-eggs-basket-investing-advice-2021-8

**Twenty seven**, Of course Charles Schwab is not responsible for the volatility in the stock market or CBI decision 'when' to mass upload customer accounts to IBKR. That said, regardless, at any time this would have been and has been incredibly disruptive and difficult to navigate. The timing of which could not have

been worse. At the end of June, CBI was up +36% in our model portfolios. From July – Mid August CBI clients have experienced a -20% correction. CBI had $23,000,000 at the end of June 2021 (apparently not enough assets for a Schwab RIA) minus a -20% haircut = $18,400,000 or - $4,600,000 X 1% = $46,000 in annual lost revenue/damages. CBI would not have SOLD everything, but we would have certainly SOLD some to CASH, and have a track record of trimming positions when the portfolio gets extended as CBI customers clearly were being up +36% midyear (see selling NASDAQ names in August 2020). The point here is, CBI could not professionally and adequately address market conditions presented to us and other investors because Schwab abruptly terminated CBI IASA without merit, without warning, and without any reason leaving CBI not only miffed but in a languishing 4-6 month (still ongoing) tailspin of confusion and blocked access to customer accounts. CBI would have never "chosen" this time to "switch" custodians. This timeframe was thrust upon CBI by Charles Schwab without any warning whatsoever. CBI focuses on returns as is well documented on our web page. The actions by Schwab further diminished CBI results which is nearly impossible to quantify; however, certainly, those knowledgeable of investment returns, the investment industry in general, can gather some opportunity cost damages occurred here because of ***Charles Schwab's egregious, calculated, willful, negligent, and intentional (malicious) misconduct by terminating CBI IASA on April 2, 2021.***

28/This of course added after this statement of claim filed as I/Jason R. Clark didn't learn of this conversation until Tuesday March 1, 2022 in a phone conversation with my Dad, Jeffrey R. Clark. Jeffrey R. Clark, Connie Clark (my Mom), my Moms brother and my uncle Tom Ranek, my Aunt Lori Ranek (Toms wife) were playing cards down in Arizona when the Schwab topic came up as ALL are Clients of CBI. My Dad said, Aunt Lori used these terms when discussing DORA/CDS examination acting in direct (not indirect) concert with Charles Schwab by phone calls to MY CLIENTS without my knowledge or consent …. **"avoid doing business with CBI and Jason R. Clark"**; and, **"CBI/Jason R. Clark have been stealing customer monies"! Words cannot describe what I want to type right now.**

Sincerely,

Jason R. Clark, Founder & CEO, Individual CRD#2578633
Clark Brothers Investments/Clark Brothers, Inc./CBI Firm CRD#143777
2851 S. Parker Rd. #510
Aurora, CO 80014
720.255.5711; jason@clarkbrothersinvestments.com
www.clarkbrothersinvestments.com

# Supporting Document

# Steptoe Johnson/Charles Schwab Response to CBI Statement of Claim

Robyn C. Crowther, CASB No. 193840
Leah M. Quadrino
Nailah Z. Ogle, CASB No. 336846
STEPTOE & JOHNSON LLP
633 West Fifth Street, Suite 1900
Los Angeles, California 90071
Telephone: (213) 439-9400
Facsimile: (213) 439-9599
Email: rcrowther@steptoe.com
lquadrino@steptoe.com
nogle@steptoe.com

Kevin H. Lewis, CASB No. 197421
CHARLES SCHWAB & CO., INC.
Office of Corporate Counsel
211 Main Street
San Francisco, California 94105
Telephone: (415) 667-9095
Facsimile: (415) 667-1638

Attorneys for Respondent
CHARLES SCHWAB & CO., INC.

**BEFORE THE**
**FINANCIAL INDUSTRY REGULATORY AUTHORITY**

| | |
|---|---|
| In The Matter of the Arbitration Between<br><br>CLARK BROTHERS, INC. d/b/a CLARK BROTHERS INVESTMENTS<br><br>Claimant,<br><br>v.<br><br>CHARLES SCHWAB & CO., INC.,<br><br>Respondent. | FINRA Dispute Resolution Case Number: 21-02439<br><br>RESPONDENT'S ANSWER TO AMENDED STATEMENT OF CLAIM |

Pursuant to Rule 13303 of the Financial Industry Regulatory Authority ("FINRA") Code of Arbitration Procedure for Industry Disputes, Respondent Charles Schwab & Co., Inc. ("Schwab" or "Respondent") submits this Answer in response to the Amended Statement of Claim filed by Clark

Brothers, Inc. d/b/a Clark Brothers Investments ("CBI" or "Claimant").

## INTRODUCTION

CBI is an investment advisory firm, formerly registered with the SEC,[1] which had a contractual relationship with Schwab through which Schwab provided custody and trade execution services to CBI and its clients. Jason R. Clark is sole owner of CBI. The parties' agreement is memorialized in a contract called the Investment Advisor Service Agreement (IASA) executed by Clark as of May 23, 2018, a true and correct copy of which is attached hereto as Exhibit A. The IASA provides both parties with the right to terminate it at any time for any reason upon written notice to the other. *See* Exhibit A (IASA) at ¶ 18. Following several inquiries from the Colorado Department of Regulatory Agencies, Division of Securities ("CDS") and the United States Securities and Exchange Commission ("SEC"), Schwab reviewed its relationship with CBI and elected to terminate it, effective July 6, 2021. Schwab informed CBI of its decision in writing on April 2, 2021. As explained below, consistent with its obligations to the customers whose accounts were custodied with Schwab, Schwab notified the clients of CBI who had accounts with Schwab that Schwab was terminating the relationship with CBI and explained the steps the CBI customers should take as a result.

CBI is apparently dissatisfied with this determination and has filed a lengthy Amended Statement of Claim alleging: (1) Defamation; (2) Emotional Distress; (3) Breach of Contract; (4) Breach of Fiduciary Duty; (5) Tortious Interference with Contract; (6) violations of Competition Laws and (7) violations of Antitrust Laws seeking some $112,500,000 based on CBI's belief that Schwab wrongfully ended its relationship with CBI, wrongfully communicated that decision to the clients CBI shared with Schwab and then attempted to poach CBI's clients. None of these claims has any merit.

[1] CBI's registration with the SEC terminated on September 20, 2021. *See* https://adviserinfo.sec.gov/firm/summary/143777. The firm appears to have refiled for SEC registration on September 24, 2021. *See* Exhibit B (CBI's Form ADV), *available at* https://reports.adviserinfo.sec.gov/reports/ADV/143777/PDF/143777.pdf. Mr. Clark's registration with the State of Colorado appears active. *See* https://www.nasaa.org/verify-a-license/

First, the plain language in the IASA both provides Schwab with the right to terminate the agreement and explains what will happen if Schwab elects to do so. Schwab fully complied with its obligations under the IASA by providing CBI written notice that it was terminating the agreement on April 2, 2021. Schwab gave CBI more than 90 days until July 6, 2021 to find another broker-dealer to provide custody and trade execution services for its clients. CBI's clients were free to remain Schwab customers or they could move with CBI to another broker-dealer of their or CBI's choice. Schwab accurately communicated to those customers their options but did not indicate that CBI had engaged in any misconduct or that Schwab had reason to believe that it had done so.

Second, although Schwab was not required to have cause to terminate the IASA, it did so here. Schwab (like the CDS and SEC) was concerned that CBI made inaccurate statements on its website about its investment returns and management fees, creating at least the risk that CBI's statements could mislead clients who then would also become clients of Schwab. The panel should issue an award in Schwab's favor dismissing this meritless Amended Statement of Claim in its entirety.

## FACTUAL BACKGROUND

### A. The Relationship Between CBI and Schwab.

Claimant CBI is an investment adviser registered with the State of Colorado. Clark is the owner, Chief Executive Officer and Chief Compliance Officer of CBI. *See* Exhibit B (CBI Form ADV) at Schedule A. Respondent Charles Schwab, Inc. is a full-service brokerage firm based in San Francisco, California. Through its Advisor Services Group, Schwab provides trading, recordkeeping, and other custodial services to certain investment advisors or investment managers such as CBI and their clients. .

The business relationship between CBI and Schwab was established by the IASA. As the terms of the IASA set forth, "You and your Clients have selected Schwab as custodian, and Schwab acknowledges the critical importance of your relationship with your Clients. We will cooperate with each other in connection with the performance of our respective services to your Clients. You have the responsibility for communicating with your Clients about investments and investment advice.

Schwab will communicate with your Clients as the account custodian." Exhibit A (IASA) at § 1, ¶ 1. Schwab separately required CBI's clients to enter into brokerage account agreements with Schwab, which authorized Schwab to serve as their broker-dealer. As a result, CBI's clients also became Schwab's clients.

The IASA defines the scope of the parties' relationship with each other and does not create any fiduciary duties. Specifically, it provides, "We are not affiliated with each other in any way. Neither of us will claim to have any relationship with each other except as described in this Agreement." Exhibit A (IASA) at § 1, ¶ 2.

The IASA also contains specific provisions stating that either CBI or Schwab could terminate the agreement without cause as long as adequate notice was provided. "Either party may terminate this Agreement at any time for any reason by giving written notice to the other." *Id.* at § 18, ¶ 1. The IASA termination provisions address how both parties would handle the fact that each of them had client relationships with the same customers. Broadly speaking, Schwab would honor individual investors' decisions as to whether they would like to remain with CBI and therefore transfer their accounts elsewhere or whether they would like to leave CBI and keep their accounts at Schwab. *Id.* Finally, the IASA provides that each party "expressly waive[s] any claim against the other for termination in accordance with this provision." *Id.* at § 18, ¶ 5.

**B. Schwab's Termination of The Parties' Investment Advisor Service Agreement.**

On April 2, 2021, in conformance with the terms of the IASA, Schwab provided written notice via email to Clark that it was terminating the IASA with CBI, effective July 6, 2021. *See* Exhibit C (April 2, 2021 Notice of Termination). This notice provided CBI with more than 90 days in which to transition its clients to another platform. Schwab also provided Clark with a copy of the letter it planned to send (and ultimately did send) to CBI's and Schwab's mutual clients informing them of this decision. *See* Exhibit C (April 2, 2021 Notice of Termination) at sample letter to investors.

Prior to making the decision to terminate, Schwab had received several inquiries about CBI from the SEC and the CDS. On October 27, 2017, the CDS contacted Schwab to request information about CBI and its clients as part of its examination of CBI. Schwab received this request before CBI had formally applied to use Schwab's custodial platform for its clients. On December 10, 2020, the

SEC contacted Schwab requesting information about client complaints, securities holdings, and money movements in CBI client accounts. In January 2021, the SEC sent Schwab follow up questions via email with more specific requests for information about money movements, management fees, and how account information was communicated to a specific CBI client. Schwab's communications with an SEC examiner indicated that the examiner had concerns with potentially incorrect information on CBI's website.

Lastly, in February 2021, CDS sent Schwab a written request for a comprehensive set of documents relating to CBI and its clients, including detailed reports on wire transfers, checks, and other disbursements from client accounts. Regarding the request for disbursement information, this request from the CDS stated "This is a for-cause examination and there is heightened concern of this advisor's activities."

Following these multiple inquiries from federal and state regulators, Schwab reviewed its relationship with CBI and identified certain discrepancies in CBI's website and its disclosures. Specifically, Schwab discovered that the fees stated on CBI's website did not align with fees stated in CBI's Uniform Application for Investment Adviser Registration, or more commonly known as Form ADV. Schwab also found that CBI's website made statements about its investment returns that did not appear to be true, including that its returns were "Examined and Approved by the SEC dated 3/5/21."

Based in part on those inquiries, as well as its own investigation, Schwab made the reasonable business decision to terminate this relationship.

## ARGUMENT

CBI's nineteen-page, single-spaced Amended Statement of Claim seeks recovery of $112,500,000[2] for multiple claims based in contract and tort, as well as antitrust and competition laws. *See* Amended Statement of Claim at 1. However, CBI fails to explain how Schwab allegedly

[2] CBI's initial Statement of Claim demanded $90,000,000 in total damages. On November 22, 2021, CBI amended that demand to seek reimbursement for the taxes that would be owed on that sum (alleging an additional 20 percent in damages) for a total of $112,500,000. *See* Amended Statement of Claim at 1.

breached the IASA and does not explain how it was defamed. CBI also has not provided any information that would explain how it allegedly suffered millions of dollars in damages.

As described more fully below, CBI's allegations of wrongdoing are baseless. Schwab fully honored the terms of the parties' IASA, Schwab never made any untrue statements of fact about CBI to anyone, and Schwab terminated its relationship with CBI in accordance with the termination provisions of the agreement. While Schwab did not need cause to end its relationship with CBI, the termination was consistent with investor protection and regulatory compliance.

**A. Schwab Did Not Breach the Parties' IASA.**

CBI has not and cannot identify any specific term in the IASA that Schwab allegedly violated when it terminated its agreement with CBI. Schwab complied with all of its obligations under the contract. The plain language states that either party may terminate the agreement "at any time *for any reason* by giving written notice to the other," and that both parties "waive any claim against the other for termination in accordance with this provision." Exhibit A (IASA) at § 18, ¶¶ 1 & 5 (emphasis added). It is undisputed that Schwab provided CBI with its written termination notice on April 2, 2021. *See* Exhibit C. Schwab's termination notice allowed CBI more than 90 days for CBI and its clients to find a satisfactory replacement broker-dealer by making the termination effective on July 6, 2021. Schwab's actions complied with its contractual obligations and were entirely reasonable.

Because the terms of the IASA allow either party to elect to terminate the agreement at any time and for any reason, Schwab's motive for ending its relationship with CBI is irrelevant. Nevertheless, as discussed more fully above, Schwab terminated the IASA after inquiries from regulators and Schwab's own review of potentially false statements appearing on the CBI website.

Schwab did not, however, communicate its concerns to CBI's clients or otherwise make any statements about CBI's performance or fees. Instead, Schwab's letter to CBI's clients simply informed those clients of the terminated relationship and the required next steps. The IASA's plain language provides Schwab the right to communicate with CBI's clients—who were also Schwab's customers by virtue of being Schwab accountholders—as the "account custodian." Exhibit A (IASA)

at § 1, ¶ 1. That is the capacity in which Schwab notified CBI's clients of the termination of the IASA. *See* Exhibit C (April 2, 2021 Notice of Termination) at sample letter to investors.

It was reasonably necessary for Schwab to notify CBI's clients in April 2021 that Schwab was discontinuing its relationship with CBI. After July 6, 2021, Schwab would no longer allow CBI to make trades in Schwab accounts on any client's behalf. If the clients chose to remain with Schwab after that date, they would become Schwab retail clients and the service offerings and pricing would change. Schwab's announcement letter was designed to inform CBI's clients of these changes so that they could take appropriate action as they deemed necessary, including taking their business to another broker-dealer so as to continue to work with CBI, if they so wished.

Despite seeking millions of dollars in damages for breach of contract, the only specific clause Claimant identifies in the IASA relates to Schwab's authority to conduct "whatever due diligence inquiries regarding [CBI] as Schwab determines necessary," and Schwab's agreement, "[w]here permitted" to "provide [CBI] with the results of such inquiries upon [CBI's] request." *See* Exhibit A (IASA) at § 3, ¶ 2; *see also* Amended Statement of Claim at 2. Claimant alleges that Schwab failed to provide it with such due diligence materials *after* Schwab terminated the parties' business relationship. Schwab's review of that allegation is ongoing, but the heart of this claim necessarily *post-dates* the decision to terminate—and nowhere does Claimant show any damages reasonably tied to Schwab's alleged failure to share the results of a due diligence review (as opposed to the termination itself). Moreover, where, as here, Schwab needed *no reason* to terminate the IASA, any due diligence materials are irrelevant.

**B. Claimant's Defamation Claim is Baseless.**

Claimant also alleges that Schwab somehow defamed CBI when Schwab announced to CBI's clients that Schwab was ending its relationship with CBI. Nothing in the straightforward, factual letter that Schwab sent to CBI's clients informing them of this termination could possibly give rise to a claim for defamation.

A claim for defamation requires a false publication that exposes the plaintiff "to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a

tendency to injure him in his occupation." Cal. Civil Code §45.[3] The most basic element of a defamation claim is that the allegedly defamatory publication must contain a "provably false assertion of fact." *McGarry v. University of San Diego*, 154 Cal. App. 4th 97, 113 (2007).

There are no false statements in Schwab's letter to CBI's clients. *See* Exhibit C. The letter accurately states that Schwab was terminating the IASA between Claimant and Schwab and explains how that termination affected these clients and their securities accounts at Schwab. *Id.* It does not attribute any improper conduct to CBI. The letter truthfully announces the termination of a business relationship, and contains nothing defamatory.

### C. Claimant's Remaining Claims Also Lack Merit.

Claimant also alleges claims for emotional distress, breach of fiduciary duty, tortious interference with contract, as well as claims under competition and antitrust laws. All of Claimant's remaining claims stem from the breach of contract claim. As discussed, Schwab did not breach that agreement and Claimant's remaining claims similarly lack any merit.

## AFFIRMATIVE DEFENSES

1. The Amended Statement of Claim fails to state a claim on which relief may be granted.

2. Schwab acted reasonably and in good faith, for legitimate business reasons and without improper motive at all times, and therefore Claimant's claims are barred.

3. Respondent justifiably terminated the contracts at issue in the Amended Statement of Claim because Claimant made potentially false statements to clients and potential investors.

4. Any purported damages sought by Claimant in this arbitration were proximately caused, in whole or in part, by the intentional conduct, fault, and/or negligence of persons or entities other than Respondent, including, without limitation, Claimant.

5. Claimant, by its own actions and conduct in and about the matters which are the subject

[3] Under the terms of the IASA, the parties agreed that the laws of the state of California govern the agreement. *See* Exhibit A (IASA) at ¶ 23. "The laws of the state of California as applied to agreements signed and performed in California will apply and bind the parties in any and all questions arising under this Agreement, including, without limitation, questions of validity interpretation, and performance, without giving effect to conflicts of law principles thereof." *Id.*

of the Amended Statement of Claim, has been guilty of comparative or contributory fault, which diminishes or defeats any right of recovery that Claimant might otherwise have or had.

6. Claimant is barred from asserting claims and recovering any damages by the waiver provision of the IASA.

7. Claimant cannot prevail in any claim for breach of fiduciary duty because Schwab did not owe CBI a fiduciary duty, and Claimant is contractually barred from asserting such a relationship with Schwab under the IASA.

8. Claimant is barred from asserting claims and recovering any damages by the doctrine of unclean hands.

9. Claimant cannot prevail in any claim for defamation because of the affirmative defense of truth.

10. Claimant lacks standing to assert damages under the various antitrust and competition-related statutes cited in the Statement of Claim.

11. Claimant did not suffer any injury or damages, and if Claimant did suffer damage or injury, Respondent denies that it is liable for any injury or damages.

12. Claimant is barred under the terms of the IASA from recovering consequential damages.

13. Claimant's damages are wholly speculative and, as a well-settled matter of law, are not recoverable from Schwab.

14. Claimant is not entitled to punitive damages because there was no underlying wrong by Respondent and, moreover, Claimant has not alleged and cannot prove that Respondent acted with the requisite malice, willfulness, and/or dishonesty.

## CONCLUSION

For the reasons set forth above, Schwab respectfully requests the following:

1. Dismissal of Claimant's Statement of Claim in its entirety; and
2. Such further relief as the Panel deems just and proper.

Dated: December 14, 2021

STEPTOE & JOHNSON LLP

By: */s/ Robyn C. Crowther*
Robyn C. Crowther

STEPTOE & JOHNSON LLP
Robyn C. Crowther
Leah M. Quadrino
Nailah Z. Ogle
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071
Tel: 213.439.9400
Fax: 213.439.9599
Email: rcrowther@steptoe.com

*Attorneys for Respondent Charles Schwab & Co., Inc.*

# EXHIBIT A

EXHIBITS TO RESPONDENT CHARLES SCHWAB & CO., INC.'S
ANSWER TO AMENDED STATEMENT OF CLAIM

charles SCHWAB

# Investment Advisor Service Agreement



This Investment Advisor Service Agreement ("Agreement" or IASA), also referred to in other Schwab documents as "Investment Manager Service Agreement" or IMSA, provides the terms and conditions under which Charles Schwab & Co., Inc. ("Schwab") will make certain products and services available to you.

The terms "you" and "your" in this Agreement refer to the Investment Advisor firm executing this Agreement and its officers, employees, agents, delegates, service providers, and independent contractors. The terms "we," "us," and "our" are used to refer to both you and Schwab. The terms "Client" and "Clients" refer to your investment advisory client or clients who open and maintain accounts at Schwab and have appointed you as Investment Advisor. By signing below, you agree to these terms and conditions.

**1. Relationships of Schwab, Investment Advisor, and Clients**

You and your Clients have selected Schwab as custodian, and Schwab acknowledges the critical importance of your relationship with your Clients. We will cooperate with each other in connection with the performance of our respective services to your Clients. You have the responsibility for communicating with your Clients about investments and investment advice. Schwab will communicate with your Clients as the account custodian.

We are not affiliated with each other in any way. Neither of us will claim to have any relationship with each other except as described in this Agreement. Neither of us will use the other's name in advertising or marketing materials without the other's written consent. You may use Schwab's name without Schwab's consent as may be required in your Form ADV. Schwab may disclose the identity of your firm and the mutual fund or exchange-traded fund (ETF) balance and transaction information relating to purchases and sales you or your Clients make through Schwab. Except as may be required by law, regulation, court order or decree, or arbitration, any other use of one party's name requires the other's prior written consent.

**2. Investment Advisor's Authorization**

You represent and warrant that as of the date of this Agreement and on each date that you submit an order or instruction to Schwab:

- You have and will maintain in your files written authorization appointing you as Investment Advisor for every Client account opened and maintained with Schwab (individually, an "Account," or collectively, the "Accounts"), including, where applicable, your appointment as an "investment manager" as defined under Section 3(38) of the Employee Retirement Income Security Act of 1974, as amended (ERISA).
- The written authorization described above is in the form of an agreement or power of attorney to engage in all actions you undertake relating to Client Accounts, including giving instructions to Schwab for (i) transactions in securities and financial instruments including aggregating orders of multiple Client Accounts, and (ii) movement of Client securities or moneys.
- You have reviewed applicable documentation of each Client's Account and have verified that the persons who provided you with the respective authorizations to act on such Client's behalf were properly authorized to give them. Schwab may rely on such authorizations without further inquiry.
- You know and understand the financial position and investment objectives of your Clients and have confirmed that the orders placed on behalf of each Client are suitable.
- You have all necessary authority to enter into this Agreement.

To the extent that you act as an Investment Advisor or Investment Manager (as defined in ERISA) to qualified plans or to participants in them, and your Client has delegated to you certain administrative responsibilities with respect to participant distributions, plan disbursements, and transfers:

1. As between us, you alone, either directly or through your agent, have all the duties, responsibilities, and obligations with respect to applicable tax reporting and tax withholding for participant distributions, plan disbursements, and transfers authorized by the plan trustee.
2. You have the authority to provide this authorization to Schwab, and the delegation of any responsibilities under the plan and trust is permitted under the terms of each such plan and trust and under applicable law and regulation, including ERISA.
3. You shall be responsible for providing any directions, authorizations, and instructions to Schwab with respect to plan disbursements, transfers, and distributions as may be required by Schwab for the performance of its services.
4. You have in your files authorizations from trustees that permit and authorize Schwab to rely on the directions, authorizations, and instructions from any of your delegates without any obligation by Schwab to investigate the validity or accuracy of such instructions received by Schwab from such delegates, as if such directions, authorizations, and instructions were provided by you and the trustee.
5. The services provided by Schwab pursuant to this Agreement are provided to you, and not to the plan.
6. You shall be responsible for providing all disclosures related to your role, including that related to any compensation received as a covered service provider directly to a covered plan as may be required under Section 408(b)(2) of ERISA or other regulations.
7. You covenant and agree that you shall not provide any directions, submit any orders, or otherwise cause Schwab to take any action that would result in a nonexempt prohibited transaction under ERISA or Internal Revenue Code Section 4975. Schwab may require any supplemental or additional documentation from plan trustee(s) as Schwab may, in its discretion, require. If any representation or warranty in this Section becomes inaccurate at any time, you will notify Schwab promptly.

We both acknowledge that notwithstanding anything in this Agreement to the contrary, your Clients will be authorized to take any action in, and will be entitled to receive any information with respect to, their Accounts as authorized in their Schwab account agreement.

**3. Information Regarding Investment Advisor**

You represent and warrant that all information you provide (to Schwab in this Agreement, in any other document or communication to Schwab, and on your form ADV) is true, accurate, and complete. If any information you furnish to Schwab becomes materially inaccurate, false, or otherwise misleading, you will notify Schwab promptly and take the necessary action to revise it.

You authorize Schwab to conduct whatever due diligence inquiries regarding you as Schwab determines necessary. Where permitted, Schwab will provide you with the results of such inquiries upon your request. You will promptly provide to Schwab any information reasonably requested by Schwab concerning your management of Client Accounts or your compliance with any federal or state laws, rules, or regulations.

**4. Investment Orders and Transactions**

Schwab will execute orders placed by you or your Clients provided that Schwab receives securities or other property in good deliverable form before settlement. Unless you or your Client specify to Schwab that an order be executed on a specified exchange or market (and Schwab has agreed to such execution), Schwab will, at its sole discretion, execute any order to purchase or sell securities in any location or on any market or any exchange where such security is traded. Unless you or your Client designate orders as "short," Schwab will assume that all orders you or your Client place are "long."

All transactions are subject to:

- Schwab's house trading rules and policies;
- The applicable rules, regulations, customs, and uses of any exchange, market, clearinghouse, or self-regulatory organization; and
- Applicable state and federal laws, rules, and regulations, all as amended from time to time.

WB
©2014 Charles Schwab & Co., Inc. ("Schwab"). All rights reserved. Member SIPC.
CS22853-01 (1214-7989) APP83188-00 (11/14)

Schwab will send your Clients trade confirmations and Client Account statements. If your Client so authorizes, Schwab will send you duplicate trade confirmations, Client Account statements, and other documentation.

Schwab will make available to you price and other market data information (collectively, "market data") upon your reasonable request. Schwab obtains market data from industry sources Schwab believes to be reliable. The accuracy, completeness, timeliness, and correct sequencing of the market data cannot be guaranteed by either Schwab or the market data providers. Neither Schwab nor such providers will be liable for the accuracy or availability of such market data.

**5. Instructions and Recording**

You authorize Schwab to act on telephone, telex, facsimile, wire, written, and any other instruction Schwab believes to be authorized by you. Schwab, however, reserves the right to require written instructions.

You, and any agent or representative acting on your behalf, agree that we may (but are not obligated to) record telephone calls or listen to conversations you have with any Schwab representative to monitor the quality of the service you receive and to verify securities transaction information to banks, mutual funds, and other entities regarding the products or services we offer or arrange on behalf of Clients, or for other business reasons. You acknowledge that we may not be able to locate a tape recording unless you can provide the date and time of the conversation and the full name of the representative to whom you spoke. You further agree that Schwab has the sole right to determine how long tape recordings will be retained.

**6. Investment Advisor Fee Payment Services**

Schwab will provide you with the advisor fee payment services described in this Agreement.

Schwab will charge the respective Client Account for your investment management fees within a reasonable time after Schwab receives your advisor fee payment instructions for such fees, subject to all the following:

- Schwab has received your Client's written authorization to charge the designated Client Account for your investment advisory fees.
- Schwab has received your written or electronic instruction specifying the amount of fees to be charged to the Client Account.
- The available funds in the Client's Account at the time the charge for your fees is to be made against such Account are sufficient to cover the amount to be charged as specified in your instructions. Schwab will have no obligation to charge a Client Account if available funds in the Client's Account at the time the charge is to be made are not sufficient to pay the amount to be charged in full. Instead, Schwab will notify you that your fees were not charged to that Client's Account. Schwab will have no duty to monitor Client Accounts for the availability of funds.
- Schwab will credit investment advisory fees charged to your Clients' Accounts to your management fee account. Subject to Schwab's right as described in this Agreement to credit such amounts to the full or partial satisfaction of "Investment Advisor Payment Obligations" (as defined in Section 11, below), Schwab will remit such fees to you in the form of credit to an account of yours at Schwab or, subject to a handling charge, in the form of a check payable to you or wire transfer to another financial institution (such form to be designated by you). If you instruct us to remit such fees to you in the form of a check payable to you or a wire transfer to another financial institution, Schwab will deduct the handling fee from the amount to be remitted to you. Schwab will continue to remit your fees in the form you designate until you give us other written instructions at least 30 days before the time you want them to take effect or until we notify you that we are modifying or discontinuing the fee payment service.

You will not submit subsequent written or electronic instructions to Schwab for advisory fees, or otherwise seek to collect such fees from a Client, once the fees have been charged to a Client Account, even if Schwab has applied such fees to "Investment Advisor Payment Obligations" (as defined below).

Schwab will have no duty to review the accuracy of any instructions or fee calculations performed by you, or to monitor whether you have sent an invoice to your Client. Schwab will not be liable for any Client's nonpayment of your investment advisory fees. Without any liability to you, Schwab may modify, suspend, or discontinue its investment management fee payment services at any time upon notice to you with respect to any or all Client Accounts.

**7. Compliance With Applicable Law**

During the term of this Agreement, each of us and our employees and representatives will remain in substantial compliance with applicable federal and state laws, rules, and regulations, as they may be amended from time to time, including, without limitation, making such disclosure as may be required by applicable law, rule, or regulation, including all fiduciary requirements under ERISA and ERISA regulatory filings.

**8. Associated Persons**

You represent and warrant that unless you have notified Schwab otherwise in writing, neither you nor any of your employees, agents, delegates, service providers, or independent contractors acting on behalf of a Client Account under this Agreement are "associated persons" of a member of the Financial Industry Regulatory Authority (FINRA) within the meaning of applicable sections of the FINRA bylaws (an "Associated Person"). During the term of this Agreement, you will provide Schwab with prompt written notice if you or any of your employees, agents, delegates, service providers, or independent contractors acting on behalf of a Client Account under this Agreement become or cease to be an Associated Person.

**9. Sale of Control or Restricted Securities**

Before instructing Schwab to sell or buy securities that are (i) "restricted securities" or securities of an issuer of which you or your Client is an "affiliate" (as those terms are defined in Rule 144 under the Securities Act of 1933); or (ii) securities that are being sold or bought in reliance on Rule 144, Rule 144A, Regulation D, and/or Regulation S under the Act; or (iii) securities of an issuer of which your Client and the issuer or their underwriter have entered into an agreement restricting the transferability of such securities, you will advise Schwab of the status of such securities and promptly furnish whatever information and documents (including opinions of legal counsel or certifications of investor) that Schwab may request. Schwab may delay the execution of orders in restricted or nonrestricted securities, or refuse to execute orders in such securities, pending delivery of information and documents sufficient to exhibit that the proposed order is consistent with applicable legal and regulatory requirements in Schwab's sole discretion.

You agree not to deliver restricted or nonnegotiable securities for payment to an outside contra firm for an obligation a Client owes to settle trades or other debits to such contra firm. You further agree not to tender any such securities as collateral for an obligation a Client owes Schwab, unless you first provide any required documents.

**10. Indemnification**

You agree (without otherwise limiting your obligations to Schwab) to indemnify and hold harmless Schwab, its affiliates, and its and their directors, officers, employees, independent contractors, and agents from and against any and all claims, actions, costs, and liabilities, including attorneys' fees, arising out of or relating to:

- Any action taken by you;
- Any action taken by Schwab at your direction;
- Any breach by you of any provision of this Agreement or any federal or state securities or other laws;
- The performance or nonperformance of your services to a Client;
- Any dispute, including disputes between you and any Client or third party, concerning fees, trading instructions, disbursements, investments in advisor-sponsored products, investment advice or suitability, or your other actions or inactions relating to any Client; or
- Any claim of fraud, misappropriation of assets, self-dealing, or intentional misconduct by you, irrespective of the performance or nonperformance of services by Schwab.

Schwab agrees (without limiting its obligation to you) to indemnify you and hold harmless you, your affiliates, and your and their directors, officers, employees, and agents from and against any and all claims, actions, costs, and liabilities, including attorneys' fees, arising out of or relating to:

- Any breach by Schwab of any material provision of this Agreement;
- The grossly negligent performance or nonperformance of Schwab's services hereunder; or
- Any dispute between Schwab and any Client arising out of the services Schwab provides to such Client unless related to your acts or omissions.

Our respective obligations to indemnify each other will apply only to the extent that the respective claims, actions, costs, and liabilities are not due to the fault of the indemnified party. Neither of us will be liable to the other for consequential damages. The indemnification and hold-harmless provisions in this Agreement will survive any termination or expiration of this Agreement.

WB
©2014 Charles Schwab & Co., Inc. ("Schwab"). All rights reserved. Member SIPC.
CS22853-01 (1214-7969) APP83188-00 (11/14)

**11. Fees and Charges**

You agree to pay service fees and other charges, including SchwabLink® user fees, research and information charges, investment advisor fee payment processing charges, and quarterly services fees, as designated by Schwab from time to time with respect to the services Schwab provides hereunder. You further agree to pay any amount you owe Schwab arising out of any other agreement between us or out of any transaction Schwab executes on your instruction. Such fees and charges and other payment obligations are referred to collectively in this Agreement as "Investment Advisor Payment Obligations."

As security for the payment of all present or future Investment Advisor Payment Obligations, you grant to Schwab a continuing security interest in, lien on, and right of setoff with respect to:

- All investment advisor fees now or in the future payable to you by Clients and otherwise payable to you by Schwab;
- Any and all accounts, including your Investment Advisor Fee account, with Schwab in which the investment advisory firm has an interest now or in the future; and
- All securities, money, and other assets at any time held in any such account and in all earnings on, and proceeds of, such assets (collectively, "Investment Advisor assets").

Schwab will notify you of the amount of your Investment Advisor Payment Obligations and request your payment of them. If you fail to pay any Investment Advisor Payment Obligations after Schwab's notice and request that you do so, any obligation Schwab has to you will be reduced to the same extent, and Schwab may (at its sole discretion and without further request, demand, or notice, and without limiting any right of setoff Schwab may have, which right Schwab expressly reserves herein):

1. Reduce the amount of any investment advisor fee payments otherwise payable or transferred to your Investment Advisor Fee account by the amount of such Investment Advisor Payment Obligation; and/or
2. Sell or liquidate any Investment Advisor assets; and
3. Apply the proceeds of such sales to reduce or fulfill your Investment Advisor Payment Obligations to Schwab hereunder.

All Schwab's rights and remedies with respect to your failure to fulfill your Investment Advisor Payment Obligations will be cumulative, and Schwab may execute its rights in any order.

You will be responsible for making any disclosure to clients, regulators, or any third party as may be required by applicable law, rule, or regulation with respect to any reduction in or waiver of any Investment Advisor Payment Obligations you accept.

The Fees and Charges provisions in this Agreement will survive any termination or expiration of this Agreement.

**12. Extraordinary Events**

Schwab will not be responsible for losses caused directly or indirectly by conditions beyond its reasonable control, including war, natural disasters, terrorist acts, government restrictions, exchange or market rulings, strikes, interruptions of communications or data processing services, or disruptions in orderly trading on any exchange or market.

**13. Required Arbitration Disclosures**

**This Agreement contains a predispute arbitration clause. By signing an arbitration agreement, the parties agree as follows:**

- **All parties to this Agreement are giving up the right to sue each other in court, including the right to a trial by jury, except as provided by the rules of the arbitration forum in which a claim is filed.**
- **Arbitration awards are generally final and binding; a party's ability to have a court reverse or modify an arbitration award is very limited.**
- **The ability of the parties to obtain documents, witness statements, and other discovery is generally more limited in arbitration than in court proceedings.**
- **The arbitrators do not have to explain the reason(s) for their award unless, in an eligible case, a joint request for an explained decision has been submitted by all parties to the panel at least 20 days prior to the first scheduled hearing date.**
- **The panel of arbitrators may include a minority of arbitrators who were or are affiliated with the securities industry.**
- **The rules of some arbitration forums may impose time limits for bringing a claim in arbitration. In some cases, a claim that is ineligible for arbitration may be brought in court.**
- **The rules of the arbitration forum in which the claim is filed, and any amendments thereto, shall be incorporated into this Agreement.**

No person shall bring a putative or certified class action to arbitration nor seek to enforce any predispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until:

- The class certification is denied;
- The class is decertified; or
- The customer is excluded from the class by the court.

Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this Agreement except to the extent stated herein.

**14. Arbitration Agreement**

You agree that any controversy or claim arising out of or relating to (i) this Agreement, any other agreement with Schwab, an instruction or authorization provided to Schwab, or the breach of any such agreements, instructions, or authorizations; (ii) any or all accounts you maintain or serve as Investment Advisor for at Schwab (including your appointment as "investment manager" as defined under Section 3(38) of the Employment Retirement Income Security Act of 1974), any other Schwab account services; and (iii) transactions in any such account or in any way arising from your relationship with Schwab, its parent, subsidiaries, affiliates, officers, directors, employees, agents, or service providers ("Related Third Parties"), including any controversy over the arbitrability of a dispute, will be settled by arbitration.

You agree that you will execute and deliver to the appropriate arbitration agency or forum, including but not limited to FINRA, any agency's or forum's required Post-Dispute Arbitration Agreement.

This arbitration agreement will be binding upon and inure to the benefit of the parties hereto and their respective representatives, attorneys-in-fact, heirs, successors, assigns, and any other persons having or claiming to have a legal or beneficial interest in any account you maintain or serve as Investment Advisor for at Schwab, including court-appointed trustees and receivers. This arbitration agreement will also inure to the benefit of third-party service providers that assist Schwab in providing Services ("Third-Party Service Providers"), and such Third-Party Service Providers are deemed to be third-party beneficiaries of this arbitration agreement.

The parties agree that this arbitration agreement will apply even if an application to open an account is denied or the relationship contemplated by this Agreement is not entered into and will survive the closure of any account you maintain or serve as Investment Advisor for at Schwab and/or the termination of services rendered under this Agreement.

Such arbitration will be conducted by, and according to the securities arbitration rules and regulations then in effect of, FINRA or any national securities exchange that provides a forum for the arbitration of disputes, provided that Schwab is a member of such national securities exchange at the time the arbitration is initiated. Any party may initiate arbitration by filing a written claim with FINRA or such eligible national securities exchange. If arbitration before FINRA or an eligible national securities exchange is unavailable or impossible for any reason, then such arbitration will be conducted by, and according to the rules and regulations then in effect of, the American Arbitration Association (AAA). If arbitration before the AAA is unavailable or impossible for any reason, the parties agree to have a court of competent jurisdiction appoint three (3) neutral arbitrators to resolve any and all disputes or controversies between or among the parties through binding arbitration. Each party shall bear its own attorney's fees and arbitration costs, which are determined by the rules and regulations of the arbitration forum. At the conclusion of the hearing, the arbitrators will decide how to assess the arbitration costs, but not attorney's fees, among the parties. In the event of financial hardship, the arbitration forum may waive certain costs in accordance with such rules.

**Any award the arbitrator makes shall be final and binding, and judgment on it may be entered in any court having jurisdiction. This arbitration agreement shall be enforced and interpreted exclusively in accordance with applicable federal laws of the United States, including the Federal Arbitration Act. Any costs, fees, or taxes involved in enforcing the award shall be fully assessed against and paid by the party resisting enforcement of said award.**

**All notices from one party to the other involving arbitration shall be considered to have been fully given when so served, mailed by first-class,**

W8
©2014 Charles Schwab & Co., Inc. ("Schwab"). All rights reserved. Member SIPC.
CS22853-01 (1214-7969) APP83188-00 (11/14)

certified, or registered mail, or otherwise given by other commercially accepted medium of written notification.

In addition to the above provisions, if a party to this Agreement is or becomes a non-U.S. resident at the time of any controversy subject to this arbitration agreement, such party acknowledges and agrees to the following additional provisions:

1. The party agrees to abide by the rules of the organization administering the arbitration that provide for the formal designation of the place at which the arbitration is to be held.
2. Entering into this Agreement constitutes consent to submit to the personal jurisdiction of the courts of the state of California, U.S.A., to interpret or enforce any or all of these arbitration provisions. Judgment on any arbitration award may be entered in any court having jurisdiction, or application may be made to such court for judicial acceptance of the award and an order of enforcement, as the case may be.
3. The exclusive language to be used by the parties and the arbitrators in the arbitration proceedings shall be English. Any party wishing an interpreter shall make all arrangements directly with the interpreter and shall assume all costs of the service.
4. If a party is a foreign government or state, state-owned or state-operated enterprise, or other instrumentality of a foreign government or state, such party waives all rights of sovereign immunity, and neither the Federal Act of State doctrine nor the doctrine of sovereign immunity shall apply insofar as any enforcement in courts located in the U.S.A. is concerned.

**15. Confidentiality**

For the purposes of this provision, "Business Confidential Information" includes the terms of this Agreement and any pricing schedules or other addenda or agreements you have with Schwab, and any other information or documents we share with each other relating to the business of the other party not publicly available. You and Schwab will each maintain the confidentiality of Business Confidential Information, and not disclose it to any outside party except as may be required by law, judicial process, or regulation, including Form ADV, or when requested in the course of a regulatory examination or inspection. We each will use Business Confidential Information only for the purpose of performing our respective obligations under this Agreement. If disclosure of Business Confidential Information is required, the disclosing party will, to the extent legally permissible, promptly give the other party written notice of the disclosure.

For the purposes of this provision, "Confidential Client Information" is any information relating to a Client Account, including without limitation the name, address, and Taxpayer Identification number of a Client, and any personally identifiable financial information (as that term is defined in Regulation S-P of the Securities and Exchange Commission) relating to a Client or Client Account. You agree that you will (i) maintain the confidentiality of, (ii) not disclose to any outside party, or (iii) use for any purpose any Confidential Client Information except (A) as may be required by law, judicial process, or regulation, or when requested in the course of a regulatory examination or inspection, (B) as necessary in the ordinary course of business to provide services to Clients in accordance with this Agreement, or (C) as may otherwise be legally permissible. You further agree that you will not use Client Confidential information to represent yourself to Schwab as the account holder (except when you are the account holder).

You agree that you, and not Schwab, are solely responsible for the use, disclosure, and safeguarding of Confidential Client Information that you receive from or access through Schwab. You will maintain written policies and procedures reasonably designed to ensure the security and confidentiality of Confidential Client Information and protect it against loss, theft, or unauthorized use, access, disclosure, or acquisition. You acknowledge that you are subject to and responsible for compliance with all applicable federal and state laws relating to giving notice of events that may have compromised the security of Confidential Client Information following your receipt of it from Schwab. You will promptly notify Schwab if (i) you become aware of any loss, theft, or any unauthorized use, access, disclosure, or acquisition of Confidential Client Information; or (ii) you become obligated to give notice of any event that may have compromised the security of Confidential Client Information following your receipt of it from Schwab.

The Confidentiality provisions of this Agreement will survive the termination or expiration of this Agreement.

**16. Additional Terms**

Additional terms contained in any other agreement between you and Schwab (collectively, "Other Agreements") also apply to you and are incorporated by reference in this Agreement if you use the products and services for which such agreements apply. If you are dissatisfied with all or some of those products and services, or if you do not accept and agree to be bound by all terms and conditions in the Other Agreements, you will return to Schwab all software and any other materials related to those products and services governed by the respective agreement to which you do not agree, and you will not be permitted to use the products and/or services associated with such an agreement.

**17. Entire Agreement and Amendments**

This Agreement and such Other Agreements that govern the Schwab products and services you obtain contain all of the agreements, representations, and understandings made between the parties with respect to the subject matter of this Agreement and the Other Agreements, respectively. The terms of this Agreement, the Other Agreements, and the services offered by Schwab may be modified at any time by Schwab on 30 days' prior written notice, except that:

- Schwab will provide you with 45 days' prior written notice of any change in fees and charges.
- Schwab may modify, suspend, or discontinue investment advisor fee payment services at any time upon notice to you with respect to any or all Client Accounts.
- Modifications required by law will become effective immediately.

Notwithstanding these exceptions, if Schwab provides you with written notice of a change in terms, other than a change required by law, and you elect to terminate this Agreement as a result thereof, such change will not be effective for a period of 60 days from the date of Schwab's notice of change in terms, provided that at least 30 days before the end of such 60-day period you give Schwab written notice of your intent to terminate.

**18. Termination**

Either party may terminate this Agreement at any time for any reason by giving written notice to the other. Upon termination by either of us:

- Schwab will not be obligated to honor the authorizations granted to you by your Clients in the respective Client Account agreements and in any written notices to Schwab.
- Client Accounts will be handled by Schwab in accordance with the termination of authorization provisions set forth in the respective Client brokerage account agreement, and Schwab will consider each Client to have exclusive control over, and responsibility for, that Client's Accounts.
- Schwab will not be obligated to send you any further information with respect to Client Accounts.

Upon Schwab's receipt of notice from the Client of a Client's termination of your authority with respect to a Client Account, the termination provisions of this paragraph shall apply with respect to such Client Account(s). The termination of this Agreement will not reduce or extinguish any outstanding Investment Advisor Payment Obligations or Schwab's authority to access IA assets to reduce such obligations as provided in Section 11 of this Agreement. We each expressly waive any claim against the other for termination in accordance with this provision.

**19. Assignment**

Schwab may assign its rights and obligations under this Agreement to any subsidiary, affiliate, or successor by merger or consolidation without notice to you or to any other entity after 30 days' written notice to you. You may assign your rights and obligations under this Agreement to any subsidiary or affiliate or successor by merger or consolidation after 30 days' written notice to Schwab, subject to the successor company's agreement in writing to be bound by this Agreement. The assignment provisions stated in this Agreement will not affect the right of either of us to terminate as otherwise provided in this Agreement. This Agreement is binding upon and will inure to the benefit of our successors and assigns.

**20. Waiver**

The failure of either of us at any time to require performance by the other of any provision of this Investment Advisor Service Agreement will not affect in any way either party's right to require such performance at any time thereafter. The waiver by either of us of a breach of any provisions of this Agreement will not be taken or held to be a waiver of the provision itself.

**21. Notices**

Notices required by this Agreement to be given in writing will be sent to you at the address you provided to Schwab and to Schwab at the mailing address of your Schwab Advisor Services Service team that has been provided to you by Schwab.

WB
©2014 Charles Schwab & Co., Inc. ("Schwab"). All rights reserved. Member SIPC.
CS22853-01 (1214-7969) APP83188-00 (11/14)

**22. Severability**

If any provision of this Agreement is found to be invalid or unenforceable, all other provisions of this Agreement will remain in full force and effect.

**23. Applicable Law**

The laws of the state of California as applied to agreements signed and performed in California will apply and bind the parties in any and all questions arising under this Agreement, including, without limitation, questions of validity, interpretation, and performance, without giving effect to conflicts of law principles thereof.

**24. Delivery of Agreement to Schwab**

You may sign this Agreement and deliver it to Schwab by mail, courier delivery, or hand delivery to your Schwab Advisor Services Sales Representative. You may also deliver this Agreement to Schwab, after signature, by electronic mail or by facsimile transmission directed to your Schwab Advisor Services Sales Representative at either the email address or fax transmission number provided directly to you, in writing, by that Sales Representative. If you deliver the signed Agreement to Schwab by email or facsimile, you acknowledge and agree that this Agreement and your signature below will be treated as, and are just as binding as, an original copy.

By signing below, the undersigned acknowledges receipt of a copy of this Investment Advisor Service Agreement and further acknowledges that a predispute arbitration agreement is contained in Section 14, which is titled "Arbitration Agreement."

**Taxpayer Identification Number:** Redacted

I certify under penalty of perjury that (1) the number shown is my correct taxpayer identification number; (2) I am not subject to backup withholding because (a) I am exempt from backup withholding, or (b) I am not subject to backup withholding due to a failure to report interest and dividend income; (3) I am a U.S. person (U.S. citizen or U.S. resident alien); and (4) I am exempt from Foreign Account Tax Compliance Act (FATCA) reporting. I understand that if I have been notified by the IRS that I am subject to backup withholding as a result of dividend or interest underreporting and I have not received a notice from the IRS advising me that backup withholding is terminated, I must strike or cross out the information contained in item 2 above.

THE INTERNAL REVENUE SERVICE DOES NOT REQUIRE YOUR CONSENT TO ANY PROVISION OF THIS DOCUMENT OTHER THAN THE CERTIFICATIONS REQUIRED TO AVOID BACKUP WITHHOLDING.

This Agreement is to be signed by an Executive Officer of the Investment Advisor listed on Schedule A of your ADV.

Jason R. Clark

Please print Firm Name as reflected on your ADV.

## Signature and Date Required

X [signature] Signature: Executive Officer — Please print name and title. Founder — 5/23/18 Date (mm/dd/yyyy)

By signature immediately below, the Chief Compliance Officer of Investment Advisor acknowledges execution of this Agreement by the Investment Advisor and further acknowledges receipt of a copy thereof. The undersigned certifies that Investment Advisor will make all appropriate ADV disclosures concerning this Agreement as required by law, rule, or regulation and will continue to make such disclosures so long as this Agreement is in effect.

## Signature and Date Required

X [signature] Signature: Chief Compliance Officer — Please print name. Jason R. Clark — 5/23/18 Date (mm/dd/yyyy)

Receipt of this Agreement Acknowledged by:

Charles Schwab & Co., Inc.

▶ ______ Signature ______ Print name and title. ______ Date ______ (mm/dd/yyyy)



©2014 Charles Schwab & Co., Inc. ("Schwab"). All rights reserved. Member SIPC.

# EXHIBIT B

EXHIBITS TO RESPONDENT CHARLES SCHWAB & CO., INC.'S
ANSWER TO AMENDED STATEMENT OF CLAIM

# FORM ADV

## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION AND REPORT BY EXEMPT REPO

| |
|---|
| **imary Business Name: CLARK BROTHERS INVESTMENTS** |
| **her-Than-Annual Amendment - All Sections** |
| **24/2021 12:41:51 PM** |

**/ARNING:** Complete this form truthfully. False statements or omissions may result in denial of your application, revocation of your registration, keep this form updated by filing periodic amendments. See Form ADV General Instruction 4.

**m 1 Identifying Information**

esponses to this Item tell us who you are, where you are doing business, and how we can contact you. If you are filing an *umbrella registratior* ovided for the *filing adviser* only. General Instruction 5 provides information to assist you with filing an *umbrella registration.*

. Your full legal name (if you are a sole proprietor, your last, first, and middle names):
**CLARK BROTHERS, INC.**

. (1) Name under which you primarily conduct your advisory business, if different from Item 1.A.
**CLARK BROTHERS INVESTMENTS**

*List on Section 1.B. of Schedule D any additional names under which you conduct your advisory business.*

(2) If you are using this Form ADV to register more than one investment adviser under an *umbrella registration*, check this box ☐

*If you check this box, complete a Schedule R for each relying adviser.*

. If this filing is reporting a change in your legal name (Item 1.A.) or primary business name (Item 1.B.(1)), enter the new name and specify w ☐ your legal name or ☐ your primary business name:

. (1) If you are registered with the SEC as an investment adviser, your SEC file number:

(2) If you report to the SEC as an *exempt reporting adviser*, your SEC file number:

(3) If you have one or more Central Index Key numbers assigned by the SEC ("CIK Numbers"), all of your CIK numbers:

No Information Filed

. (1) If you have a number ("*CRD* Number") assigned by the *FINRA's CRD* system or by the IARD system, your *CRD* number: **143777**

*If your firm does not have a CRD number, skip this Item 1.E. Do not provide the CRD number of one of your officers, employees, or affiliate*

(2) If you have additional *CRD* Numbers, your additional *CRD* numbers:

No Information Filed

. *Principal Office and Place of Business*

(1) Address (do not use a P.O. Box):

| | | | |
|---|---|---|---|
| Number and Street 1: | | Number and Street 2: | |
| 2851 S. PARKER ROAD | | #510 | |
| City: | State: | Country: | ZIP+4/Postal Code: |
| AURORA | Colorado | United States | 80014 |

If this address is a private residence, check this box: ☐

Number and Street 1: Number and Street 2:

City: State: Country: ZIP+4/Postal Code:

If this address is a private residence, check this box: ☐

I. If you are a sole proprietor, state your full residence address, if different from your *principal office and place of business* address in Item 1.F

Number and Street 1: Number and Street 2:

City: State: Country: ZIP+4/Postal Code:

Do you have one or more websites or accounts on publicly available social media platforms (including, but not limited to, Twitter, Facebook

*If "yes," list all firm website addresses and the address for each of the firm's accounts on publicly available social media platforms on Sectic address serves as a portal through which to access other information you have published on the web, you may list the portal without listing a information. You may need to list more than one portal address. Do not provide the addresses of websites or accounts on publicly available not control the content. Do not provide the individual electronic mail (e-mail) addresses of employees or the addresses of employee accou platforms.*

. Chief Compliance Officer

(1) Provide the name and contact information of your Chief Compliance Officer. If you are an *exempt reporting adviser*, you must provide the Compliance Officer, if you have one. If not, you must complete Item 1.K. below.

Name: Other titles, if any:

Telephone number: Facsimile number, if any:

Number and Street 1: Number and Street 2:

City: State: Country: ZIP+4/Postal Code:

Electronic mail (e-mail) address, if Chief Compliance Officer has one:

(2) If your Chief Compliance Officer is compensated or employed by any *person* other than you, a *related person* or an investment company Company Act of 1940 that you advise for providing chief compliance officer services to you, provide the *person's* name and IRS Employer Ide

Name:

IRS Employer Identification Number:

. Additional Regulatory Contact Person: If a person other than the Chief Compliance Officer is authorized to receive information and respond may provide that information here.

Name: Titles:

Telephone number: Facsimile number, if any:

Number and Street 1: Number and Street 2:

City: State: Country: ZIP+4/Postal Code:

Electronic mail (e-mail) address, if contact person has one:

. Do you maintain some or all of the books and records you are required to keep under Section 204 of the Advisers Act, or similar state law, s *principal office and place of business*?

*If "yes," complete Section 1.L. of Schedule D.*

I. Are you registered with a *foreign financial regulatory authority*?

*on the balance sheet for your most recent fiscal year end.*

. Provide your *Legal Entity Identifier* if you have one:

A *legal entity identifier* is a unique number that companies use to identify each other in the financial marketplace. You may not have a *legal*

**:CTION 1.B. Other Business Names**

No Information Filed

**:CTION 1.F. Other Offices**

No Information Filed

**:CTION 1.I. Website Addresses**

.ist your website addresses, including addresses for accounts on publicly available social media platforms where you control the content (inclı
-acebook and/or LinkedIn). You must complete a separate Schedule D Section 1.I. for each website or account on a publicly available social m

\ddress of Website/Account on Publicly Available Social Media Platform: http://WWW.CLARKBROTHERSINVESTMENTS.COM

\ddress of Website/Account on Publicly Available Social Media Platform: https://www.linkedin.com/company/clark-brothers-investments/

\ddress of Website/Account on Publicly Available Social Media Platform: https://www.linkedin.com/company/clark-brothers-investments

**:CTION 1.L. Location of Books and Records**

No Information Filed

**:CTION 1.M. Registration with Foreign Financial Regulatory Authorities**

No Information Filed

**m 3 Form of Organization**

/ou are filing an *umbrella registration*, the information in Item 3 should be provided for the *filing adviser* only.

. How are you organized?

(•) Corporation

( ) Sole Proprietorship

*If you are a partnership, provide the name of the state or country under whose laws your partnership was formed. If you are a sole proprietor country where you reside.*

*If you are changing your response to this Item, see Part 1A Instruction 4.*

**m 4 Successions**

. Are you, at the time of this filing, succeeding to the business of a registered investment adviser, including, for example, a change of your str form of organization or state of incorporation)?

*If "yes", complete Item 4.B. and Section 4 of Schedule D.*

. Date of Succession: (MM/DD/YYYY)

*If you have already reported this succession on a previous Form ADV filing, do not report the succession again. Instead, check "No." See Pa*

**:CTION 4 Successions**

No Information Filed

**m 5 Information About Your Advisory Business - Employees, Clients, and Compensation**

esponses to this Item help us understand your business, assist us in preparing for on-site examinations, and provide us with data we use wh struction 5.a. provides additional guidance to newly formed advisers for completing this Item 5.

***mployees***

*you are organized as a sole proprietorship, include yourself as an employee in your responses to Item 5.A. and Items 5.B.(1), (2), (3), (4), and ıan one function, you should count that employee in each of your responses to Items 5.B.(1), (2), (3), (4), and (5).*

. Approximately how many *employees* do you have? Include full- and part-time *employees* but do not include any clerical workers.

1

. (1) Approximately how many of the *employees* reported in 5.A. perform investment advisory functions (including research)?

1

(2) Approximately how many of the *employees* reported in 5.A. are registered representatives of a broker-dealer?

1

(3) Approximately how many of the *employees* reported in 5.A. are registered with one or more *state securities authorities* as *investment a*

1

(4) Approximately how many of the *employees* reported in 5.A. are registered with one or more *state securities authorities* as *investment a* investment adviser other than you?

0

(5) Approximately how many of the *employees* reported in 5.A. are licensed agents of an insurance company or agency?

0

(6) Approximately how many firms or other *persons* solicit advisory *clients* on your behalf?

businesses organized as sole proprietorships.

*The category "business development companies" consists of companies that have made an election pursuant to section 54 of the Investme provide advisory services pursuant to an investment advisory contract to an investment company registered under the Investment Company (d)(3) below.*

Indicate the approximate number of your *clients* and amount of your total regulatory assets under management (reported in Item 5.F. below type of *client*. If you have fewer than 5 *clients* in a particular category (other than (d), (e), and (f)) you may check Item 5.D.(2) rather than respo

The aggregate amount of regulatory assets under management reported in Item 5.D.(3) should equal the total amount of regulatory assets 5.F.(2)(c) below.

If a *client* fits into more than one category, select one category that most accurately represents the *client* to avoid double counting *clients* an investment company, business development company, or pooled investment vehicle, report those assets in categories (d), (e), and (f) as a

| Type of *Client* | (1) Number of *Client(s)* | (2) Fewer than 5 *Clients* | (3) A |
|---|---|---|---|
| (a) Individuals (other than *high net worth individuals*) | 75 | ☐ | |
| (b) *High net worth individuals* | 0 | ☐ | |
| (c) Banking or thrift institutions | 0 | ☐ | |
| (d) Investment companies | 0 | | |
| (e) Business development companies | 0 | | |
| (f) Pooled investment vehicles (other than investment companies and business development companies) | 0 | | |
| (g) Pension and profit sharing plans (but not the plan participants or government pension plans) | 0 | ☐ | |
| (h) Charitable organizations | 0 | ☐ | |
| (i) State or municipal *government entities* (including government pension plans) | 0 | ☐ | |
| (j) Other investment advisers | 0 | ☐ | |
| (k) Insurance companies | 0 | ☐ | |
| (l) Sovereign wealth funds and foreign official institutions | 0 | ☐ | |
| (m) Corporations or other businesses not listed above | 0 | ☐ | |
| (n) Other: | 0 | ☐ | |

**ompensation Arrangements**

. You are compensated for your investment advisory services by (check all that apply):

- ☑ (1) A percentage of assets under your management
- ☐ (2) Hourly charges
- ☐ (3) Subscription fees (for a newsletter or periodical)
- ☐ (4) Fixed fees (other than subscription fees)
- ☐ (5) Commissions
- ☐ (6) *Performance-based fees*
- ☐ (7) Other (specify):

**m 5 Information About Your Advisory Business - Regulatory Assets Under Management**

**egulatory Assets Under Management**

. (1) Do you provide continuous and regular supervisory or management services to securities portfolios?

(2) If yes, what is the amount of your regulatory assets under management and total number of accounts?

- [x] (2) Portfolio management for individuals and/or small businesses
- [ ] (3) Portfolio management for investment companies (as well as "business development companies" that have made an election pu Company Act of 1940)
- [ ] (4) Portfolio management for pooled investment vehicles (other than investment companies)
- [ ] (5) Portfolio management for businesses (other than small businesses) or institutional *clients* (other than registered investment cc vehicles)
- [ ] (6) Pension consulting services
- [ ] (7) Selection of other advisers (including *private fund* managers)
- [ ] (8) Publication of periodicals or newsletters
- [ ] (9) Security ratings or pricing services
- [ ] (10) Market timing services
- [ ] (11) Educational seminars/workshops
- [ ] (12) Other(specify):

*Do not check Item 5.G.(3) unless you provide advisory services pursuant to an investment advisory contract to an investment company regi Act of 1940, including as a subadviser. If you check Item 5.G.(3), report the 811 or 814 number of the investment company or investment co in Section 5.G.(3) of Schedule D.*

I. If you provide financial planning services, to how many *clients* did you provide these services during your last fiscal year?

- (●) 0
- ( ) 1 - 10
- ( ) 11 - 25
- ( ) 26 - 50
- ( ) 51 - 100
- ( ) 101 - 250
- ( ) 251 - 500
- ( ) More than 500

If more than 500, how many?
(round to the nearest 500)

*In your responses to this Item 5.H., do not include as "clients" the investors in a private fund you advise, unless you have a separate adviso*

(1) Do you participate in a *wrap fee program*?

(2) If you participate in a *wrap fee program*, what is the amount of your regulatory assets under management attributable to acting as:

(a) *sponsor* to a *wrap fee program*
$

(b) portfolio manager for a *wrap fee program*?
$

(c) *sponsor* to and portfolio manager for the same *wrap fee program*?
$

*If you report an amount in Item 5.I.(2)(c), do not report that amount in Item 5.I.(2)(a) or Item 5.I.(2)(b).*

*If you are a portfolio manager for a wrap fee program, list the names of the programs, their sponsors and related information in Section 5.I.(*

*If your involvement in a wrap fee program is limited to recommending wrap fee programs to your clients, or you advise a mutual fund that is do not check Item 5.I.(1) or enter any amounts in response to Item 5.I.(2).*

(1) In response to Item 4.B. of Part 2A of Form ADV, do you indicate that you provide investment advice only with respect to limited types of i

(4) After subtracting the amounts in Item 5.D.(3)(d)-(f) above from your total regulatory assets under management, does any custodian holc remaining amount of regulatory assets under management?

*If yes, complete Section 5.K.(3) of Schedule D for each custodian.*

---

**:CTION 5.G.(3) Advisers to Registered Investment Companies and Business Development Companies**

No Information Filed

---

**:CTION 5.I.(2)** ***Wrap Fee Programs***

No Information Filed

---

**:CTION 5.K.(1) Separately Managed Accounts**

fter subtracting the amounts reported in Item 5.D.(3)(d)-(f) from your total regulatory assets under management, indicate the approximate perc ttributable to each of the following categories of assets. If the remaining amount is at least $10 billion in regulatory assets under management emaining amount is less than $10 billion in regulatory assets under management, complete Question (b).

ny regulatory assets under management reported in Item 5.D.(3)(d), (e), and (f) should not be reported below.

you are a subadviser to a separately managed account, you should only provide information with respect to the portion of the account that you

nd of year refers to the date used to calculate your regulatory assets under management for purposes of your *annual updating amendment* . N ie end of year date. Each column should add up to 100% and numbers should be rounded to the nearest percent.

ivestments in derivatives, registered investment companies, business development companies, and pooled investment vehicles should be re eport those investments based on related or underlying portfolio assets. Cash equivalents include bank deposits, certificates of deposit, bank istruments.

ome assets could be classified into more than one category or require discretion about which category applies. You may use your own interna f your service providers in determining how to categorize assets, so long as the methodologies or conventions are consistently applied and co iternally and to current and prospective clients. However, you should not double count assets, and your responses must be consistent with an ) this Section.

a)

| Asset Type |
|---|
| (i) Exchange-Traded Equity Securities |
| (ii) Non Exchange-Traded Equity Securities |
| (iii) U.S. Government/Agency Bonds |
| (iv) U.S. State and Local Bonds |
| (v) *Sovereign Bonds* |
| (vi) Investment Grade Corporate Bonds |
| (vii) Non-Investment Grade Corporate Bonds |
| (viii) Derivatives |
| (ix) Securities Issued by Registered Investment Companies or Business Development Companies |
| (x) Securities Issued by Pooled Investment Vehicles (other than Registered Investment Companies or Business Development Compani |
| (xi) Cash and Cash Equivalents |
| (xii) Other |

Generally describe any assets included in "Other"

| | |
|---|---|
| (xi) Cash and Cash Equivalents | |
| (xii) Other | |

Generally describe any assets included in "Other"

ECTION 5.K.(2) Separately Managed Accounts - Use of *Borrowings*and Derivatives

☐ No information is required to be reported in this Section 5.K.(2) per the instructions of this Section 5.K.(2)

your regulatory assets under management attributable to separately managed accounts are at least $10 billion, you should complete Questio
ıanagement attributable to separately managed accounts are at least $500 million but less than $10 billion, you should complete Question (b)

a) In the table below, provide the following information regarding the separately managed accounts you advise. If you are a subadviser to a se only provide information with respect to the portion of the account that you subadvise. End of year refers to the date used to calculate your r for purposes of your *annual updating amendment*. Mid-year is the date six months before the end of year date.

In column 1, indicate the regulatory assets under management attributable to separately managed accounts associated with each level of of this table, the gross notional exposure of an account is the percentage obtained by dividing (i) the sum of (a) the dollar amount of any *bor value* of all derivatives, by (ii) the regulatory assets under management of the account.

In column 2, provide the dollar amount of *borrowings* for the accounts included in column 1.

In column 3, provide aggregate *gross notional value* of derivatives divided by the aggregate regulatory assets under management of the ac respect to each category of derivatives specified in 3(a) through (f).

You may, but are not required to, complete the table with respect to any separately managed account with regulatory assets under manage

Any regulatory assets under management reported in Item 5.D.(3)(d), (e), and (f) should not be reported below.

(i) Mid-Year

| Gross Notional Exposure | (1) Regulatory Assets Under Management | (2) *Borrowings* | (3) Derivative Exposures | | | |
|---|---|---|---|---|---|---|
| | | | (a) *Interest Rate Derivative* | (b) *Foreign Exchange Derivative* | (c) *Credit Derivative* | (d) *Equ Deriva* |
| Less than 10% | $ | $ | % | % | % | % |
| 10-149% | $ | $ | % | % | % | % |
| 150% or more | $ | $ | % | % | % | % |

Optional: Use the space below to provide a narrative description of the strategies and/or manner in which *borrowings* and derivatives are u separately managed accounts that you advise.

(ii) End of Year

| Gross Notional Exposure | (1) Regulatory Assets Under Management | (2) *Borrowings* | (3) Derivative Exposures | | | |
|---|---|---|---|---|---|---|
| | | | (a) *Interest Rate Derivative* | (b) *Foreign Exchange Derivative* | (c) *Credit Derivative* | (d) *Equ Deriva* |
| [illegible] | $ | $ | % | % | % | % |

You may, but are not required to, complete the table with respect to any separately managed accounts with regulatory assets under manag

Any regulatory assets under management reported in Item 5.D.(3)(d), (e), and (f) should not be reported below.

| Gross Notional Exposure | (1) Regulatory Assets Under Management | |
|---|---|---|
| Less than 10% | $ | |
| 10-149% | $ | |
| 150% or more | $ | |

Optional: Use the space below to provide a narrative description of the strategies and/or manner in which *borrowings* and derivatives are u separately managed accounts that you advise.

**CTION 5.K.(3) Custodians for Separately Managed Accounts**

No Information Filed

**m 6 Other Business Activities**

this Item, we request information about your firm's other business activities.

. You are actively engaged in business as a (check all that apply):

☐ (1) broker-dealer (registered or unregistered)
☐ (2) registered representative of a broker-dealer
☐ (3) commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
☐ (4) futures commission merchant
☐ (5) real estate broker, dealer, or agent
☐ (6) insurance broker or agent
☐ (7) bank (including a separately identifiable department or division of a bank)
☐ (8) trust company
☐ (9) registered municipal advisor
☐ (10) registered security-based swap dealer
☐ (11) major security-based swap participant
☐ (12) accountant or accounting firm
☐ (13) lawyer or law firm
☐ (14) other financial product salesperson (specify):

*If you engage in other business using a name that is different from the names reported in Items 1.A. or 1.B.(1), complete Section 6.A. of Scl*

. (1) Are you actively engaged in any other business not listed in Item 6.A. (other than giving investment advice)?

(2) If yes, is this other business your primary business?

*If "yes," describe this other business on Section 6.B.(2) of Schedule D, and if you engage in this business under a different name, prov*

(3) Do you sell products or provide services other than investment advice to your advisory *clients*?

*If "yes," describe this other business on Section 6.B.(3) of Schedule D, and if you engage in this business under a different name, prov*

you engage in that business under a different name, provide that name.

**m 7 Financial Industry Affiliations**

this Item, we request information about your financial industry affiliations and activities. This information identifies areas in which conflicts of i
ur *clients*.

. This part of Item 7 requires you to provide information about you and your *related persons*, including foreign affiliates. Your *related persons*
*person* that is under common *control* with you.

You have a *related person* that is a (check all that apply):

- ☐ (1) broker-dealer, municipal securities dealer, or government securities broker or dealer (registered or unregistered)
- ☐ (2) other investment adviser (including financial planners)
- ☐ (3) registered municipal advisor
- ☐ (4) registered security-based swap dealer
- ☐ (5) major security-based swap participant
- ☐ (6) commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
- ☐ (7) futures commission merchant
- ☐ (8) banking or thrift institution
- ☐ (9) trust company
- ☐ (10) accountant or accounting firm
- ☐ (11) lawyer or law firm
- ☐ (12) insurance company or agency
- ☐ (13) pension consultant
- ☐ (14) real estate broker or dealer
- ☐ (15) sponsor or syndicator of limited partnerships (or equivalent), excluding pooled investment vehicles
- ☐ (16) sponsor, general partner, managing member (or equivalent) of pooled investment vehicles

*Note that Item 7.A. should not be used to disclose that some of your employees perform investment advisory functions or are registered re number of your firm's employees who perform investment advisory functions should be disclosed under Item 5.B.(1). The number of your f representatives of a broker-dealer should be disclosed under Item 5.B.(2).*

*Note that if you are filing an umbrella registration, you should not check Item 7.A.(2) with respect to your relying advisers, and you do not h Schedule D for your relying advisers. You should complete a Schedule R for each relying adviser.*

*For each related person, including foreign affiliates that may not be registered or required to be registered in the United States, complete S*

*You do not need to complete Section 7.A. of Schedule D for any related person if: (1) you have no business dealings with the related perso you provide to your clients; (2) you do not conduct shared operations with the related person; (3) you do not refer clients or business to the r does not refer prospective clients or business to you; (4) you do not share supervised persons or premises with the related person; and (5) your relationship with the related person otherwise creates a conflict of interest with your clients.*

*You must complete Section 7.A. of Schedule D for each related person acting as qualified custodian in connection with advisory services y any mutual fund transfer agent pursuant to rule 206(4)-2(b)(1)), regardless of whether you have determined the related person to be opera 206(4)-2 of the Advisers Act.*

**CTION 7.A. Financial Industry Affiliations**

No Information Filed

**m 7 *Private Fund* Reporting**

. Are you an adviser to any *private fund*?

:CTION 7.B.(2) *Private Fund* Reporting

No Information Filed

**:m 8 Participation or Interest in *Client* Transactions**

this Item, we request information about your participation and interest in your *clients*' transactions. This information identifies additional areas :tween you and your *clients*. Newly-formed advisers should base responses to these questions on the types of participation and interest that yo :ar.

ke Item 7, Item 8 requires you to provide information about you and your *related persons*, including foreign affiliates.

**roprietary Interest in *Client* Transactions**

. Do you or any *related person*:

(1) buy securities for yourself from advisory *clients*, or sell securities you own to advisory *clients* (principal transactions)?

(2) buy or sell for yourself securities (other than shares of mutual funds) that you also recommend to advisory *clients*?

(3) recommend securities (or other investment products) to advisory *clients* in which you or any *related person* has some other proprietary than those mentioned in Items 8.A.(1) or (2))?

**ales Interest in *Client* Transactions**

. Do you or any *related person*:

(1) as a broker-dealer or registered representative of a broker-dealer, execute securities trades for brokerage customers in which advisor or bought from the brokerage customer (agency cross transactions)?

(2) recommend to advisory *clients*, or act as a purchaser representative for advisory *clients* with respect to, the purchase of securities for w *person* serves as underwriter or general or managing partner?

(3) recommend purchase or sale of securities to advisory *clients* for which you or any *related person* has any other sales interest (other th commissions as a broker or registered representative of a broker-dealer)?

**ıvestment or Brokerage Discretion**

:. Do you or any *related person* have *discretionary authority* to determine the:

(1) securities to be bought or sold for a *client's* account?

(2) amount of securities to be bought or sold for a *client's* account?

(3) broker or dealer to be used for a purchase or sale of securities for a *client's* account?

(4) commission rates to be paid to a broker or dealer for a *client's* securities transactions?

'. If you answer "yes" to C.(3) above, are any of the brokers or dealers *related persons*?

. Do you or any *related person* recommend brokers or dealers to *clients*?

. If you answer "yes" to E. above, are any of the brokers or dealers *related persons*?

i. (1) Do you or any *related person* receive research or other products or services other than execution from a broker-dealer or a third party (' connection with *client* securities transactions?

(2) If "yes" to G.(1) above, are all the "soft dollar benefits" you or any *related persons* receive eligible "research or brokerage services" unde Securities Exchange Act of 1934?

I. (1) Do you or any *related person*, directly or indirectly, compensate any *person* that is not an *employee* for *client* referrals?

(2) Do you or any *related person*, directly or indirectly, provide any *employee* compensation that is specifically related to obtaining *clients* fo compensation in addition to the *employee's* regular salary)?

Do you or any *related person*, including any *employee*, directly or indirectly, receive compensation from any *person* (other than you or any re

*If you are registering or registered with the SEC, answer "No" to Item 9.A.(1)(a) and (b) if you have custody solely because (i) you deduct yo clients' accounts, or (ii) a related person has custody of client assets in connection with advisory services you provide to clients, but you hav are not operationally independent (pursuant to Advisers Act rule 206(4)-2(d)(5)) from the related person.*

(2) If you checked "yes" to Item 9.A.(1)(a) or (b), what is the approximate amount of *client* funds and securities and total number of *clients* f

| U.S. Dollar Amount | Total Number of *Clients* |
|---|---|
| (a) $ 1,600,000 | (b) 70 |

*If you are registering or registered with the SEC and you have custody solely because you deduct your advisory fees directly from your clien of those assets and the number of those clients in your response to Item 9.A.(2). If your related person has custody of client assets in conne to clients, do not include the amount of those assets and number of those clients in your response to 9.A.(2). Instead, include that informatic*

. (1) In connection with advisory services you provide to *clients*, do any of your *related persons* have *custody* of any of your advisory *clients'*:

(a) cash or bank accounts?

(b) securities?

*You are required to answer this item regardless of how you answered Item 9.A.(1)(a) or (b).*

(2) If you checked "yes" to Item 9.B.(1)(a) or (b), what is the approximate amount of *client* funds and securities and total number of *clients* f *custody*:

| U.S. Dollar Amount | Total Number of *Clients* |
|---|---|
| (a) $ 1,600,000 | (b) 70 |

. If you or your *related persons* have *custody* of *client* funds or securities in connection with advisory services you provide to *clients*, check all t

(1) A qualified custodian(s) sends account statements at least quarterly to the investors in the pooled investment vehicle(s) you manage.

(2) An *independent public accountant* audits annually the pooled investment vehicle(s) that you manage and the audited financial stateme investors in the pools.

(3) An *independent public accountant* conducts an annual surprise examination of *client* funds and securities.

(4) An *independent public accountant* prepares an internal control report with respect to custodial services when you or your *related persc* for *client* funds and securities.

*If you checked Item 9.C.(2), C.(3) or C.(4), list in Section 9.C. of Schedule D the accountants that are engaged to perform the audit or exami report. (If you checked Item 9.C.(2), you do not have to list auditor information in Section 9.C. of Schedule D if you already provided this info funds you advise in Section 7.B.(1) of Schedule D).*

. Do you or your *related person(s)* act as qualified custodians for your *clients* in connection with advisory services you provide to *clients*?

(1) you act as a qualified custodian

(2) your *related person(s)* act as qualified custodian(s)

*If you checked "yes" to Item 9.D.(2), all related persons that act as qualified custodians (other than any mutual fund transfer agent pursuant identified in Section 7.A. of Schedule D, regardless of whether you have determined the related person to be operationally independent und*

. If you are filing your *annual updating amendment* and you were subject to a surprise examination by an *independent public accountant* duri date (MM/YYYY) the examination commenced:

. If you or your *related persons* have *custody* of *client* funds or securities, how many *persons*, including, but not limited to, you and your *relatec* for your *clients* in connection with advisory services you provide to *clients?*

1

. Does any *person* not named in Item 1.A. or Schedules A, B, or C, directly or indirectly, *control* your management or policies?

*If yes, complete Section 10.A. of Schedule D.*

. If any *person* named in Schedules A, B, or C or in Section 10.A. of Schedule D is a public reporting company under Sections 12 or 15(d) of tl please complete Section 10.B. of Schedule D.

**:CTION 10.A. *Control Persons***

No Information Filed

**:CTION 10.B. *Control Person* Public Reporting Companies**

No Information Filed

**:m 11 Disclosure Information**

this Item, we ask for information about your disciplinary history and the disciplinary history of all your *advisory affiliates*. We use this informatio ɔplication for registration, to decide whether to revoke your registration or to place limitations on your activities as an investment adviser, and tc ıcus on during our on-site examinations. One event may result in "yes" answers to more than one of the questions below. In accordance with G ıd "your" include the *filing adviser* and all *relying advisers* under an *umbrella registration*.

ɔur *advisory affiliates* are: (1) all of your current *employees* (other than *employees* performing only clerical, administrative, support or similar fur ɜrtners, or directors (or any *person* performing similar functions); and (3) all *persons* directly or indirectly *controlling* you or *controlled* by you. If y ɜpartment or division" (SID) of a bank, see the Glossary of Terms to determine who your *advisory affiliates* are.

*you are registered or registering with the SEC or if you are an exempt reporting adviser, you may limit your disclosure of any event listed in Iten le event. If you are registered or registering with a state, you must respond to the questions as posed; you may, therefore, limit your disclosure t ɾent only in responding to Items 11.A.(1), 11.A.(2), 11.B.(1), 11.B.(2), 11.D.(4), and 11.H.(1)(a). For purposes of calculating this ten-year period, ·der, judgment, or decree was entered, or the date any rights of appeal from preliminary orders, judgments, or decrees lapsed.*

ɔu must complete the appropriate Disclosure Reporting Page ("DRP") for "yes" answers to the questions in this Item 11.

ʼo any of the events below involve you or any of your *supervised persons*?

<u>or "yes" answers to the following questions, complete a Criminal Action DRP:</u>

. In the past ten years, have you or any *advisory affiliate*:

(1) been convicted of or pled guilty or nolo contendere ("no contest") in a domestic, foreign, or military court to any *felony*?

(2) been *charged* with any *felony*?

*If you are registered or registering with the SEC, or if you are reporting as an exempt reporting adviser, you may limit your response to Item pending.*

. In the past ten years, have you or any *advisory affiliate*:

(1) been convicted of or pled guilty or nolo contendere ("no contest") in a domestic, foreign, or military court to a *misdemeanor* involving: in *related* business, or any fraud, false statements, or omissions, wrongful taking of property, bribery, perjury, forgery, counterfeiting, extor commit any of these offenses?

(2) been *charged* with a *misdemeanor* listed in Item 11.B.(1)?

(2) ever *found* you or any *advisory affiliate* to have been *involved* in a violation of *investment-related* regulations or statutes?

(3) ever *found* you or any *advisory affiliate* to have been a cause of an *investment-related* business having its authorization to do business revoked, or restricted?

(4) in the past ten years, entered an *order* against you or any *advisory affiliate* in connection with an *investment-related* activity?

(5) ever denied, suspended, or revoked your or any *advisory affiliate's* registration or license, or otherwise prevented you or any *advisory a* associating with an *investment-related* business or restricted your or any *advisory affiliate's* activity?

. Has any *self-regulatory organization* or commodities exchange ever:

(1) *found* you or any *advisory affiliate* to have made a false statement or omission?

(2) *found* you or any *advisory affiliate* to have been *involved* in a violation of its rules (other than a violation designated as a "*minor rule vio* by the SEC)?

(3) *found* you or any *advisory affiliate* to have been the cause of an *investment-related* business having its authorization to do business de restricted?

(4) disciplined you or any *advisory affiliate* by expelling or suspending you or the *advisory affiliate* from membership, barring or suspendin from association with other members, or otherwise restricting your or the *advisory affiliate's* activities?

. Has an authorization to act as an attorney, accountant, or federal contractor granted to you or any *advisory affiliate* ever been revoked or su

i. Are you or any *advisory affiliate* now the subject of any regulatory *proceeding* that could result in a "yes" answer to any part of Item 11.C., 11.

---

or "yes" answers to the following questions, complete a Civil Judicial Action DRP:

I. (1) Has any domestic or foreign court:

(a) in the past ten years, *enjoined* you or any *advisory affiliate* in connection with any *investment-related* activity?

(b) ever *found* that you or any *advisory affiliate* were *involved* in a violation of *investment-related* statutes or regulations?

(c) ever dismissed, pursuant to a settlement agreement, an *investment-related* civil action brought against you or any *advisory affiliate financial regulatory authority*?

(2) Are you or any *advisory affiliate* now the subject of any civil *proceeding* that could result in a "yes" answer to any part of Item 11.H.(1)?

---

**m 12 Small Businesses**

ne SEC is required by the Regulatory Flexibility Act to consider the effect of its regulations on small entities. In order to do this, we need to dete mall business" or "small organization" under rule 0-7.

nswer this Item 12 only if you are registered or registering with the SEC **and** you indicated in response to Item 5.F.(2)(c) that you have regulato an $25 million. You are not required to answer this Item 12 if you are filing for initial registration as a state adviser, amending a current state re ate registration.

or purposes of this Item 12 only:

- Total Assets refers to the total assets of a firm, rather than the assets managed on behalf of *clients*. In determining your or another *persc* assets shown on a current balance sheet (but use total assets reported on a consolidated balance sheet with subsidiaries included, if tl
- *Control* means the power to direct or cause the direction of the management or policies of a *person*, whether through ownership of secur *person* that directly or indirectly has the right to vote 25 percent or more of the voting securities, or is entitled to 25 percent or more of the to *control* the other *person*.

---

. Did you have total assets of $5 million or more on the last day of your most recent fiscal year?

*"yes," you do not need to answer Items 12.B. and 12.C.*

amend this information.

Direct Owners and Executive Officers. List below the names of:

(a) each Chief Executive Officer, Chief Financial Officer, Chief Operations Officer, Chief Legal Officer, Chief Compliance Officer(Chief Complia registered or applying for registration and cannot be more than one individual), director, and any other individuals with similar status or fu

(b) if you are organized as a corporation, each shareholder that is a direct owner of 5% or more of a class of your voting securities, unless yo company subject to Section 12 or 15(d) of the Exchange Act);

Direct owners include any *person* that owns, beneficially owns, has the right to vote, or has the power to sell or direct the sale of, 5% or m For purposes of this Schedule, a *person* beneficially owns any securities: (i) owned by his/her child, stepchild, grandchild, parent, steppa mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, sharing the same residence; or (ii) that he/she h through the exercise of any option, warrant, or right to purchase the security.

(c) if you are organized as a partnership, all general partners and those limited and special partners that have the right to receive upon disso of your capital;

(d) in the case of a trust that directly owns 5% or more of a class of your voting securities, or that has the right to receive upon dissolution, or capital, the trust and each trustee; and

(e) if you are organized as a limited liability company ("LLC"), (i) those members that have the right to receive upon dissolution, or have contri (ii) if managed by elected managers, all elected managers.

Do you have any indirect owners to be reported on Schedule B? ○ Yes ⦿ No

In the DE/FE/I column below, enter "DE" if the owner is a domestic entity, "FE" if the owner is an entity incorporated or domiciled in a foreign cc officer is an individual.

Complete the Title or Status column by entering board/management titles; status as partner, trustee, sole proprietor, elected manager, share shareholders or members, the class of securities owned (if more than one is issued).

Ownership codes are: NA - less than 5% | B - 10% but less than 25% | D - 50% but less than 75%
A - 5% but less than 10% | C - 25% but less than 50% | E - 75% or more

(a) In the *Control Person* column, enter "Yes" if the *person* has *control* as defined in the Glossary of Terms to Form ADV, and enter "No" if the under this definition, most executive officers and all 25% owners, general partners, elected managers, and trustees are *control persons*.

(b) In the PR column, enter "PR" if the owner is a public reporting company under Sections 12 or 15(d) of the Exchange Act.

(c) Complete each column.

| JLL LEGAL NAME (Individuals: Last Name, First ame, Middle Name) | DE/FE/I | Title or Status | Date Title or Status Acquired MM/YYYY | Ownership Code | *Control Person* | PR | *CRD* No. If Noi No. or Employ |
|---|---|---|---|---|---|---|---|
| LARK, JASON, RAY | I | CCO, CEO | 11/2006 | E | Y | N | 2578633 |

**:hedule B**

**ıdirect Owners**

. Complete Schedule B only if you are submitting an initial application or report. Schedule B asks for information about your indirect owners; y which asks for information about your direct owners. Use Schedule C to amend this information.

. Indirect Owners. With respect to each owner listed on Schedule A (except individual owners), list below:

(a) in the case of an owner that is a corporation, each of its shareholders that beneficially owns, has the right to vote, or has the power to se class of a voting security of that corporation;

For purposes of this Schedule, a *person* beneficially owns any securities: (i) owned by his/her child, stepchild, grandchild, parent, stepp mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, sharing the same residence; or (ii) that he/she through the exercise of any option, warrant, or right to purchase the security.

(b) in the case of an owner that is a partnership, all general partners and those limited and special partners that have the right to receive up 25% or more of the partnership's capital;

(c) in the case of an owner that is a trust, the trust and each trustee; and

(d) in the case of an owner that is a limited liability company ("LLC"), (i) those members that have the right to receive upon dissolution, or ha LLC's capital, and (ii) if managed by elected managers, all elected managers.

. Continue up the chain of ownership listing all 25% owners at each level. Once a public reporting company (a company subject to Sections 1: reached, no further ownership information need be given.

. In the DE/FE/I column below, enter "DE" if the owner is a domestic entity, "FE" if the owner is an entity incorporated or domiciled in a foreign c individual.

. Complete the Status column by entering the owner's status as partner, trustee, elected manager, shareholder, or member; and for sharehol

:hedule R

No Information Filed

ꞦP Pages

RIMINAL DISCLOSURE REPORTING PAGE (ADV)

o Information Filed

EGULATORY ACTION DISCLOSURE REPORTING PAGE (ADV)

o Information Filed

IVIL JUDICIAL ACTION DISCLOSURE REPORTING PAGE (ADV)

o Information Filed

rbitration DRPs

o Information Filed

ond DRPs

o Information Filed

udgment/Lien DRPs

o Information Filed

irt 1B Item 1 - State Registration

**ou must complete this Part 1B only if you are applying for registration, or are registered, as an investment adviser with any of the *state se***

:omplete this Item 1 if you are submitting an initial application for state registration or requesting additional state registration(s). Check the box( ubmitting this application. If you are already registered with at least one state and are applying for registration with an additional state or states 'hich you are applying for registration. Do not check the boxes next to the states in which you are currently registered or where you have an app

urisdictions

| | | | |
|---|---|---|---|
| ☐ AL | ☐ IL | ☐ NE | ☐ : |
| ☐ AK | ☐ IN | ☐ NV | ☐ : |
| ☐ AZ | ☐ IA | ☐ NH | ☐ |
| ☐ AR | ☐ KS | ☐ NJ | ☐ |
| ☐ CA | ☐ KY | ☐ NM | ☐ |
| ☑ CO | ☐ LA | ☐ NY | ☐ |
| ☐ CT | ☐ ME | ☐ NC | ☐ |

Number and Street 1:

Number and Street 2:

City: State: Country: ZIP+4/Postal Code:

Email address, if available:

If this address is a private residence, check this box: ☐

. Bond/Capital Information, if required by your *home state*

(1) Name of Issuing Insurance Company:

(2) Amount of Bond:

$ .00

(3) Bond Policy Number:

(4) If required by your home state, are you in compliance with your home state's minimum capital requirements?

**irt 1B - Disclosure Questions**

**OND DISCLOSURE**

or "yes" answers to the following question, complete a Bond DRP.

C. Has a bonding company ever denied, paid out on, or revoked a bond for you, any *advisory affiliate*, or any *management person*?

**UDGMENT/LIEN DISCLOSURE**

or "yes" answers to the following question, complete a Judgment/Lien DRP.

D. Are there any unsatisfied judgments or liens against you, any *advisory affiliate*, or any *management person*?

**RBITRATION DISCLOSURE**

or "yes" answers to the following questions, complete an Arbitration DRP.

E. Are you, any *advisory affiliate*, or any *management person* currently the subject of, or have you, any *advisory affiliate*, or any *managemer* an arbitration claim alleging damages in excess of $2,500, involving any of the following:

(1) any investment or an *investment-related* business or activity?

(2) fraud, false statement, or omission?

(3) theft, embezzlement, or other wrongful taking of property?

(4) bribery, forgery, counterfeiting, or extortion?

(5) dishonest, unfair, or unethical practices?

**IVIL JUDICIAL DISCLOSURE**

or "yes" answers to the following questions, complete a Civil Judicial Action DRP.

F. Are you, any *advisory affiliate*, or any *management person* currently subject to, or have you, any *advisory affiliate*, or any *management pe* civil, *self-regulatory organization*, or administrative *proceeding* involving any of the following:

(1) an investment or *investment-related* business or activity?

(2) fraud, false statement, or omission?

(3) theft, embezzlement, or other wrongful taking of property?

(4) bribery, forgery, counterfeiting, or extortion?

(5) dishonest, unfair, or unethical practices?

**irt 1B - Business Information**

i. Other Business Activities

$2,500,001 to $5,000,000

More than $5,000,000

If securities investments are over $5,000,000, how much? (round to the nearest $1,000,000)

If non-securities investments are over $5,000,000, how much? (round to the nearest $1,000,000)

*Custody*

(1) Advisory Fees

Do you withdraw advisory fees directly from your *clients'* accounts? If you answered "yes", respond to the following:

(a) Do you send a copy of your invoice to the custodian or trustee at the same time that you send a copy to the *client*?

(b) Does the custodian send quarterly statements to your *clients* showing all disbursements for the custodian account, including the

(c) Do your *clients* provide written authorization permitting you to be paid directly for their accounts held by the custodian or trustee?

(2) Pooled Investment Vehicles and Trusts

(a) (i) Do you or a *related person* act as a general partner, managing member, or person serving in a similar capacity, for any poolec which you are the adviser to the pooled investment vehicle, or for which you are the adviser to one or more of the investors in t vehicle? If you answered "yes", respond to the following:

(a) (ii) As the general partner, managing member, or person serving in a similar capacity, have you or a *related person* engaged any authority permitting each direct payment or any transfer of funds or securities from the account of the pooled investment vehic

Attorney

Independent certified public accountant

Other independent party

Describe the independent party:

*For purposes of this Item 2I.2(a), "Independent party" means a person that: (A) is engaged by the investment adviser to act as a g expenses and capital withdrawals from the pooled investment; (B) does not control and is not controlled by and is not under comm adviser; (C) does not have, and has not had within the past two years, a material business relationship with the investment adviser agree to have material business relations or commonly controlled relations with an investment adviser for a period of two years af in an independent party agreement.*

(b) Do you or a *related person* act as investment adviser and a trustee for any trust, or act as a trustee for any trust in which your advis of the trust?

(3) Do you require the prepayment of fees of more than $500 per *client* and for six months or more in advance?

If you are organized as a sole proprietorship, please answer the following:

(1) (a) Have you passed, on or after January 1, 2000, the Series 65 examination?

(b) Have you passed, on or after January 1, 2000, the Series 66 examination and also passed, at any time, the Series 7 examina

(2) (a) Do you have any investment advisory professional designations?

*If "no",you do not need to answer Item 2.J(2)(b).*

(b) I have earned and I am in good standing with the organization that issued the following credential:

- ☐ Certified Financial Planner ("CFP")
- ☐ Chartered Financial Analyst ("CFA")
- ☐ Chartered Financial Consultant ("ChFC")
- ☐ Chartered Investment Counselor ("CIC")
- ☐ Personal Financial Specialist ("PFS")
- ☐ None of the above

(3) Your Social Security Number:

If you are organized other than as a sole proprietorship, please provide the following:

(1) Indicate the date you obtained your legal status. Date of formation: 08/01/2007

(2)

## \ppointment of Agent for Service of Process

3y signing this Form ADV Execution Page, you, the undersigned adviser, irrevocably appoint the Secretary of State or other legally designated o naintain your *principal office and place of business* and any other state in which you are submitting a *notice filing*, as your agents to receive sei nay accept service on your behalf, of any notice, subpoena, summons, *order* instituting *proceedings*, demand for arbitration, or other process c ;uch service may be made by registered or certified mail, in any federal or state action, administrative *proceeding* or arbitration brought against urisdiction of the United States, if the action, *proceeding*, or arbitration (a) arises out of any activity in connection with your investment advisory urisdiction of the United States, and (b) is *founded*, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exc \ct of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these acts, or (ii naintain your *principal office and place of business* or of any state in which you are submitting a *notice filing*.

## 3ignature

, the undersigned, sign this Form ADV on behalf of, and with the authority of, the investment adviser. The investment adviser and I both certify, ı ›f the United States of America, that the information and statements made in this ADV, including exhibits and any other information submitted, ε ;igning this Form ADV Execution Page as a free and voluntary act.

certify that the adviser's books and records will be preserved and available for inspection as required by law. Finally, I authorize any *person* ha ›ooks and records to make them available to federal and state regulatory representatives.

| | |
|---|---|
| 3ignature:<br>IASON R CLARK | Date: MM/DD/YYYY<br>09/24/2021 |
| ᵓrinted Name:<br>IASON R CLARK | Title:<br>OWNER |
| \dviser *CRD* Number:<br>143777 | |

---

**'ON-RESIDENT INVESTMENT ADVISER EXECUTION PAGE**

'ou must complete the following Execution Page to Form ADV. This execution page must be signed and attached to your initial submission of F ımendments.

## I. Appointment of Agent for Service of Process

3y signing this Form ADV Execution Page, you, the undersigned adviser, irrevocably appoint each of the Secretary of the SEC, and the Secretar ›fficer, of any other state in which you are submitting a *notice filing*, as your agents to receive service, and agree that such persons may accept ;ubpoena, summons, *order* instituting *proceedings*, demand for arbitration, or other process or papers, and you further agree that such service ɔertified mail, in any federal or state action, administrative *proceeding* or arbitration brought against you in any place subject to the jurisdiction c ›*roceeding* or arbitration (a) arises out of any activity in connection with your investment advisory business that is subject to the jurisdiction of tl lirectly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, tl he Investment Advisers Act of 1940, or any rule or regulation under any of these acts, or (ii) the laws of any state in which you are submitting a /

## ?. Appointment and Consent: Effect on Partnerships

f you are organized as a partnership, this irrevocable power of attorney and consent to service of process will continue in effect if any partner w ›artnership, provided that the admission or withdrawal does not create a new partnership. If the partnership dissolves, this irrevocable power c ɜffect for any action brought against you or any of your former partners.

## }. *Non-Resident* Investment Adviser Undertaking Regarding Books and Records

3y signing this Form ADV, you also agree to provide, at your own expense, to the U.S. Securities and Exchange Commission at its principal offi Regional or District Office of the Commission, or at any one of its offices in the United States, as specified by the Commission, correct, current,

**TATE-REGISTERED INVESTMENT ADVISER EXECUTION PAGE**

'ou must complete the following Execution Page to Form ADV. This execution page must be signed and attached to your initial application for s o registration.

## 1. Appointment of Agent for Service of Process

3y signing this Form ADV Execution Page, you, the undersigned adviser, irrevocably appoint the legally designated officers and their successoı 'our *principal office and place of business* and any other state in which you are applying for registration or amending your registration, as your a hat such persons may accept service on your behalf, of any notice, subpoena, summons, *order* instituting *proceedings*, demand for arbitration urther agree that such service may be made by registered or certified mail, in any federal or state action, administrative *proceeding* or arbitratic subject to the jurisdiction of the United States, if the action, *proceeding*, or arbitration (a) arises out of any activity in connection with your invest o the jurisdiction of the United States, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securitie ndenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these which you maintain your *principal office and place of business* or of any state in which you are applying for registration or amending your registr

## 2. State-Registered Investment Adviser Affidavit

f you are subject to state regulation, by signing this Form ADV, you represent that, you are in compliance with the registration requirements of t principal place of business and are in compliance with the bonding, capital, and recordkeeping requirements of that state.

## Signature

, the undersigned, sign this Form ADV on behalf of, and with the authority of, the investment adviser. The investment adviser and I both certify, ı of the United States of America, that the information and statements made in this ADV, including exhibits and any other information submitted, a signing this Form ADV Execution Page as a free and voluntary act.

certify that the adviser's books and records will be preserved and available for inspection as required by law. Finally, I authorize any *person* ha books and records to make them available to federal and state regulatory representatives.

Date: MM/DD/YYYY
09/24/2021

Adviser *CRD* Number:
143777

Signature:
JASON R CLARK

Printed Name:
JASON R CLARK

Title:
OWNER

# EXHIBIT C

EXHIBITS TO RESPONDENT CHARLES SCHWAB & CO., INC.'S
ANSWER TO AMENDED STATEMENT OF CLAIM

charles SCHWAB

April 2, 2021

Via email: jason@clarkbrothersinvestments.com

& UPS Express:

Clark Brothers Investments
2851 S. Parker Rd
#510
Aurora, CO 80014

Re: **Notice of Termination—Investment Advisor Service Agreement**
Master Account: ****-*955

Dear Mr. Clark:

Charles Schwab & Co., Inc. ("Schwab") has elected to terminate the Investment Advisor Service Agreement ("IASA") with Clark Brothers Investments ("CBI"), effective July 6, 2021 ("***Effective Date***"). On the Effective Date, Schwab will remove any authorizations held by CBI and its principals, employees and agents with respect to accounts at Schwab, including but not limited to the accounts identified in the Schedule attached to a copy of this letter you will receive by courier delivery.

**How will this decision impact my firm's administration of client accounts at Schwab?**

(1) On the Effective Date, pursuant to the terms of the IASA between CBI and Schwab, Schwab will discontinue its investment management fee payment services to CBI with respect to any and all CBI client accounts. This means that CBI will no longer be able to draw fees directly from client accounts through the Schwab investment management fee payment system.
(2) On the Effective Date, Schwab will close your Investment Advisor Master account(s) with Schwab and turn off your firm's access to Schwab Advisor Center. Before the Effective Date, CBI should take the necessary steps to collect any client information it may require.
(3) **Effective Immediately**, Schwab will no longer accept or process new account opening documentation for clients of CBI. Additionally, Schwab will no longer accept or process documentation to link existing Schwab accounts to the master account(s) of CBI.
(4) Any account transfers completed on or before the Effective Date will not be charged a Schwab TOA-Out fee.

**What about my personal accounts?**

The personal accounts of each of the principals of CBI held at Schwab must be moved to a broker/dealer or other financial institution of their choosing before the Effective Date.

Schwab account holders whose accounts are currently linked to your firm's master accounts will receive notice by way of regular mail regarding this change. A courtesy copy of that mailing is included.

Sincerely,
Schwab Advisor Services

Schwab Advisor Services serves independent investment advisors and includes the custody, trading and support services of Schwab. Independent investment advisors are not owned by, affiliated with or supervised by Schwab.
©2020 Charles Schwab & Co., Inc. ("Schwab"). All rights reserved. Member SIPC.

April 2, 2021

Client Name
Client Address Line 1
Client Address Line 2

Re: Schwab Account: XXXXXXXX

Dear Investor:

We are writing to inform you the Investment Advisor Service Agreement ("IASA") between Clark Brothers Investments ("CBI") and Charles Schwab & Co., Inc. ("Schwab") will terminate effective July 6, 2021 ("***Effective Date***"). As of the Effective Date, Schwab will no longer honor any authorizations held by CBI and its principals, employees and agents with respect to your Schwab account identified above.

We regret the inconvenience this change may cause you and encourage you to review the information below.

**Frequently Asked Questions**

**What steps do I need to take if I want CBI to continue managing my account?**

If you wish for CBI or its representative(s) to continue managing your brokerage account, you will need to transfer your account to a broker-dealer or custodian other than Schwab before the Effective Date. You may do so by completing the required documentation with CBI's assistance or by contacting our Transfer of Accounts team directly at 1-800-435-4000.

**Will my account still be enrolled with Schwab Advisor Services?**

No. After the Effective Date, your account will be considered a retail account. Please see the enclosed Client Relationship Summaries and Best Interest Disclosure.

**If I decide to maintain my account at Schwab after the Effective Date, how will my account be impacted?**

If you choose to maintain your account at Schwab after the Effective Date, the following changes will occur:

- Your statements will no longer have CBI listed on them and copies will no longer be sent to CBI.
- We will continue to provide you with brokerage services in accordance with the terms and conditions set forth in this letter and those contained in your Schwab Account Agreement(s); however, your account will no longer be enrolled with Schwab Advisor Services.
- Your account will also become subject to the *Charles Schwab Pricing Guide for Individual Investors* (a copy of which is enclosed), including all commissions and fees, such as those charged for transferring out assets.
- Please note that your account was previously exempt from some of these terms, conditions and fees, so you should consult your Account Agreement and the *Pricing Guide* for complete details.
- If you participate in Dollar Cost Averaging or Automated Periodic Distributions, you will need to re-establish those programs directly with Schwab.

**What will happen to any trades that are pending on the Effective Date?**

- If, as of the Effective Date, your account has any pending trades that are noted as "GTC" or "Good until cancelled," those trades will be executed and settled unless you personally take the steps necessary to cancel those pending trades. You should contact your Investment Advisor concerning pending trades in your account.

**Will I still have access to Investment Advisor-only investment alternatives?**

- You will not be able to access certain Investment Advisor-only investment alternatives that may have previously been available; however, you will have access to investment products and other services available to Schwab retail customers. If you continue to maintain your account at Schwab after the Effective Date, you can discuss alternatives to these programs with a Schwab representative.

**I have an account on the Schwab Advisor Services™ Managed Account Platform. What happens to that account?**

- If your account is on the Schwab Advisor Services™ Managed Account Platform, authorizations previously granted to a money manager will be terminated and the money manager will be removed.

**Who can I call if I have questions?**

If you have any questions or need help with your account at Schwab please contact Schwab Alliance at **1-800-515-2157** between the hours of 8:30 a.m. EDT and 7:00 p.m. EDT. At Schwab we take our obligations as the custodian of client accounts very seriously, and we strive to provide the best service we can.

Sincerely,
Schwab Advisor Services
Enclosure

Schwab Advisor Services serves independent investment advisors and includes the custody, trading and support services of Schwab. Independent investment advisors are not owned by, affiliated with or supervised by Schwab.

©2020 Charles Schwab & Co., Inc. ("Schwab"). All rights reserved. Member SIPC.

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 633 West Fifth Street, Suite 1900, Los Angeles, California 90071.

On December 14, 2021, I served true copies of the following document(s) described as **RESPONDENT'S ANSWER TO AMENDED STATEMENT OF CLAIM** on the interested parties in this action as follows:

Jason R. Clark
Clark Brothers Investments/Clark Brothers, Inc.
2851 S. Parker Rd. #510
Aurora, CO 80014
720.255.5711
iason@clarkbrothersinvestments.com

☒ **BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with the practice of Steptoe & Johnson LLP for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid. I am a resident or employed in the county where the mailing occurred. The envelope was placed in the mail at Los Angeles, California.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on December 14, 2021, at Los Angeles, California.

/s/ Melissa Hernandez
MELISSA HERNANDEZ

# Supporting Document

# FINRA Arbitration Panel Protective Order

# FINRA DISPUTE RESOLUTION

| | |
|---|---|
| In the Matter of the Arbitration Between<br><br>CLARK BROTHERS, INC. d/b/a CLARK BROTHERS INVESTMENTS,<br><br>Claimant,<br><br>v.<br><br>CHARLES SCHWAB & CO., INC.<br><br>Respondent. | Arb. No.: 20-02439<br><br>**ORDER GRANTING RESPONDENT CHARLES SCHWAB & CO., INC.'S MOTION FOR PROTECTIVE ORDER REGARDING CONFIDENTIALITY AND WITNESS TESTIMONY; PROTECTIVE ORDER** |

A pretrial conference was held August 23, 2022 through the Zoom conference system to review discovery issues, in particular Respondent's Motion for Protective Order Regarding Confidentiality and Witness Testimony. Mr. Jason Clark appeared pro-se on behalf of the Claimant and his arguments were heard, and Ms. Robyn Crowther appeared on behalf of the Respondent and her arguments were heard. Other persons representing Respondent attended but did not offer argument. The parties submitted briefs before the conference. Having considered Respondent Charles Schwab & Co., Inc.'s ("Schwab") Motion for Protective Order Regarding Confidentiality and Witness Testimony and all arguments, papers, and submissions regarding the Motion, and it appearing that there is good cause, the FINRA Arbitration Panel, through the Panel chair, GRANTS the requested relief.

The Panel enters the Protective Order as set forth below, which shall take effect immediately upon issuance and the violation of which may be punishable by money damages, sanctions, or such other or additional relief as appropriate, and ORDERS that:

1. Claimant Clark Brothers Investments ("CBI") shall be precluded from calling Schwab employees Bernie J. Clark, Charles R. Schwab, and Walter W. Bettinger II to testify or otherwise appear in any way at the arbitration hearing in this matter.
2. CBI may only call the following Schwab employees as witnesses at the hearing:
   A. Kara Suro

B. Chris Valoria

C. Max Levine

D. Lisa Maxwell

3. To protect the confidentiality of information and documents that Parties have requested, produced, and/or anticipate producing that reflect material of a sensitive, proprietary and/or confidential nature, the Parties shall comply with the restrictions as set forth below.

A. Scope:

i. This Protective Order governs the treatment of all information, documents, and things within the scope of discovery in the above-referenced matter ("Discovery Material"), including but not limited to all documents and/or information provided in response to discovery requests, live testimony, and other written, recorded, computerized, electronic, or graphic matter, and all copies, summaries, abstracts, and indices thereof, produced by any party to this action or necessary non-party as described below.

B. Confidential Discovery Material:

i. Any party to this action may designate as "Confidential" any Discovery Material, whether in printed or electronic form, produced by the party that it reasonably considers to be private, confidential, a trade secret, commercially sensitive, and/or proprietary in nature ("Confidential Material").

ii. Any party may designate any Discovery Material as Confidential Material by stamping or otherwise affixing the legend "CONFIDENTIAL" upon the documents and things designated, or for information produced in a non-documentary form, the party may affix the legend "CONFIDENTIAL" in a prominent place on the exterior of the container in which the information is stored.

iii. The designating party must have a good-faith basis for designating Discovery Material as confidential.

C. Security of Confidential Material

i. Confidential Material shall be maintained securely and be reasonably safeguarded from disclosure by the Parties and/or their employees, representatives, and agents.

D. Use of Confidential Material

i. All documents, information and things designated as confidential pursuant to this Paragraph, and any and all summaries, transcripts, indices, and/or lists of Confidential Material, shall not be disclosed, published, disseminated, exploited, or otherwise used in any manner other than for purposes of the Arbitration.

ii. Confidential Material and all materials specified above shall not be used, either directly or indirectly, for any other purpose and/or in any other proceeding.

iii. Confidential Material shall be viewed by or otherwise disclosed only to:

a. Parties to this Arbitration and their officers, employees, related corporate entities, insurers, and reinsurers, if any, who are necessarily involved in connection with the Arbitration of this matter;

b. Counsel and representatives for the Parties and their employees;

c. Expert witnesses or consultants employed by the Parties or their counsel in connection with this Arbitration;

d. Witnesses to this Arbitration during the hearing;

e. Arbitrators in this matter; and

f. Any other person or entity as may be required by law, by order of any court or by any governmental or self-regulatory organization.

E. Permitted Disclosures of Confidential Material:

i. Prior to disclosing any Confidential Material to any persons enumerated above, the disclosing party and/or its counsel/representative must first complete each of the steps detailed below:

a. Inform each such person of: the sensitive nature of such documents and/or information; its designation as Confidential Material; that such materials must be held in strict confidence; and the contents thereof may not, explicitly or implicitly, be revealed or used for any purpose other than preparing for and participating in this Arbitration;

b. Provide any such person with copies of the Protective Order; and

c. Instruct such person to execute the Declaration to be Bound attached hereto as Appendix A.

ii. Disclosing party shall promptly notify the producing party of such disclosure, and within two (2) calendar days file a true and correct copy of the executed Declaration with the Arbitration Panel through the FINRA Dispute Resolution Portal and with each other party via electronic mail.

F. Inadvertent Disclosure:

i. A Party's inadvertent production of any documents and things designate as Confidential Material and/or protected by any privilege or immunity (including but not limited to the attorney-client privilege and the work

product doctrine) is not intended to be, and shall not be construed to be, a waiver of any such privilege or protection.

ii. Any Confidential Material and/or privileged documents and things that are inadvertently produced shall be promptly returned to the producing party, and no copies shall be kept by the receiving party.

G. Disputing any Confidentiality Designation:

i. Consistent with the confidential nature of arbitration proceedings, the Parties are entitled to a broad construction of confidentiality which shall be interpreted liberally in favor of the protection of the material designated as Confidential. However, this shall be without prejudice to the Parties' rights to contest the confidential or privileged status of any documents or things produced.

ii. If a Party disputes the designation of any Confidential Material, counsel for that party shall promptly provide written notice of such objection to counsel/representatives for the designating party of such objection. Such writing shall identify the document(s) and/or information to which the party is objecting and shall specify the grounds for the objection. Parties shall first try to resolve the dispute cooperatively through good faith informal discussions, and if they are unable to do so the designating party shall raise the issue with the Arbitration Panel.

iii. During this process, the disputed documents and/or information shall be presumed to be confidential and shall remain subject to the provisions of the Protective Order, pending a contrary finding by the Arbitration Panel.

H. <u>Conclusion of Arbitration and Any Related Proceedings:</u>

i. Within fourteen (14) days of the conclusion of this case (including any court proceedings between the Parties that may arise from this Arbitration), each Party and/or their counsel or representatives shall destroy and/or return all Confidential Material to counsel for the other Party upon written request.

ii. Counsel for the receiving party may keep one copy of the documents for counsel's records, subject to the terms of the Protective Order and each disclosure prohibition herein.

iii. Unless otherwise agreed to in writing by the Parties or ordered by the Arbitration Panel, this Protective Order shall remain enforceable notwithstanding the final resolution of the Arbitration.

I. <u>No Admission or Waiver</u>:

i. Nothing in this Agreement shall be construed as an agreement, admission, and/or waiver regarding:

a. The evidentiary value of any Discovery Material or Confidential Material;

b. The correctness or truth of any allegation made or position taken relative to any Discovery Material or Confidential Material or the contents thereof;

c. The authenticity, competency, relevance, or materiality of any Discovery Material or Confidential Material; and/or

d. any objections asserted or otherwise available to be asserted by any party as to the discoverability and/or admissibility of any Discovery Material or Confidential Material.

**IT IS SO ORDERED.**

Date: August 23, 2022

By: Langdon T. Owen, Jr.

Langdon T. Owen, Jr., Panel Chair

*Appendix A*

**DECLARATION TO BE BOUND**
**<u>BY THE PROTECTIVE ORDER</u>**

I, ____________________________ , hereby declare, under penalty of perjury, that:

I am over the age of twenty-one years, of sound mind and capable of making this declaration.

I have read the Protective Order in the above-captioned matter, understand its terms and agree to be fully bound by it and hereby submit to the jurisdiction of the FINRA Arbitration Panel for purpose of enforcement of this Protective Order.

I understand that any violation of the terms of the Protective Order may be punishable by money damages, sanctions, or such other or additional relief as deemed appropriate by the Arbitration Panel.

I will hold in confidence, and will not disclose to anyone not qualified under the Protective Order, any "Discovery Material" (as that term is defined in the Protective Order) designated as "Confidential Material" (as that term is defined in the Agreed Protective Order), or any summaries, abstracts, or indices of Confidential Material disclosed to me, and I shall utilize Confidential Material only for purposes of the Arbitration, and not for any other purpose including, without limitation, any business, proprietary, commercial, governmental, or unrelated litigation.

At the conclusion of this matter, I will promptly return to whomever provided me with such Confidential Material any and all copies, summaries, abstracts, or indices thereof, which came into my possession, together with documents or materials of any type or nature prepared by me relating to or derived there from.

| ____________________ | ____________________ |
|---|---|
| Date | Signature |

# Supporting Document

# CBI Gravamen of Claims and Stipulations of Fact FINRA Arbitration Hearing

**OPENING STATEMENT FINRA Arb Hearing CBI v. Schwab Case #21-02439**

My name is Jason Clark Owner and Founder of Clark Brothers Investments/CBI. I graduated in the top 5% of my class of 1992 with a degree in business finance and systems engineering from the United States Military Academy at WEST POINT, served my time in the United States Army, and then started my own investment firm, Clark Brothers Investments, after having studied Warren Buffett since I was 16 (so 36 years). **I have NEVER lied, stolen, or cheated once in MY ENTIRE LIFE**, to include during this **ENTIRE** arbitration process. I am 52 years old. My father was an Army Surgeon who practiced under General Malone who was the first two-star medical General in the United States Army and to whom the Cadet Health clinic at WEST POINT is named. The cadet honor code of which I still live by to this day states: "A cadet will not lie, cheat, or steal, **nor tolerate** those who do." The actions of Schwab and now STJ are intolerable to me, my family, and our values. These actions WILL NOT go unchecked. I knew immediately, IMMEDIATLEY, Schwab terminating CBI IASA was WRONG. I have full faith and trust in The United States of America legal systems, laws, and rules – to include FINRA. I/Jason Clark/CBI have done ABSOLUTLEY NOTHING WRONG. And I/Jason Clark/CBI have ALL the facts and evidence to prove that Charles SCHWAB & Co., INC. got EVERYTHING WRONG. **EVERYTHING!**

All that said. This too must be said.

1. There is no FINRA RULE that FORCES a pro se claimant/me/CBI/Jason Clark to sign an NDA/Confidentiality Agreement/Protective Order/GAG order to THEN receive discovery, documents, and depose witnesses. This is a FACT, not an opinion. As of the start of this Trial, pro se claimant Jason Clark/CBI/myself DOES NOT have ANY discovery, documents, or witnesses from opposing counsel STJ/Charles Schwab. NONE. I/Jason Clark/CBI have given opposing counsel STJ/Schwab **EVERYTHING** in my possession on this case to include my personal handwritten notes and personal medical information. NOT providing discovery is against the LAW and against FINRA RULES, guidelines, and procedures; AND everyone in this room knows this. This too is a FACT, not an opinion. This also shows Bias, evident partiality, undue means, and Manifest disregard for the Law – all of which are grounds to vacate a FINRA award according to FINRA rules, guidelines, and procedures.
2. Asking Bernie Clark (who made the decision on behalf of Schwab to TERMINATE CBI IASA) what happened**?** DOES NOT have any adverse business effects or attack him personally both of which are **REQUIRED** by FINRA RULES to issue a Protective Order in favor of Bernie Clark/Schwab/STJ. This trial is by FINRA RULE closed to the public

until an Award is issued, then said Award is made public. This is also a non-debatable FACT. There is NOTHING confidential, proprietary, or personal about that very simple, straightforward, RELEVANT, and MATERIAL question. Also, a FACT, not an opinion.

3. I/CBI/Jason Clark being a pro se claimant **DOES NOT** change the Law, FINRA Rules, guidelines, or procedures. This is a FACT, not an opinion.
4. Yet, despite **ALL OF THE ABOVE FACTS**, FINRA/FINRA arbitration panel specifically Mr. Own ruled in favor of Bernie Clark/Schwab/STJ. In further disregard for the Law in general, FINRA RULES, guidelines, and procedures FINRA/FINRA Arbitration Panel has completely and totally ignored ALL of STJ/Schwab **LIES**, deception, bribes, bad faith legal tactics, deceitful legal tactics, undue means, manifest disregard of the law, bullying, threatening, and intimidating a pro se claimant, thus allowing **THE LARGEST AND MOST POWERFUL SECURITIES LITIGATION FIRM IN THE COUNTRY (STJ)** REPRESENTING **THE LARGEST AND MOST POWERFUL WALL STREET FINANCIAL SERVICES FIRM IN THE COUNTRY (Charles SCHWAB)** an unfair competitive Business AND Legal advantage without reasonable cause. These too are FACTS, not opinions.
5. Now, I/Jason Clark/CBI pro se claimant, ASK all of YOU before this panel does ANY of that sound like .... **"Integrity" "Fairness" "Honesty" "Investor Protection" "Vibrant Market" AND "Confidence"** FOR **"EVERYONE."** As is so stated and quoted ALL OVER FINRA's web page, marketing materials, and communications to the public and FINRA member firms?

Moving on to the material and relevant FACTS and EVIDENCE of this case:

## Charles SCHWAB & Co. is **WRONG ON EVERYTHING.**

1. No federal tax lien. No exam in 2017. No Customer complaints from exam in 2017. No wire transfers OR loans from customer accounts. **EVERYTHING** on CBI web page is 100% accurate, 100% correct, and 100% FACT backed up by 100% MATH.
2. **Breach of Contract X 3** ***"effective date"*** July 6, 2021, date of notification **April 2, 2021**.

1/IASA Due diligence clause, notified in writing **4/8/2021(breach)**, received **NOTHING.** Still.

2/**Only** "custodian services", Schwab is not "A Regulator", I/Jason Clark/CBI don't work for Schwab. This breach of IASA occurred on **April 2, 2021** prior to ***"effective date"*** July 6, 2021.

3/Tortious interference with contract – Blocked ALL N.A./New Clients 4/2/21-7/6/2021. Breach of Contract occurred on **April 2, 2021** which is prior to ***"effective date"*** July 6, 2021.

3. **Implied Defamation** – As the Judge states in RICHARD W. YOUNG v. ALISA A. YOUNG, 2015, "Defamation by implication is premised **not on direct statements** but on false suggestions, impressions and implications." Award for implied defamation: the difference between the plaintiff's actual earnings and the plaintiff's projected earnings

**but for the defendant's actions.** (**SEE excel spreadsheets**). Schwab actions of sending all the letters and then terminating CBI IASA suggested, implied, and gave the impression of WRONGDOING which then caused MY CBI customers to question my integrity, my trustworthiness, my credibility in handling THEIR money. THIS IS IMPLIED DEFAMATION of Character caused by Schwab's **ACTIONS**, Not My/Jason Clark/CBI actions of not updating my ADV, updating my web page, or changing my fee structure from paper checks to 1% AUM (industry standard). My BIGGEST clients (Mom, Dad, Brother) all testified to this. And, MY BIGGEST ex Customer as well (John and Cara Prann). As well as 18 other customers and who knows how many prospects, referrals or future clients?

4. TRUST – "All comes down to TRUST" SEC Chair Gary Gensler.
5. REPUTATION – "Lose money for the firm, and I will be understanding; lose a shred of reputation for the firm, and I will be ruthless." Warren Buffett
6. **Emotional distress** article and symptoms from defamation.
7. **Tort interference w contract** – Tried Poach/Steal CBI clients (Parents Tom Murray).
8. **Sawtelle v. Waddell & Reed. $25,000,000 Awarded by FINRA arb panel.**

**1**/Sawtelle quit v. CBI terminated. **2**/Sawtelle employee v. Myself/Jason Clark/CBI Owner. **3**/Sawtelle no emotional distress claimed. **4**/Sawtelle kept/retained virtually ALL of his clients. **5**/Difference btw "new" v. "old" customers (lifelong F&F). **6**/Direct Defamation (Sawtelle) v. Implied Defamation (CBI).

9. **Breach of Fiduciary duty** – MY PA & Clark Family accounts. All CBI other clients.
10. Good faith, fair dealings, and full disclosure. **"Only custody services".**
11. Size/Power to gain unfair business & legal advantage. "Undue Means". "Bad Faith".
12. Too Big to Fail bailouts and M/A by Schwab. **293 FINRA Broker Check Red Flags.**
13. FINRA **"Integrity" "Fairness" "Honesty" "Investor Protection" "Vibrant" "Confidence"** FOR **"EVERYONE."**
14. **Intelligent Portfolios** – Schwab FINED by SEC. Tried to My Parents (see Dads Letter).
15. **All the Lies** (19 total). See **FINRA Rule 13501 (stipulations of fact).**

**1**/No federal tax lien = LIE = FACT. **2**/No exam on 10/27/2017 = LIE = FACT. **3**/NO "numerous" customer complaints after 2017 exam = LIE = FACT. **4**/No wire transfers = LIE = FACT. **5**/No loans from customer accounts = LIE = FACT. **6)Multiple** flood locals = LIE = FACT. **7)**"Routine examination" v. "examination for cause" = LIE = FACT. **7)** NDA/Confidentiality Agreement/PO is not a "Gag" order = LIE = FACT. **8)"multiple" engagements** with CBI on NDA = LIE = FACT. **9)**Making **"proposals" & "compromises" over NDA dispute** = LIE = FACT. I spoke with Leah Quadrino once for less than 5 min. (Bribery). 10)"engaging" CBI in NDA dispute v. ultimatum = LIE = FACT. **11)** Asked If I sign NDA, then can I go to press/**sue in Federal court**? Leah Quadrino REFUSED to answer = LIE = FACT. **12)**"CBI has refused to cooperate" = LIE = FACT. Schwab ignored me for 10 months. Schwab WOULD NOT mediate with no valid reason. STJ/Schwab has played the lawyering me/CBI/Jason Clark to death v. focusing on and providing THE FACTS AND THE EVIDENCE in this case. FACT. **13)**"In fact, FINRA Rules .... Encourage" NDA = LIE = FACT. There is

**NO FINRA RULE** requiring I/Jason Clark/CBI sign NDA to then GET discovery! FACT. **14)** Naming key witnesses **"purely to retaliate"** = LIE = FACT. **ALL** originally listed (Charles Schwab, Walt Bettinger, Bernie Clark). **15) "Why"** Leah Quadrino was removed from case**?** See Bribery LIE #8, 9. 16) Robyn Crowther stating on conference call she hasn't lied = LIE = FACT. 17) Robyn Crowther proclaiming in Closing Argument that I/Jason Clark called Kevin Lewis a "liar" is LIE. FACT. I/Jason Clark have never once spoken a single word to Kevin Lewis during this entire process. 18) CBI waiving discovery = LIE = FACT. 19) CBI "threatening" to publish over the internet "confidential/personal information" = LIE = FACT.

16. 7 FINRA RULES BROKEN (12505, 13207, 13501, 13503, 13512, 13513, and 13601). Yet, FINRA/FINRA Arbitration panel completely and totally ignored ALL aspects of Schwab/STJ rule breaking throughout this entire process.

24 LIES/FINRA RULES broken/Deceptive Tactics/Bad Faith negotiations/And insulting, bullying, threatening then BLAMING a pro se claimant, Jason Clark/CBI/myself. I/Jason Clark/CBI have NOT lied a single time or stolen or cheated. Schwab/STJ has DONE ALL Three – lied, cheated, and stolen repeatedly. And, thus far, FINRA has allowed Schwab/STJ to do so!

17.Robyn Crowther/STJ/Schwab consistent/repetitive bad faith lawyering tactics, lies, bribery, deceitful tactics, fraudulent lawyering tactics, undue means, breaking FINRA rules left and right, as well as Manifest Disregard of the Law. This is NOT in line with FINRA **"Integrity" "Fairness" "Honesty" "Investor Protection" "Vibrant Market" "Confidence"** FOR **"EVERYONE."** FINRA "allowing" these actions by STJ/Schwab equates to **Bias, Evident Partiality, and Manifest disregard of the Law.**

18.Conspiracy/Corruption. Schwab-SEC-DORA-CDS behind CBI back. **And in 2010.**
19.CBI model **RETURNS** v. Fisher v. SWLSX. **Top 1% = FACT. (See packet)**

CBI/Jason Clark/Me will prove with an overwhelming **preponderance of evidence ALL** 7 legal arguments presented in CBI statement of claim: Defamation of Character by Implication, Emotional Distress, Breach of Contract, Breach of Fiduciary Duty, Tortious interference with Contract, Competition Laws, and Antitrust Laws. To any reasonable person Charles Schwab & Co. is the perpetrator and CBI/Jason Clark/Me the **VICTIM.** Arbitration panel should award CBI $112,500,000 which is justified by the Law, by MATH, by FINRA statutes, guidelines, and rules, by FINRA case precedence, by FINRA precedent Awards, and by ALL of the Evidence presented by CBI/Jason Clark/myself. THANK YOU.

**CLOSING ARGUMENT:** CBI has proven with a preponderance of evidence Schwab/STJ has been **WRONG** on **EVERYTHING**. And That Charles SCHWAB should have to PAY for DAMAGES incurred by CBI/Jason Clark/me.

1)WRONG on breaching the IASA contract 3 TIMES. FACT.

2)WRONG on NOT providing ANY due diligence per IASA contract. FACT.

3)WRONG on "ONLY custodian services" stated in IASA contract. FACT.

4)WRONG on tortious interference with IASA contract. FACT.

5)WRONG on TRYING to poach/steal CBI customers. FACT.
6)WRONG on delaying/denying due diligence per FINR rules 12505, 13512, 13513. FACT.

7)WRONG on lying about a flood to gain an unfair competitive advantage in this case. FACT.

8)WRONG on lying about investigation v. examination. FACT.
9)WRONG on Examination on October 27, 2017. FACT.
10)WRONG on "numerous" customer complaints after 10/27/17 exam. FACT.
11)WRONG on trying to bribe & lie to me to sign an N.D.A. FACT.

12)WRONG on using "undue means" to get me to sign NDA. FACT.

13)WRONG on lying about "multiple" engagements on NDA. FACT.

14)WRONG on lying about "engaging" CBI on NDA. FACT.

15)WRONG on lying about making "proposals/compromises" on NDA. FACT.

16)WRONG on "stipulations of facts". 7 deceptive lies/tactics. FACT.

17)WRONG on "protecting" Bernie Clark from even testifying on the truth. FACT.

18)WRONG on defaming me/Jason Clark/CBI. FACT.
19)WRONG on ruining my reputation for Life. FACT.
20)WRONG on damaging my credibility with MY clients for Life. FACT.
21)WRONG on damaging my TRUST with MY clients for Life. FACT.
22)WRONG on permanently STAINING My trustworthiness for Life. FACT.
23)WRONG on permanently stigmatizing Me as a wrongdoer for Life. FACT.
24)WRONG on breach of fiduciary duty to MY clients. FACT.
25)WRONG on breach of fiduciary duty to Me/MY personal accounts. FACT.
26)WRONG on federal tax lien. FACT.
27)WRONG on move money authority in Schwab LPOA's. FACT.
28)WRONG on CBI/Jason Clark "borrowing money" from customers. FACT.
29)WRONG on CBI/Jason Clark "borrowing money" from customer accounts. FACT.
30)WRONG on CBI/Jason Clark "wiring money" from customer accounts. FACT.
31)WRONG on CBI being false/misleading on web site claims. FACT.
32)WRONG on NOT acting in good faith. FACT.
33)WRONG on fair dealings. FACT.
34)WRONG on full disclosure. FACT.
35)WRONG on anti-competitive laws, statues, and guidelines. FACT.

36)WRONG on anti-trust legality and intent of laws. FACT.
37)WRONG on retributive justice. FACT.
38)WRONG on the chilling effects of Schwab's actions on the INDUSTRY. FACT.
39)WRONG on Intelligent Portfolios. FACT.
40)WRONG on FINRA Rules 12505, 13207, 13501, 13503, 13512, 13513, 13601. FACT.
41)WRONG on bad faith lawyering tactics, lies, bribery, deceitful tactics, fraudulent lawyering tactics, undue means, breaking FINRA rules left and right, as well as Manifest Disregard of the Law and Evident Partiality. FACT.
42)WRONG to CONSTANTLY infer CBI/Jason Clark/myself is ignorant because CBI/Jason Clark is a pro se litigant. FACT.
43)WRONG to put CBI customers thru this mess. FACT.
44)WRONG to put Clark Brothers Investments through this mess. FACT.
45)WRONG to put MY FAMILY thru this mess. FACT.
46)WRONG to put ME through this mess. FACT.
47)WRONG to take MY constitutional inalienable rights to life, liberty, **& pursuit of happiness**. FACT.
48) WRONG on lying about CBI publishing confidential and personal information. FACT.
49) WRONG on Jason Clark calling Kevin Lewis a "liar". FACT.
50) WRONG on lying about CBI/Jason Clark waiving discovery. FACT.
**51) WRONG on denying CBI/Jason Clark due process (discovery) under 5th AND 14th Amendments to The United States Constitution.**

**Charles SCHWAB & Co., INC. has been 100% WRONG ON EVERYTHING.** FACT.

CBI/Jason Clark/Me has proven with an overwhelming **preponderance of evidence ALL** 7 legal arguments presented in CBI statement of claim: Defamation of Character by Implication, Emotional Distress, Breach of Contract, Breach of Fiduciary Duty, Tortious interference with Contract, Competition Laws, and Antitrust Laws. To any reasonable person Charles Schwab & Co. is the perpetrator and CBI/Jason Clark/Me the **VICTIM.** Arbitration panel should award CBI $112,500,000 which is justified by the Law, by MATH, by FINRA statutes, guidelines, and rules, by FINRA case precedence, by FINRA precedent Awards, and by ALL of the Evidence presented by CBI/Jason Clark/myself. THANK YOU TO: Mr. Owen, Ms. Barrington, Ms. Roslund, and Ms. Crowther and Her Team.

# Supporting Document

# Award and Judgement FINRA Arbitration Trial

# Award
# FINRA Dispute Resolution Services

In the Matter of the Arbitration Between:

Claimant
Clark Brothers Investments

vs.

Respondent
Charles Schwab & Co., Inc.

Case Number: 21-02439

Hearing Site: Denver, Colorado

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

Nature of the Dispute: Non-Member vs. Member

This case was decided by a majority-public panel.

## REPRESENTATION OF PARTIES

For Claimant Clark Brothers Investments: Jason R. Clark, Clark Brothers Investments, Parker, Colorado.

For Respondent Charles Schwab & Co., Inc.: Robyn C. Crowther, Esq., Surya Kundu, Esq., and Nailah Z. Ogle, Esq., Steptoe & Johnson LLP, Los Angeles, California.

## CASE INFORMATION

Statement of Claim filed on or about: September 24, 2021.
Amended Statement of Claim filed on or about: November 22, 2021.
Claimant signed the Submission Agreement: September 28, 2021.

Statement of Answer filed by Respondent on or about: December 14, 2021.
Respondent signed the Submission Agreement: December 14, 2021.

## CASE SUMMARY

In the Statement of Claim, as amended, Claimant asserted the following causes of action: prima facie defamation of character; emotional distress; breach of contract; breach of fiduciary duty; tortious interference with contract; competition laws; and antitrust laws. The causes of action relate to termination of the Investment Advisor Service Agreement ("IASA") by Respondent.

Unless specifically admitted in the Statement of Answer, Respondent denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

## RELIEF REQUESTED

In the Statement of Claim, as amended, Claimant requested:

1. Presumed damages, compensatory damages, and punitive damages, including treble damages, in the amount of $30,000,000.00 pursuant to the one year statute of limitation;
2. Opportunity cost damages, compensatory damages, and punitive damages, including treble damages, in the amount of $30,000,000.00 pursuant to the three year statute of limitation;
3. Compensatory damages, opportunity cost damages, and punitive damages, including treble damages, in the amount of $30,000,000.00 pursuant to the four year statute of limitation;
4. Taxes to be owed on the total damages sought in the amount of $22,500,000.00; and
5. Proof of the due diligence conducted by Respondent on Claimant that led to the termination of the IASA.

In the Statement of Answer, Respondent requested:

1. Dismissal of Claimant's Statement of Claim in its entirety; and
2. Such further relief as the Panel deems just and proper.

## OTHER ISSUES CONSIDERED AND DECIDED

The Arbitrators acknowledge that they have each read the pleadings and other materials filed by the parties.

On August 5, 2022, Respondent filed a Motion for Protective Order Regarding Confidentiality and Witness Testimony ("Motion for Protective Order"). On August 11, 2022, Claimant filed an opposition to the Motion for Protective Order. On August 12, 2022, Respondent filed a reply in support of the Motion for Protective Order. On August 23, 2022, the Panel conducted a pre-hearing conference to discuss the Motion for Protective Order. That same day, the Panel granted the Motion for Protective Order.

On August 29, 2022, Claimant filed a Motion for Reconsideration of the Protective Order. On August 30, 2022, Respondent filed an opposition to the Motion for Reconsideration and requested sanctions against Claimant for its abuse of the discovery process. On August 31, 2022, Claimant filed a reply opposing Respondent's response. On September 1, 2022, Claimant filed an additional response and opposed the request for sanctions. On September 2, 2022, the Panel denied Claimant's Motion for Reconsideration and denied Respondent's request for sanctions.

The Panel has provided an explanation of the decision in this award. The explanation is for the information of the parties only and is not precedential in nature.

The Award in this matter may be executed in counterpart copies.

## FINDINGS

The reasons for this award are that Claimant ("CBI") has failed to meet its burden of proof with respect to its claims. CBI sought damages arising from the April 2, 2021, termination by Respondent ("Schwab") of the IASA executed by CBI as of May 23, 2018, and arising from the notice of that termination sent April 2, 2021, to the end-clients of CBI, with which clients Schwab had an agreement to hold client assets as custodian. Under the investment advisor arrangement, CBI had an agreement with Schwab relating to CBI providing independent investment advice to the end-clients while Schwab provided only custodian services. Schwab also had an agreement with the end-clients with respect to providing those custodian services.

The IASA at Section 18 provided that either party could terminate the agreement at any time for any reason on written notice to the other. Schwab provided the written notice to CBI on April 2, 2021, and at the same time, by a separate letter, Schwab notified of the termination the end-clients for whom it acted as custodian. The termination was effective July 6, 2021.

The causes of action asserted by CBI are defamation, emotional distress, breach of contract, breach of fiduciary duty, tortious interference with contract, and violations of fair competition laws and of antitrust laws. CBI is seeking $112,500,000.00 in damages. The gravamen of the claims by CBI are that Schwab wrongfully terminated the IASA, wrongfully communicated that decision to the end-clients, and attempted to poach such clients for itself.

The termination was not wrongful. Schwab had the right to terminate the IASA for any reason and did not need cause. However, Schwab did have reasons for concern that led it to terminate the IASA. Schwab had received inquiries from the Securities and Exchange Commission ("SEC") and the Colorado Department of Regulation Agencies, Division of Securities ("CDS") indicating that they were looking into possible improprieties by CBI such matters as money movements and misstatements of returns. The CDS request stated "This is a for-cause examination and there is heightened concern of this advisor's activities."

There is no indication, however, that any improprieties were ultimately actually found by the SEC or the CDS and no disciplinary action of any kind was brought by these agencies. Nevertheless, such inquiries led Schwab to look into CBI and Schwab's relationship with CBI. The SEC reviewed CBI and CBI then posted on its website that the SEC had approved its returns; the statement was "Examined and Approved by the SEC dated 3/5/21." This was not so. The SEC does not approve returns. Schwab saw the statement on the website and found it concerning. The SEC told CBI to drop that statement from its website, and CBI did so quickly after the direction of the SEC.

In reviewing the website of CBI, Schwab found discrepancies between the fees stated there and those in the form ADV for CBI. (Form ADV is the uniform form used by investment advisers to register with both the SEC and state securities authorities.) Apparently, CBI changed its fee structure, but failed to timely update its form ADV. The lack of follow-up was concerning to Schwab.

Schwab's business decision to terminate the IASA was due to Schwab becoming uncomfortable with the risk that CBI may pose, particularly the risk that the end-clients may seek recourse against Schwab if ever there was a problem caused by the advisor. Schwab's business policy was to avoid such risks, even if the advisor's advice presently led to high returns for its customers. Thus, there was no breach of contract in terminating the IASA which allowed for such a termination without cause.

Also, there was no breach of the provision of the IASA, which at Section 3, provides that due diligence materials relating to entering into the IASA with CBI would be turned over to CBI. Though CBI mentioned in section THIRTEEN of the Amended Claim and CBI's owner, Jason Clark, testified that he had unsuccessfully been able to communicate with Schwab representatives between April 5-8, 2021, to seek information about the termination of the IASA, no such diligence materials relating to entering into the IASA were requested by CBI. Rather, its request for materials came several years later and related to the investigation leading to the termination of IASA. There is no breach of contract here either, since the contract provision did not apply, but if it did, it would only apply to materials "where permitted" and at least some of the materials relating to that investigation may not be permitted to be released.

Furthermore, CBI threatened to publish to anyone who would listen, including over the internet, any materials it received from Schwab and would not agree to keep confidential any of those materials entitled to confidentiality. A protective order was then granted in these proceedings. This protective order continued to be opposed by CBI and discovery information had not been provided to CBI as of shortly before the hearing. Schwab moved to postpone the hearing to deal with such matters. CBI opposed postponing the hearing and stated that it could prove its case without any discovery materials. Thus, the information request was waived.

The defamation claim is based on what CBI claims is the implication in the notice to the end-clients that the IASA arrangement was being terminated as of July 6, 2021. That letter was neutrally stated and gave no reasons for the termination, which termination could have been by CBI, by Schwab, or by passage of a termination date. It also told the end-clients how to continue to do business with CBI and what needed to be done before July 6, 2021 to do so. Some clients did transfer accounts but others did not and thus became normal retail customers of Schwab after July 6, 2021. Schwab needed to inform its custodianship customers, the end-clients, of the change that was coming and did so in a neutral manner. This is not sufficient to prove a case of implied defamation. Some of those clients did appear to assume that there was more to the termination and asked CBI about it. CBI told at least some of the clients, many of whom were friends and family of CBI's owner Jason Clark, of the various concerns of Schwab or of the SEC and CDS. When asked about the termination, Schwab only stated that it had occurred and provided no further comment about it.

As part of its investigation, Schwab did not contact any end-clients of CBI. The CDS, however, did ask some of the end-clients for information relating to its investigation. One client of CBI thought he had received a call from someone at Schwab, but the witness could not identify the person and may well have been confused about a call from a CDS investigator. This is not sufficient to meet the burden of proof in a claim for defamation.

CBI asserted that Schwab tried to poach his clients. It offered as proof, accounts of the parents of Jason Clark. There were four account statements from July of 2021 with respect to his parents. Three of them, those with significant balances, show CBI as the advisor and name no Schwab representative. The fourth statement, with a balance of less than $7.00, did name a Schwab representative, but that statement related to an older retail account established in prior years for a particular purpose, had not been used in years, and had always been a retail account. This is no proof of client poaching by Schwab. That Schwab sent brochures to clients that did not switch accounts to stay with CBI, is also no proof of an unfair competition or

poaching of clients. CBI has not proved any violation of unfair competition or antitrust laws or any tortious interference with CBI's contracts with its clients.

CBI's owner, Jason Clark, does appear to have suffered emotionally from the termination, but this does not mean Schwab intentionally or wrongfully caused his distress. Mr. Clark asserted that Schwab accused him of wrongdoing, such as mishandling funds and misstating returns. In this, he is in error. Schwab did not look into the validity of his investment returns or into any other possible basis for the inquiries from the SEC or CDS and did not use any results of any such regulatory investigations in its termination decisions. Schwab had no duty to, and probably couldn't have, investigated the regulatory investigators to see what was behind their inquiries. The most that can be said that Schwab may have "accused" Mr. Clark of, was of unacceptably raising Schwab's risk profile beyond the low risk level at which it was comfortable in maintaining a business relationship with CBI.

As stated earlier in this Award, there is no evidence that Mr. Clark did anything dishonest or dishonorable, and Schwab never accused him of such things, and never passed on to his clients any information about what the SEC or CDS might have been looking into. If clients learned of such suspiciousness, they learned it from Mr. Clark or the regulators, or from other clients who learned of it from Mr. Clark or the regulators, not from Schwab. An investigation is just that, it does not imply wrongdoing.

No fiduciary duty by Schwab toward CBI was proven; no evidence of such a relationship was presented.

Neither party asked for or proved any claim for attorneys' fees.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, and any post-hearing submissions, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1. Claimant's claims are denied in their entirety.

2. Any and all claims for relief not specifically addressed herein, including any requests for punitive damages and treble damages, are denied.

## FEES

Pursuant to the Code of Arbitration Procedure ("Code"), the following fees are assessed:

**Filing Fees**
FINRA Dispute Resolution Services assessed a filing fee* for each claim:

| | |
|---|---|
| Initial Claim Filing Fee | =$ 2,300.00 |

**The filing fee is made up of a non-refundable and a refundable portion.*

**Member Fees**

Member fees are assessed to each member firm that is a party in these proceedings or to the member firm that employed the associated person at the time of the event giving rise to the dispute. Accordingly, as a party, Respondent is assessed the following:

| | | |
|---|---|---|
| Member Surcharge | =$ | 4,325.00 |
| Member Process Fee | =$ | 7,300.00 |

**Contested Motion for Issuance of Subpoena Fees**
Fees apply for each decision on a contested motion for the issuance of a subpoena.

| | | |
|---|---|---|
| Two (2) decisions on contested motions for the issuance of a subpoena with one Arbitrator @ $200.00 | =$ | 400.00 |
| Total Contested Motion for Issuance of Subpoena Fees | =$ | 400.00 |

The Panel has assessed $200.00 of the contested motion for issuance of subpoena fees Claimant.

The Panel has assessed $200.00 of the contested motion for issuance of subpoena fees to Respondent.

**Hearing Session Fees and Assessments**
The Panel has assessed hearing session fees for each session conducted. A session is any meeting between the parties and the Arbitrator(s), including a pre-hearing conference with the Arbitrator(s), which lasts four (4) hours or less. Fees associated with these proceedings are:

| | | | | |
|---|---|---|---|---|
| One (1) pre-hearing session with a single Arbitrator @ $450.00/session | | | =$ | 450.00 |
| Pre-Hearing Conference: | August 23, 2022 | 1 session | | |
| One (1) pre-hearing session with the Panel @ $1,575.00/session | | | =$ | 1,575.00 |
| Pre-Hearing Conference: | February 16, 2022 | 1 session | | |
| Four (4) hearing sessions @ $1,575.00/session | | | =$ | 6,300.00 |
| Hearings: | September 8, 2022 | 2 sessions | | |
| | September 9, 2022 | 2 sessions | | |
| Total Hearing Session Fees | | | =$ | 8,325.00 |

The Panel has assessed $1,237.50 of the hearing session fees to Claimant.

The Panel has assessed $7,087.50 of the hearing session fees to Respondent.

All balances are payable to FINRA Dispute Resolution Services and are due upon receipt.

## ARBITRATION PANEL

| | | |
|---|---|---|
| Langdon T. Owen, Jr. | - | Public Arbitrator, Presiding Chairperson |
| Carol L. Roslund | - | Public Arbitrator |
| Margaret Ann Barrington | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

**Concurring Arbitrators' Signatures**

***Langdon T. Owen, Jr.***
Langdon T. Owen, Jr.
Public Arbitrator, Presiding Chairperson

**09/19/2022**
Signature Date

***Carol L. Roslund***
Carol L. Roslund
Public Arbitrator

**09/18/2022**
Signature Date

***Margaret Ann Barrington***
Margaret Ann Barrington
Non-Public Arbitrator

**09/16/2022**
Signature Date

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

September 19, 2022
Date of Service (For FINRA Dispute Resolution Services use only)

# Supporting Document

## CDS/DORA/Colorado Attorney General

## Notice of duty to answer, notice to set, notice of hearing, and notice of charges

STATE OF COLORADO OFFICE OF ADMINISTRATIVE COURTS

1525 Sherman Street, 4th Floor, Denver, Colorado 80202

Case No.

AMENDED NOTICE OF DUTY TO ANSWER, NOTICE TO SET, NOTICE OF HEARING, AND NOTICE OF CHARGES

IN THE MATTER OF JASON RAY CLARK AND CLARK BROTHERS, INC. (dba CLARK BROTHERS INVESTMENTS

**Petitioner:**

TUNG CHAN, Securities Commissioner for the State of Colorado

**Respondents:**

Jason Ray Clark 19580 Victorian Drive #306
Parker, CO 80138

Clark Brothers, Inc. 19580 Victorian Drive #306
Parker, CO 80138

## NOTICE OF DUTY TO ANSWER

**YOU ARE HEREBY NOTIFIED** that pursuant to § 24-4-105(2)(b), C.R.S., you are required to file a written answer to the following Notice of Charges set forth below with the Office of Administrative Courts, 1525 Sherman Street, 4th Floor, Denver, Colorado 80203, within **thirty (30)** days after the mailing date of this Notice of Duty to Answer, Notice of Hearing, and Notice of Charges (collectively "Notice of Charges"). You **must** also mail a copy of such answer to the attorney of record in this matter for the Colorado Securities Commissioner, India Kidd-Aaron, Assistant Attorney General, Office of the Attorney General, 1300 Broadway, 8th Floor, Denver, Colorado, 80203, within the same thirty-day time period.

If you fail to file your written answer within thirty (30) days as set forth above, then an order entering a default decision may be issued against you. You are further advised that issuance of a default decision may grant the relief requested in the Notice of Charges, or such other relief or penalties that may be provided for by law, or both.

## NOTICE TO SET

**YOU ARE HEREBY NOTIFIED** that the attorney for the Commissioner, or her delegate, shall call the Office of Administrative Courts, 1525 Sherman Street, 4th Floor, Denver, Colorado 80203, for a Setting Conference on **November 10, 2022 at 10:00am** in order to set the date, time and location for a hearing regarding the Notice of Hearing and Notice of Charges set forth below. You or your attorney may make prior arrangements to be reached by telephone at the date and time specified above by contacting the Office of Administrative Courts via email at oac-gs@state.co.us or by phone at (303) 866-5626 prior to the day of setting. In the event you do not appear, a date may be obtained and, if it is obtained, you will be notified in writing of the hearing date, time and place.

## NOTICE OF HEARING

**YOU ARE HEREBY NOTIFIED** that, pursuant to §§ 11-51-606(1), 24-4-104 and 24-4-105, C.R.S., a hearing will be held before an authorized administrative law judge at a date, time, and location to be determined pursuant to the above Notice to Set. At the hearing, testimony will be taken and other evidence will be received by an administrative law judge for the purpose of determining whether any of the sanctions set forth in § 11-51-410(1), C.R.S. should be imposed upon you, including but not limited to suspension, revocation or other conditions imposed upon the investment adviser license of Clark Brothers, Inc. and the investment adviser representative license of Jason Ray Clark, based upon the violations set forth in §§ 11-51-501(5)(b) and (c), C.R.S.; 11-41-502, C.R.S.; 11-41-409.5, C.R.S.; 11-51-410(1)(b) and (l), C.R.S.; 3 CCR 704-1 and Commissioner Rules 51-4.4(IA)(D), 51-6.5, 51-4.3(IA)(F), and 51-4.8(IA)(B), (H), (J), (M), (N), (P), (U), (W), and (X).

**YOU ARE FURTHER NOTIFIED** that at the hearing in this matter, you shall have the right to appear in person and/or by legal counsel, to present evidence on your own behalf, to cross-examine any witnesses, and to rebut any evidence presented. You may also have subpoenas issued on your behalf upon request to the administrative law judge. A copy of the General Rules of Procedure may be obtained at the Division of Administrative Hearings or by visiting their Internet web site at: http://www.colorado.gov/dpa/oac/gs_procedural_rules.htm.

## RELEVANT LEGAL AUTHORITY

### § 11-51-410, C.R.S. Denial, suspension, or revocation.

(1) The securities commissioner may by order deny an application for a license, suspend or revoke a license, censure a licensed person, limit or impose conditions on the securities activities that a licensed person may conduct in this state, and bar a person from association with any licensed broker-dealer,

investment adviser, or federal covered adviser in the conduct of its business in this state in such capacities and for such period as the order specifies. These sanctions may be imposed only if the securities commissioner makes a finding, in addition to the findings required by section 11-51-704 (2), that the applicant or licensed person or, in the case of a broker-dealer or investment adviser, a partner, officer, director, person occupying a similar status or performing similar functions, or person directly or indirectly controlling the broker-dealer or investment adviser:

...

(b)Has willfully violated or willfully failed to comply with any provision of this article or any rule or order under this article, except any rule that is subject to the additional findings required by paragraph (g) of this subsection (1);

...

(l) In the case of an investment adviser or investment adviser representative, willfully has:

(I) Failed to provide a client with a written disclosure statement as required pursuant to section 11-51-409.5; or

(II) Engaged in conduct contrary to one or more rules wherein the securities commissioner prohibits dishonest or unethical conduct in connection with providing investment advisory services. This subparagraph (II) applies to an investment adviser representative employed by or affiliated with a federal covered adviser only to the extent permitted under the federal "National Securities Markets Improvement Act of 1996". In the interests of uniformity, any rules promulgated pursuant to this subparagraph (II) shall be coordinated and consistent with the regulation of federal covered advisers by the securities and exchange commission under the federal "Investment Advisers Act of 1940" and the rules promulgated pursuant to that act, and with the rules of other states regarding such conduct by investment advisers and investment adviser representatives, unless the securities commissioner makes the specific finding that to do so would be contrary to the public interest, the protection of investors and advisory clients in this state, and the purposes of this article.

...

**§ 11-51-501(5)(b) and (c), C.R.S. Fraud and other prohibited conduct.**

(1) It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly:

...

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

...

**§ 11-51-409.5, C.R.S. Mandatory disclosure – investment advisers and investment adviser representatives.**

(1) Each investment adviser and investment adviser representative of a licensed investment adviser shall furnish a written disclosure statement to each prospective client and to each client who is to receive investment advisory services. Such statement shall, at a minimum, contain the information the securities commissioner by rule requires to be furnished to clients or prospective clients by an investment adviser and an investment adviser representative. In the interests of uniformity, the requirements for disclosure of information under such rules should be coordinated and consistent with those that would be imposed under the federal "Investment Advisers Act of 1940" and the rules promulgated pursuant to that act, and with the requirements of other states, unless the securities commissioner makes the specific finding that to do so would be contrary to the public interest, the protection of investors and advisory clients in this state, and the purposes of this article.
(2) The disclosure statement described in subsection (1) of this section shall be delivered before the client or prospective client incurs any obligation for or in connection with the investment advisory services. In addition, the investment adviser or investment adviser representative shall annually deliver or offer to deliver without charge upon written request of each client a true copy of the most recently available disclosure statement.

...

**§ 11-51-502, C.R.S. Misleading filings.**

It is unlawful for any person to make or cause to be made, in any document filed with the securities commissioner or in any proceeding under this article, any statement which the person knows or has reasonable grounds to know is, at the time and in the light of the circumstances under which it is made, false or misleading in any material respect.

...

**3 CCR 704-1, Rule 51-4.4(IA). Application for an Investment Adviser Representative License.**

(D) An investment adviser representative is under a continuing obligation to update information required by Form U-4 as changes occur. In this regard, an investment adviser representative and the investment adviser must file promptly with IARD any amendments to the representative's Form U-4 to reflect such changes. Such amendment will be considered to be filed promptly if the amendment is filed within

thirty (30) days of the event that requires the filing of the amendment.

...

**3 CCR 704-1, Rule 51-4.3(IA). Application for an Investment Adviser License.**
(F) Updates and amendments to an investment adviser's Form ADV shall be filed with IARD in accordance with the instructions in Form ADV. An amendment will be considered promptly filed if the amendment is filed within thirty (30) days of the event that requires the filing of the amendment.

...

**3 CCR 704-1, Rule 51-4.8(IA). Dishonest and Unethical Conduct.**
A person who is an investment adviser, an investment adviser representative or a federal covered adviser is a fiduciary and has a duty to act primarily for the benefit of its clients. The provisions of this subsection apply to federal covered advisers to the extent that the conduct alleged is fraudulent, deceptive, or as otherwise permitted by the National Securities Markets Improvement Act of 1996 (Pub. L. No. 104-290). While the extent and nature of this duty varies according to the nature of the relationship between an investment adviser or an investment adviser representative and its clients and the circumstances of each case, an investment adviser, an investment adviser representative or a federal covered adviser shall not engage in unethical business practices, including the following:

...

(B) Exercising any discretionary power in placing an order for the purchase or sale of securities for a client without obtaining written discretionary or sale of securities for a client without obtaining written discretionary authority from the client within ten (10) business days after the date of the first transaction placed pursuant to oral discretionary authority, unless the discretionary power relates solely to the price at which, or the time when, an order involving a definite amount of a specific security that shall be executed, or both.

...

(H) Misrepresenting to any advisory client, or prospective advisory client, the qualifications of the investment adviser or any employee of the investment adviser, or to misrepresent the nature of the advisory services being offered or fees to be charged for such service, or to omit to state a material fact necessary to make the statements made regarding qualifications, services, or fees, in light of the circumstances under which they are made, not misleading.

...

(J) Charging a client an advisory fee that is unreasonable in light of the type of services to be provided, the experience of the adviser, the sophistication and bargaining power of the client, and whether the adviser has disclosed that lower fees for comparable services may be available from other sources.

...

(M) Publishing, circulating, or distributing any advertisement which does not comply with Rule 206 (4)-1 under the Investment Advisers Act of 1940.
(N) Disclosing the identity, affairs, or investments of any client, unless required by law to do so, or unless consented to by the client.

...

(P) Entering into, extending, or renewing any investment advisory contract, unless such contract is in writing and discloses, in substance, the information required by Part 2 of Form ADV. The information required by Part 2 of Form ADV may be disclosed in a document other than the investment advisory contract, so long as it is disclosed at the time the contract is entered into, extended or renewed.

...

(U) Engaging in any conduct or any act, indirectly or through or by any other person, which would be unlawful for such person to do directly under the provisions of this act or any Rule thereunder. Such conduct or act includes, but is not limited to, that conduct set forth in this Rule. Engaging in other conduct such as . . . non-disclosure, incomplete disclosure or misstatement of material facts, manipulative or deceptive practices, or aiding or abetting any unethical practice, shall be deemed an unethical business practice and shall be grounds for denial, suspension or revocation of a license.

...

(W) Failing to provide advisory fee billing information to each client in compliance with the requirements of Rule 51-4.10(IA)(B)(2).

...

(X) Accessing a client's account by using the client's own unique identifying information (such as username and password).

**NOTICE OF CHARGES**

YOU ARE HEREBY NOTIFIED of the following allegations:

**Parties and Jurisdiction**

1. Clark Brothers, Inc., CRD 143777 ("Clark Brothers") is a corporation organized under the laws of Colorado with an address of record 19580 Victorian Drive, #306, Parker, Colorado 80138. Clark Brothers is registered to do business in Colorado and has been licensed as an investment adviser in Colorado since July 11, 2007.

2. Jason Ray Clark, CRD 2578633 ("Clark") is an adult male born November 20, 1969, with a last known address of 19580 Victorian Drive, #306, Parker, Colorado 80138. Clark is the sole owner, control person, and Chief Compliance Officer of Clark Brothers. Clark is licensed in Colorado as an investment adviser representative.

3. Pursuant to §§ 11-51-410(1),703, and 704, C.R.S., the Colorado Securities

Commissioner (the "Commissioner") has jurisdiction over Clark Brothers, Clark, and the subject matter of this proceeding.

**General Allegations**

4. This is an action to revoke, suspend, or otherwise impose conditions on the investment adviser license of Clark Brothers and the investment adviser representative license of Clark (collectively, the "Respondents") based on the Respondents breach of fiduciary duty and duty of care and loyalty, and violations of relevant rules and laws.

5. As parties licensed pursuant the Colorado Securities Act ("CSA"), Respondents must comply with all relevant rules and laws. After undergoing two Colorado Division of Securities (the "Division") examinations, a multi-year examination that began in 2010 and another examination in 2021, Respondents continue to engage in practices that violate relevant rules and laws.

6. Respondents' violations extend to almost all aspects of Respondents' advisory business including, but not limited to: offering services to advisory clients without a written contractual agreement; failing to obtain written discretionary trading authority; failing to disclose the status of Clark's financial condition including tax liens and judgments; failing to disclose that Clark sought and received a loan from a client; making misleading and unsubstantiated claims in disclosure documents and advertising; failing to exercise due care in the calculation and deduction of clients' fees; and making untrue statements of material fact and omitting to state material facts necessary to make statements not misleading.

7. Respondents have made misrepresentations to both clients and to the Division on various occasions as described in further detail below.

**The First Exam**

8. On or about February 4, 2010, the staff for the Colorado Division of Securities (the "Staff") initiated an examination of Clark Brothers (the "First Exam").

9. According to the ADV filed on behalf of Clark Brothers Investments on May 20, 2010, the Respondents held $5,000,000 of "Assets Under Management".

10. On or about June 21, 2010, and upon the conclusion of the First Exam, the Staff sent a letter to the Respondents (the "Final Letter") informing Respondents of regulatory deficiencies and directing them to take corrective action to be in better compliance with the CSA and the Rules under the Colorado Securities Act (the "Rules").

11. The Final Letter provided instructions for the Respondents to produce the following no later than July 29, 2010:

a. An updated advisory contract;

b. A copy of the Clark Brothers' privacy policy; and

c. Verification or removal of specific, misleading information included on the Clark Brothers' website (the "Production Request").

12. Respondents did not respond to the Final Letter or adhere to the first Production Request.

13. On or around September 21, 2010, the Staff sent an updated final letter that requested Respondents comply with the Production Request (the "Final Letter II"). The Final Letter II informed Respondents that willfully failing to comply with the Final Letter or the Production Request could result in summary suspension or administrative action.

14. Respondents did not respond to the Final Letter II or adhere to the second Production Request.

15. After approximately a two-and-a-half-year process, the Division formally closed the First Exam on February 11, 2013 after Respondent agreed to a sufficient level of compliance.

16. Once the Final Exam was closed, according to the CRD/IARD, Respondents did not file the Annual Updating Amendment of Form ADV for the years 2014, 2015, 2016, 2017, and 2018 as is required pursuant to Rule 51- 4.3(IA)(G).[1]

17. As of April 2, 2021, Respondents had not updated the Form ADV Part 2 (the "Brochure") as required by Rule 51- 4.3(IA)(F) since 2011, which caused the Division to open another examination of Clark Brothers and Clark (the "Second Exam").

**The Second Exam**

18. On or about April 2, 2021, the Staff opened the Second Exam. The Second Exam showed that Respondents remained a high risk to Colorado investors in the following ways:

a. Clark sought and received a $50,000 loan from a future client, TG, and continually delayed repayment of the loan after TG became a client of Clark Brothers. Clark failed to inform other clients of the loan as a potential conflict of interest as required by rule.

[1] Central Registration Depository ("CRD") and the Investment Adviser Registration Depository are maintained by FINRA to support the licensing and registration filing requirements of the U.S. securities industry and its regulators.

b. Respondents failed to disclose or misrepresented material facts to clients in Form ADV filings including that Clark had multiple tax liens and judgments entered against him, trading practices that included discretionary trading on clients' accounts without first obtaining the required client approval, highly concentrated positions in just a few securities with minimal diversification in contradiction to his disclosed trading strategy, and advisory fee calculations that differed from those disclosed to investors.

c. Respondents misrepresented to the Division that there were no customer complaints when Respondents received at least two customer complaints.

d. Respondents failed to correct misleading advertising and performance claims as requested by the Division in the Final Letter and the Final Letter II.

e. To date, Respondents have not corrected most of the compliance violations the Staff identified during the First Exam.

**Loan Agreement with Future Client**

19. Clark entered into a loan agreement with a future client, TG, on October 31, 2018 (the "Loan Agreement"). The Loan Agreement included the following terms:

a. Clark borrowed $50,000;

b. Clark agreed to repay TG $60,000 for the loan;

c. Clark agreed to start repayment on November 1, 2019;

d. the duration of repayment would be over twenty months;

e. the repayment would be made in installments of $3,000 per month beginning November 1, 2019;

f. As collateral, Clark provided that TG would be added to the Clark Sibling Trust account at Charles Schwab and from this account TG would be "... entitled to $60,000 cash if loan is not paid back in full by July 4, 2021 ..."; and

g. The Loan Agreement also explicitly stated that "Any disputes of any kind will be handled out of court, no lawyers, man to man until an agreement between parties is met." (Loan Agreement Terms).

20. The loan funds were transferred to Clark's Fitzsimons account on October 31,

2018.

21. Less than one month after entering the Loan Agreement on November 28, 2018, TG funded an investment account under the control of Clark.

22. By August 2020, the balance in the Clark Sibling Trust account was $6.19. TG had not been repaid the loan nor made any payments on the loan and the account designated as collateral in the Loan Agreement had been unilaterally drained by Respondents.

23. According to Clark, at some point between November 1, 2018 and July 4, 2021, Clark and TG renegotiated the loan terms to include no monthly payments and instead Clark agreed to repay TG in one lump sum of $60,000 by July 4, 2021.

24. Clark did not repay the loan by the July 4, 2021 maturity date as agreed upon in the Loan Agreement or the renegotiated loan agreement. Clark claims, however, that Clark and TG renegotiated the Loan Agreement a second time and the repayment terms included TG forgiving $10,000 for management of TG's account, and Clark paying TG in fifteen monthly installments of $2,667.

25. TG ceased doing business with Clark around July 19, 2021 when Clark and TG renegotiated the Loan Agreement for the second time.

26. TG confirmed that Clark made, and TG received the following loan payments:

a. the first payment of $10,000 on July 19, 2021; and

b. monthly payments for the first, second, and third of the fifteen installments of $2,667.

**Respondents ADV Filings**

27. In the Second Exam, Respondents explicitly represented to the Division that they did not have any judgments or liens as demonstrated by the following:

a. In filed Form ADVs including for the year 2021, Respondents represented that they had no unsatisfied judgments or liens.

b. Clark's judgments and liens were not disclosed on Clark's Form U4 filings from April 13, 2007 through January 1, 2021.

28. The above were misrepresentations as Clark was subject to the following judgments and liens ("Clark's Judgements and Liens"):

a. A judgment from the State of Colorado Department of Revenue dated February 13, 2020, and in the amount of $576.

b. A judgment from the State of Colorado Department of Revenue dated July 10, 2019, and in the amount of $3,427.

c. A judgment from the State of Colorado Department of Revenue dated August 14, 2014, and in the amount of $2,091. This judgment is now satisfied but was not reported during the timeframe it was not satisfied.

d. A federal tax lien filed on May 13, 2013, in the amount of $37,624.52, and released on August 8, 2016.

e. A federal tax lien filed on November 29, 2010, in the amount of $981.99, and released on August 8, 2016.

29. Additionally, Respondents misrepresented in Form ADV filings that Respondents:

a. Were in compliance with their home state's minimum capital requirements when Respondents could not demonstrate compliance with State minimum capital requirements because Respondents did not maintain the required financial records.

b. Sent itemized fee invoices to clients and represented that clients provided written authorization permitting Respondents to pay fees directly from their accounts when Respondents did not provide clients itemized fee invoices or receive written authorization to directly deduct fees from clients' advisory accounts.

c. Obtained or maintained signed investment advisory contracts from clients when Respondents did not enter into advisory contracts with clients and instead relied wholly on contracts the Respondents' clients entered into with the custodian.

d. Obtained approval from clients before placing trades in client accounts when Respondents' common practice was to make discretionary trades in clients' accounts without first obtaining client approval.

e. Used diversification strategies to reduce risk and maximize returns when Respondents were investing in high concentrations of high-risk investments such as leveraged ETFs.

30. In an email response to the Division during the Second Exam, Respondents

misrepresented that they do not recommend leveraged ETFs when Respondents traded two leveraged ETFs in client accounts (JNUG and TMV) approximately 139 times during the exam period.

31. Respondents sought SEC registration and misrepresented to the SEC that the Clark Brothers had $90,000,000 under management when the Clark Brothers actually had $15,000,000 under management, and its one and only office was in the state of Colorado.

32. In discussions with Staff, Respondents stated that the "Buffet Way" includes high concentration in a select number of equity stocks, though when asked about the Brochure statements on diversification, Respondents stated they have since diversified client accounts. Additionally, the Brochure includes a general statement about risk related to investing but does not include risk language specific to Respondents' investment strategy. As a result, the Staff remains unclear on the Respondents' trading strategy and use of diversification.

33. Respondents did not maintain any written client suitability information. Accordingly, the Staff could not determine if the high concentration strategy was suitable for clients.

34. Respondents used Charles Schwab & Co., Inc. ("Schwab") as a custodian for customer accounts. In at least the first quarter of 2021, there were discrepancies between account values provided by Schwab and by Respondents. These discrepancies revealed that Respondents were not billing on the last day of the quarter, as represented in the Brochure, which caused the customer accounts to be overbilled by approximately $500.

**Client Complaints**

35. On May 7, 2021 and again on May 12, 2021, Respondents in their response to the Division stated that they did not have any client complaints.

36. During the Second Exam, Staff discovered that a client, ZC, complained in writing on March 3, 2021. ZC alleged that the ZC and Respondent "...never discussed or approved you taking such a big risk on any one stock." The client further stated to Respondents that the client was "...quite shocked you made these reckless decisions... one of the hallmarks of financial planning and investment is diversification and you always told me that you believed in this ... it is inexplicable to me that you made incredibly risky trades like this in my accounts with no prior consultation with me, putting nearly 50% of my entire portfolio in one stock. Only to tell me you have authority via your LPA to be as reckless as you want to be, to gamble on an election year, misleading, fraudulent in your response, no obligation to provide answer, no communication requirements as an advisor and investor, no accountability to act in good faith, and the list goes on and on."

37. ZC complained of being placed in highly concentrated positions of two stocks and one percent in a third. Specifically, 50 percent of ZC's IRA was comprised of China Mobile Limited (symbol CHL). CHL was delisted from the NYSE[2] on January 6, 2021, which removed the ability for Respondents to publicly trade CHL.

38. Respondents were aware of the ZC's complaint because Respondents replied to the ZC's complaint via email stating Respondents would back the principal amount of CHL stock at $27.51.

39. Respondents forwarded the ZC's emailed complaint, which contained confidential client information, to two other individuals who were not personnel of the Clark Brothers for no apparent business purpose.

40. On September 6, 2022, the Staff issued a shortened 409 letter to the Clark Brothers again inquiring about client complaints. Respondents represented in their response to the Division that they received no complaints since July 1, 2021. But Respondents received a complaint from client NN during that time period.

41. NN's complaint addressed Mr. Clark purchasing and/or selling specific securities in contradiction to what NN and Clark explicitly agreed to.

42. Based on NN's complaint, on September 15, 2020, the Division requested the client file for NN. The documents requested as part of the client file request included signed investment contract(s) and/or all investment management agreement(s), client notes and communications, client suitability, and evidence that the Brochure was provided to NN. Respondents responded to the Division that Respondents didn't have the items requested.

**Misleading Advertising and Performance Claims**

43. Respondents use several social media sites to advertise their advisory business and manage their own website at www.clarkbrothersinvestments.com.

44. On Respondents' website, they claim to use the investing principles of the "Buffet Way", which have been modified with the enhancement of "Leadership" to create "The Clark Way".

45. Respondents' website and other social media make claims about performance that cannot be substantiated, and language that suggests an investment result can be guaranteed as demonstrated by the following examples:

a. The website claims "the Clark Brothers investment philosophy, The

[2] The New York Stock Exchange is a central marketplace for investors to buy and sell stock, and for public companies to list stock to raise capital from interested investors.

Clark Brothers Way, is the only one in the country that brings the Buffet Way to the individual investor."

b. The LinkedIn page claims, "You don't need Wall Street!" while stating "There is only one investment philosophy that yields superior investment results regardless of Wall Street, interest rates, who is President, the economy overall or the direction of the stock market overall. That's value investing."

c. Respondents misrepresented on the "Investment Results" of the website page that includes performance claims with rates of return compared to the S&P 500, but were unable to substantiate the Respondents claims because Respondents did not maintain records as required by Rule 51-4.6(IA)(A)(15).

d. Respondents also misrepresented on the "Investment Results" page of the website that "All Information Examined and Approved by Securities and Exchange Commission Dated 3/5/2021" when the SEC did not approve any aspect of the Respondents' marketing.

e. Respondents' "Investments Results" page included the performance returns of four specific stock selections that was from a hypothetical period and did not correspond to an actual holding period or recommendation.

f. In a promotional video on the website, Clark's LinkedIn page, and in the cold call script used for calls with potential investors, Clark misrepresents that he traded for Goldman Sachs on the New York Stock Exchange floor. Goldman Sachs has contradicted this claim by describing Clark's role with Goldman Sachs as "an analyst on the New York Stock Exchange Floor from July 15, 1996, through July 31, 1996. Our records indicate that Mr. Clark was terminated due to incorrect pre-hire information".

a. Emails obtained show that Respondents:

a. Represented on April 1, 2021, their returns "once again easily rank in the Top 1% of all investment vehicles in the world."

b. Represented on April 5, 2021, that Respondents returns "are the best investment returns in the Industry."

Represented on June 18th that Clark Brothers' "returns are #1 in America. That's not a typo or an exaggeration."

46. Several of the claims on the website that had been identified by Staff as problematic during the First Exam were still posted including the following:

a. "Clark Brothers net investment return ranks in the top 1% of the entire investment industry."

b. "Clark Brothers investment philosophy, The Clark Brothers Way, is the only one in the country that brings the Buffett Way to the individual investor."

c. Clark Brothers only recommends the best mutual funds, ETFs, and stocks in America."

47. Respondents' performance claims fail to include disclosure that the results were based off one client's portfolio, whether the results reflect the deduction of advisory fees, and that the possibility of loss or that future returns may not reflect past performance.

**Post Examination Compliance**

48. The Second Exam was also closed with a final letter issued on August 31, 2021, that required Respondents to "implement the Division's requested changes and respond to us in writing of your corrective actions taken or plans for corrective actions by September 30, 2021." ("Second Exam Final Letter"). The Second Exam Final Letter addressed all the compliance concerns identified above.

49. Respondents provided a timely response to the Division's Second Exam Final Letter and affirmed that some of the deficiencies would be addressed. Some issues that were not addressed include:

a. Respondents not entering written advisory agreements with clients and instead solely relying on the client's custodian agreements.

b. Respondents did not specifically address the fee billing discrepancies that Staff identified during the Second Exam. Instead, Respondents only addressed claims of the Staff of overbilling by claiming denying known overbilling issues.

50. In other communications since the Second Exam Final Letter was issued, the Respondents correspondence with the Division has included the following:

a. That the Division has "...been 100% WRONG on everything you have stated and/or examined in regards to CBI - other than generic clerical updates on FINRA forms."

b. A picture on October 5, 2022, with a large banner in the office misrepresents Clark Brothers by stating, "Berkshire Hathaway Investment Advisor" despite the Clark Brothers having no affiliation with Berkshire Hathaway.

c. That TG has ended his relationship with the Clark Brothers so

Respondents do not have to pay back the loan immediately as requested in the Second Exam Final Letter.

51. In a response to the SEC, Respondents stated that "you cannot have a breach of fiduciary duty by making your clients exceptional returns and undercharging them. No illegal gains, profits, or security purchases occurred to achieve the top 1% of investment results in the industry."

52. Based on the details herein, the Staff is not confident that Respondents will take corrective actions to comply with the Colorado Securities Act and Rules under the Colorado Securities Act.

The Commissioner determined, based on the results of the examinations and investigation, that proceedings should be initiated pursuant to § 11-51-410(1), C.R.S. to suspend, revoke, or impose other conditions as appropriate against the Respondents' licenses. The Commissioner requests the following relief pursuant to § 11-51-410(1), C.R.S.:

a. Revoking the investment adviser license of Clark Brothers, Inc.

b. Revoking the investment adviser representative license of Jason Ray Clark.

c. Such other and further relief as the Administrative Law Judge deems just and proper.

DATED this 21st day of October, 2022.

COMMISSIONER OF THE DIVISION OF SECURITIES
STATE OF COLORADO

TUNG CHAN
Securities Commissioner
1560 Broadway, Suite 900
Denver, Colorado 80203
Telephone: (303) 894-2320
Facsimile: (303) 861-2126

PHILIP J. WEISER
ATTORNEY GENERAL

/s/ India Kidd-Aaron
ROBERT W. FINKE, 40756*
India Kidd-Aaron, 48420*
Business and Licensing Section
Attorneys for the Securities Commissioner
1300 Broadway, 8th Floor
Denver, Colorado 8020
Telephone: (720) 508-6376 (Finke)
Telephone: (720) 508-6401 (Kidd-Aaron)
Facsimile: (720) 508-6037
Robert.Finke@coag.gov

CERTIFICATE OF SERVICE

This is to certify that I have duly served the within **Amended Notice of Duty To Answer, Notice To Set, Notice Of Hearing, And Notice Of Charges** upon all parties herein by depositing copies of the same in the United States mail, postage prepaid, at Denver, Colorado, this 21 day of October, 2022, addressed as follows:

Respondents:

Jason Ray Clark
19580 Victorian Drive
#306
Parker, CO 80138

Clark Brothers, Inc.
19580 Victorian Drive
#306
Parker, CO 80138

/s/ Jason Mashburn
For the Office of the Attorney General

India.Kidd-Aaron@coag.gov

*Counsel of record

# Supporting Document

# CBI Response to Inquiry Registration #48420

# CDS/DORA/Colorado Attorney General

# Notice of duty to answer, notice to set, notice of hearing, and notice of charges

# Response to Inquiry CDS/DORA Registration #48420

## Welcome to the Colorado Division of Securities

**The Division of Securities exists to protect investors** and maintain confidence in the securities market, while **avoiding unreasonable burdens** on the marketplace by licensing securities professionals, enforcing securities law violations, and **helping Coloradans become more informed investors.**

What is CDS **protecting** my/CBI/Jason Clark investors from? CBI has A+ investment returns. **FACT already proven in a court of Law (FINRA Arb hearing 9/8-9/9, 2022, DENVER, CO).** ALL of CBI clients will testify that this ENTIRE process has been **unreasonable**, **unfair,** dishonest, HAS NOT **HELPED** THEM IN ANY WAY, HAS NOT **PROTECTED** THEM IN ANY WAY, AND HAS NOT **INFORMED** THEM IN ANY WAY. More **informed.** Like knowing how to invest like the best investor of all time, Warren Buffett. Like educating, informing, and empowering the individual investor on the Buffett Way. Like knowing exactly what YOUR net investment returns are (money in YOUR pocket) v. the financial advisor's pocket – ALL OVER CBI Webpage for more than 20 years.

**14th Amendment to The United States Constitution;** No **State** shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, **without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. 5th Amendment;** Although the amendment contains several provisions, four elements protect a person accused of a crime: the right against compelled self-incrimination, the right to a grand jury, the right of protection against double jeopardy **and the right to due process. 8th Amendment;** protects against imposing excessive bail, excessive fines, or **cruel and unusual punishments.**

"**Due process may also require an opportunity for confrontation and cross-examination, and for discovery**; that a decision be made based on the record, and that a party be allowed to be represented by counsel." Mullane v. Central Hanover Bank & Trust Co. 339 U.S. 306 313(1950).

## Executive Director's Office (EDO) DORA

### Welcome to the Department of Regulatory Agencies

At the Department of Regulatory Agencies (DORA), we believe in fostering a Colorado in which consumers and service providers partner, forging common successes. With a sharp focus on streamlining and modernizing processes and enhancing end-to-end customer experiences, we strive to advance an environment and regulatory framework where both businesses and consumers are treated fairly, and the economy thrives. Though the Department is diverse, our shared commitment is unwavering. Our ten divisions and over 600 employees are dedicated to preserving the integrity of the marketplace and promoting a fair and competitive business environment throughout Colorado. We are committed to quality customer service, balances and fair regulation, integrity, and respect. ***Patty Salazar, Executive Director.***

According to examiners/investigators and industry standards the average exam last 90 days. DORA/CDS has been harassing, intimidating, examining then investigating Clark Brothers Investments for 2 years or 8X longer than the average **reasonable** (as required by law) normal and **fair** exam. As of September 8-9, 2022, in a court of law under the self-regulatory body of The Financial Industry Regulatory Authority (FINRA) concluded as FACT: **"As stated earlier in this Award, there is no evidence that Mr. Clark did anything dishonest or dishonorable." AND "There is no indication, however, that any improprieties were ultimately actually found by the SEC or the CDS and no disciplinary action of any kind was brought by these agencies."** Yet, even after this FACT has already been found to be 100% TRUE in a court of Law (FINRA Arbitration hearing 9/8-9/9, 2022, DENVER, CO) DORA/CDS sues CBI/Clark Brothers Investments to take CBI/Jason Clark securities license and close down Jason Clark's business (CBI) – a business that is literally Jason Clark's lifetime of work. DORA/CDS has NO LEGAL RIGHT TO DO THIS. NO MORAL RIGHT TO DO THIS. NO ETHICAL RIGHT TO DO THIS. NO EVIDENCE. NO FACTS. NOTHING. **ALL OF THE ABOVE ALREADY PROVEN AS FACT IN A COURT OF LAW (FINRA Arb Trial September 8-9, 2022).**

## Gravamen of CDS, DORA charges:

A, Breach of fiduciary duty and duty of care and loyalty, and violations of relevant rules and laws. **This has already been proven FACTUALLY FALSE in a court of law.** FINRA Arbitration panel concluding: **"As stated earlier in this Award, there is no evidence that Mr. Clark did anything dishonest or dishonorable." AND "There is no indication, however, that any improprieties were ultimately actually found by the SEC or the CDS and no disciplinary action of any kind was brought by these agencies."**

B, Written contractual agreements exist for all clients at IBKR (current custodian) and Schwab (past custodian). As well as additional Clark Brothers Investments advisory contracts as advised by DORA State of Colorado. **FACT proven in a court of law.**

C, Discretionary authority is explained and outlined in both LPOAs at Schwab and IBKR as well as correctly updated in the written contracts that CBI provides to clients per DORA/CDS second exam. Furthermore, due to the second exam and specifically the capital requirement clause for discretionary accounts, CBI since, has informed (via email, text, or phone) ALL clients on trades, strategy, philosophy, and execution timelines for each customer trade in each client portfolio. CBI will continue this practice into perpetuity – there is no reason not to, and this further confirms CBI is in 100% agreeance and compliance with DORA/CDS. **FACT proven in a court of law.**

D, There HAVE NEVER BEEN ANY TAX LIENS for Jason Clark or CBI. This has already been proven as a FACT in a court of law/FINRA arb case. Head Arbitrator Mr. Lagdon Owen (a tax attorney coincidentally) can be heard on tape that these tax liens never existed and affirmed complete and total exoneration on behalf of Jason Clark/CBI. Yet, Jason Gross/DORA/CDS still months AFTER knowing this FACT are still claiming this falsehood. **FACT proven in a court of law.**

E, I/Jason Clark have NEVER "sought out" a loan from a client. This is a factually incorrect statement that has been continually and falsely made by Jason Gross and DORA despite me/Jason Clark giving more than adequate evidence to prove this point as fact. I have given the state of Colorado DORA the contract, the dates, the timeline, the fact that Ted Gills son Andy "sought out"/had the idea for the loan for CBI, as well as talking to Ted Gill himself. The loan is paid in full. Ted Gill is currently reopening his accounts with CBI. This is just another example of Jason Gross/DORA refusing to admit error, mistakes, carelessness, negligence, and completely and totally inaccurate due diligence littered with false claims and accusations against Jason Clark/CBI. **These are all FACTS proven in a court of law.**

F, Making misleading and unsubstantiated claims. Already proven factually WRONG in a court of law during the FINRA arbitration trail on September 8-9, 2022, Denver, CO. Further to this point, AFTER conclusion of the trial, and upon following up with requests from DORA/CDS, I offered Jason Gross/DORA access to the tapes to here for themselves AS WELL AS ALL EVIDENCE ADMITTED AND AFFIRMED AT TRIAL to include ALL performance claims, statements made on returns, calendar year returns on performance claims, YTD 2022, 1 year, 3 year, 5 year, and 13 year annualized performance claims on CBI returns ALL FROM THE Charles Schwab & Co., Inc. PERFORMANCE platform. To include, the 400 page 180+ specific example CBI/Jason Clark did on ALL CBI Returns and performance claims. Jason Gross/DORA denied wanting to view most of the above documents, **FACT**. See emails confirming these conversations in this report. Then, 2-3 weeks later, I/Jason Clark/CBI get served with a court order ORDERING the very materials that I offered Jason Gross/DORA as evidence proving Jason Clark/CBI innocence that No misleading or unsubstantiated claims have EVER been made by CBI/Jason Clark already proven and affirmed in a court of law (FINRA arb case). **This is a FACT already proven in a court of law.**

G, Due care in calculating client fees. This also proven factually WRONG in a court of law. There is no merit whatsoever to this claim. Not one client would attest or affirm that CBI/Jason Clark has errored in this area. FINRA Arbitration panel concluding: **"As stated earlier in this Award, there is no evidence that Mr. Clark did anything dishonest or dishonorable." AND "There is no indication, however, that any improprieties were ultimately actually found by the SEC or the CDS and no disciplinary action of any kind was brought by these agencies."** Furthermore, for more than a decade I/Jason Clark/CBI vastly under charged clients. This claim is both insulting and without merit; **as well as PROVEN FACTUALLY WRONG in a court of law.**

H, no statements of material fact or omissions of any kind have been proven against CBI/Jason Clark. **This FACT proven in a court of law.** FINRA Arbitration panel concluding: **"As stated earlier in this Award, there is no evidence that Mr. Clark did anything dishonest or dishonorable." AND "There is no indication, however, that any improprieties were ultimately actually found by the SEC or the CDS and no disciplinary action of any kind was brought by these agencies."** On this, CDS, DORA, Jason Gross, Schwab/STJ ALL got it WRONG. **This has already been proven as FACT in a court of law at the FINRA arbitration hearing on September 8-9, 2022, in DENVER, COLORADO.**

I, I/Jason Clark/CBI have never made a single misrepresentation to clients or the State of Colorado DORA. Call every one of my clients, which the State already did spreading false accusations of wrongdoing (wiring money, borrowing money, misappropriating money from customer accounts) and ask them if I/Jason Clark/CBI has ever misrepresented myself or my returns or anything else. The absolute absurdity and unlawfulness of quoting an examination from 12 years ago is beyond reproach. It is NOT regulators job to harass and exam and investigate small RIA firms for 12 years. **There is no statute, law, and/or statutory limits that support this. FACT.**

J, it is a blatant misleading lie that I/Jason Clark/CBI have not corrected most of the compliance violations from first exam 12 years ago. This is egregious and insulting and absolutely materially false. **AND PROVEN SO AS FACT IN A COURT OF LAW.** I/Jason Clark/CBI have corrected ALL compliance issues with the state. This is a **FACT**. I have hired Anne Jones to be my Executive Assistant and her #1 job is compliance. I have hired Hazel Smith to do all of CBI bookkeeping and taxes. I have separate business and checking accounts with a newly issued Southwest VISA CBI line of credit. Many of these aforementioned issues and the issues that arose before, during, and are still ongoing are DIRECTLY due to the Defamation that Schwab caused by terminating Jason Clark/CBI IASA abruptly and without warning or cause and with tantamount unprofessionalism, a total lack of care, negligent, and inadequate due diligence. See below referenced article on what defamation of character does to an individual. Jason Clark had all the signs, symptoms, and reactions to being WRONGFULLY accused of being untrustworthy or lacking due diligence or care for MY CLIENTS. This is materially false, and this aspect was **PROVEN FACTUALLY FALSE** in a court of law at the FINRA arb hearing. FINRA Award Page 5/7 paragraph 1 states **"CBI's owner, Jason Clark, does appear to have suffered emotionally from this termination ..."** Further to this point below is a transcript of an article discussing defamation of character (which Jason Gross and DORA and CDS are still doing with these false and unfounded continuous ongoing accusations, publishing, and actions taken in this careless, negligent, completely and totally unfounded corrupt attempt to take Jason Clark's securities license and DESTROY a lifetime of work that I/Jason Clark have put into building Clark Brothers Investments). This is insulting, infuriating, and WRONG.

## Relevant and Material article on Defamation of Character

https://www.huffpost.com/entry/defamation-of-character-t_b_9520124

Defamation of Character: The Road to Emotional Meltdown
By Nicholas Carroll, Contributor, Author, writer and expert witness on defamation
**Last sentence in above article:**

**"No, defamation is not just idle gossip - it ruins people's lives."**

Further to this point, Jason Gross and the state of Colorado DORA, CDS knew this or should have known this (FINRA Arb Awards are made public immediately upon decision) yet CDS, DORA, Jason Gross are still after Jason Clark/CBI months AFTER Jason Clark/CBI has proven ALL of DORA, CDS charges **FACTUALLY WRONG in a court of law at the FINRA Arb**

**hearing on September 8-9, 2022.** Here is further evidence and testimony to this point. In testimony on day 2 of the September 8-9, 2022, trial John Prann (lifelong best friend of Aaron Clark my brother/largest CBI customer) stated "Man, these regulators are really out to get you." Concluding this point of evidence and proof, CBI/Jason Clark is 100% in compliance with the State of Colorado as of this writing. I/Jason Clark have numerous emails asking if there is anything else I/Jason Clark/CBI need to do to come to 100% compliance with the state of Colorado, DORA. And then you have the audacity to claim this. This is infuriating, and factually FALSE. **And proven as such in a court of law, 100% FACT**, not Jason Clark/CBI opinion.

K, FINRA Arbitration panel ruled that "CBI has failed to meet its burden of proof with respect to its claims" page 3/7 paragraph 1 sentence 1. Nobody can prove their case or burden of proof with no discovery, no documents, and no witnesses. This is a FACT of law and why the rules exist to REQUIRE opposing council to share ALL (not some) relevant and material evidence and proof with each other. **This FACT is also backed up by the 5th & 14th Amendments (due process including discovery) to The United States Constitution, FINRA's OWN RULES (13503, 12505, 13512, 13513), and numerous securities laws and statutes regarding good faith, fair dealings, and full disclosure.**

L, I/Jason Clark/CBI have updated performance claims and advertising to EXACTLY what the state of Colorado DORA (both Jason Gross and Jeff Eaby) told me I could say during the so called second exam which is "A specific CBI client" v. CBI or CBI Model Leadership portfolio. This was immediately updated on the web page and remains there on this day 10/30/2022. **CBI Model Leadership portfolio returns were affirmed and validated in a court of law at the FINRA arbitration hearing on September 8-9, 2022, in DENVER, CO.** This can be heard throughout the entire two-day hearing. Since the state of Colorado DORA wants me to state "A specific CBI client" is why that verbiage remains on the CBI web site as that is what both Jason Gross and Jeff Eaby DIRECTLY stated I/Jason Clark could use. **All of the above proven as FACT in a court of law.**

M, In Steptoe Johnson/STJ representing Charles Schwab & Co., Inc. Statement of Response dated December 14, 2021, to CBI Statement of Claim dated September 24, 2021, and served on parties 9/28/2021 - STJ quotes DORA/**CDS**/SEC as stating the following factually false **DEFAMATORY**, NEGLIGENT, and CARELESS statements disseminated to third parties Charles Schwab & Co., Inc. as well as NUMEROUS CBI clients, prospects, referrals, and ex customers. This all done behind CBI back lying to Jason Clark/CBI about the nature of the exam as "routine examination" when in fact this process was NOT a "routine examination" but a "examination for cause"/INVESTIGATION directed by CDS; and stated DIRECTLY to Schwab as well as NUMEROUS clients, customers, prospects, referrals, and ex clients of CBI/Jason Clark ***"This is a for-cause examination and there is heightened concern of this advisor's activities."*** Coupled with this **DEFAMATORY** statement based on inadequate due diligence, carelessness, and negligence by the SEC/**CDS/DORA** and ultimately Charles Schwab & Co., Inc. were accusations (**ALL FOUND TO BE FACTUALLY FALSE IN A COURT OF LAW at the FINRA arb hearing of CBI v. Charles Schwab & Co., Inc.**) OF: ***"detailed reports of wire transfers, checks, and other disbursements from client accounts."***

Reference STJ/Schwab Statement of Response dated 12/14/21 page 5. <u>**ALL OF THE "HEIGHTENED CONCERNS" specifically as so stated in STJ/Schwab Statement of Response learned DIRECTLY FROM CDS/DORA *"detailed reports of wire transfers, checks, and other disbursements from client accounts."* WERE ALL PROVEN TO BE FACTUALLY FALSE IN A COURT OF LAW AT THE FINRA ARB HEARING WHICH MAKES THIS Prima facie DEFAMATION of Character by CDS/DORA, more specifically, Jason Gross, Jeff Eaby, and John Harth as the examiners/investigators in charge of the botched examination/investigation of CBI/Jason Clark/myself.**</u>

N, The BERKSHIRE HATHAWAY sign in Jason Clark's office is for visualization and motivational purposes ONLY. NO where has CBI or Jason Clark himself advertised, marketed, or proclaimed publicly any association with Warren Buffett and/or Berkshire Hathaway. **This is a <u>FACT</u> proven in a court of Law.** This claim is frivolous, absurd, and has no relevance to anything material or securities related. This further shows the vexatious nature of Jason Gross and CDS/DORA.

O, The Clark Sibling Trust was never an actual "trust" but always just a regular brokerage account nicknamed The Clark Sibling Trust. I/Jason Clark did this to keep track of CBI equity that I/Jason Clark planned to gift to a trust for my brother (Aaron Clark) and sister (Amy Clark). This never came to fruition because of the business debacle that CBI/Jason Clark has gone through the past 5 years. And, I/Jason Clark, uncovered a better more tax efficient way to gift my family (not just my brother and sister) shares in CBI through their personal IRA accounts. Lastly, this factoid is not relevant or material in any way to this examination/investigation/litigation by CDS/DORA to take away CBI/Jason Clark securities license AND lifetime worth of work.

## <u>CONCLUDING REMARKS</u>

I am writing this myself/I/Jason Clark/CBI/Clark Brothers Investments as all are one in the same. I/Jason Clark/CBI cannot afford a Securities Attorney as it would have already bankrupted me/Jason Clark and CBI effectively destroying my/Jason Clark's entire life's work. I want this documented for future reference that this entire process has been a vexatious baseless action against an upstanding law-abiding tax paying citizen as well as WEST POINT graduate and VETERAN (Jason R. Clark) and tax paying law-abiding Colorado Corporation (CBI). In addition, the concluding aspects of this entire process (taking Jason Clark/CBI securities license **<u>AFTER</u> ALL OF THE Charges/Claims against CBI/Jason Clark HAVE <u>ALREADY</u> BEEN PROVEN <u>FACTUALLY</u> FALSE IN A COURT OF LAW** during the FINRA arbitration hearings on September 8-9, 2022) is a baseless vexatious action that serves no purpose. This is a witch hunt and personal vendetta perpetrated by CDS/DORA specifically Jason Gross against Jason Clark/CBI. Furthermore, for this court's consideration is the massive and totally avoidable waste of everyone's time, energy, resources, and money – <u>MOSTLY</u> for me/Jason Clark/CBI. EVERYTHING the CDS, DORA, and Schwab has WRONGFULLY accused me/Jason Clark/CBI of **has ALREADY been <u>proven</u> factually WRONG in a court of Law (FINRA Arbitration Hearing on September 8-9, 2022, in Denver, CO).** These facts are all stated in the FINRA award and judgement settlement dated September 19, 2022. Furthermore, all verification of claims by CBI/Jason Clark are recorded per FINRA rules and available upon request. Jason

Clark/CBI has NEVER had a customer complaint registered through FINRA for either Jason Clark or CBI/Clark Brothers Investments. You can go to FINRA Broker check to verify. **This is a <u>FACT</u> proven in a court of law.** Jason Clark/CBI has NEVER wired money, borrowed money, or written checks from any customer accounts. **This is a <u>FACT</u> proven in a court of law.** Jason Clark/CBI has NEVER lost any clients monies in 20+ years of investing. **This is a <u>FACT</u> proven in a court of law.** This Clark/CBI has NEVER misappropriated client monies in 20+ years of investing. **This is a <u>FACT</u> proven in a court of law.** Jason Clark/CBI is 100% in compliance with DORA State of Colorado which is the ONLY regulatory body with jurisdiction over CBI/Jason Clark. **This is a <u>FACT</u> proven in a court of law.** Jason Clark/CBI has NEVER "sought out" a loan from a client. **This is a <u>FACT</u> proven in a court of law.** I/Jason Clark have repeatedly stated this throughout this ENTIRE PROCESS. Andy Gill "sought out" the loan from his father and future client Ted Gill. This money came from an external separate account NOT at all associated in any way with CBI or Jason Clark. 3 months after loan was given to CBI for business purposes Ted Gill opened an account to help his son with his client list and CBI with opening an office. **This is a <u>FACT</u> proven in a court of law.** Jason Clark/CBI has NEVER advertised or marketed ANY materials of any kind claiming an association of any kind with Berkshire Hathaway or Warren Buffett himself. **This is a <u>FACT</u> proven in a court of law.** Jason Clark/CBI has always consulted with and informed every customer of CBI/Jason Clark on every aspect of their account to include strategy, trades, percentages of positions, risk tolerance of each position, and risk tolerance for size of positions. **This is a <u>FACT</u> proven in a court of law.** 100% of EVERYTHING on CBI web site to include ALL performance claims and math was found to be 100% in compliance, 100% correct, and 100% accurate **<u>in a court of Law.</u>** In the Award and Judgement there is no mention of any of this because if you listen to testimony that CBI/Jason Clark gave as a pro se claimant ALL was proven correct, accurate, and **indisputable as <u>FACT</u> in a court of Law.** Evidence submitted to prove this point at trial was conducted over 1.5 years (more than 20+ years actually) of Jason Clark annotating and tracking individual investor returns. More than 180 specific examples and over almost 400 pages of due diligence. All found to be accurate, correct, and mathematically sound to back up CBI claims, performance figures, and statements made on CBI web page. DORA State of Colorado, CDS, and Schwab got EVERYTHING WRONG. **This is a <u>FACT</u> proven in a court of law.** The Summation of the FINRA Arbitration Award/Judgement states this as **<u>FACT</u>**: FINRA Award and Judgement issued on September 8-9, 2022, page 3/7 paragraph 5 sentence 1 states **<u>"There is no indication, however, that any improprieties were ultimately, actually found by the SEC or the CDS and no disciplinary action of any kind was brought by these agencies."</u>** In concluding argument FINRA arbitration panel further states: **<u>"As stated earlier in this Award, there is no evidence that Mr. Clark did anything dishonest or dishonorable."</u>**

Further showing the vexatious actions by CDS/DORA/Jason Gross is the **<u>FACT</u>** that I/Jason Clark/CBI told Jason Gross/CDS/DORA all the above <u>AFTER</u> the FINRA arbitration hearing on September 8-9, 2022. My entire family and largest customers (Jeff Clark, Connie Clark, and Aaron Clark) have all been involved on every aspect of this entire process. My father, Dr. Jeff Clark, was at the two-day FINRA arbitration hearing and testified on my/CBI behalf. Jason Gross continued pursuit of finding anything to GET Jason Clark/CBI goes against the stated goal of regulatory bodies which is investor protection. See the absurd claim of the Berkshire

Hathaway motivational sign that I/Jason Clark use for my Vision of Clark Brothers Investments. To infer or proclaim anything other is by definition outside the bounds of CDS, DORA, and Jason Gross regulatory authority. Yet, Jason Gross from a photo that I sent DORA, tries to use that photo of the Berkshire sign against me/Jason Clark/CBI. Once again wrongfully, inaccurately, carelessly, negligently accusing Jason Clark/CBI of something that I/CBI/Jason Clark is NOT doing and NEVER intended to do. CBI customers (some now ex customers because of this entire bogus process) have also stated the same. In testimony on Day 2 of the FINRA arbitration hearing of CBI v. Schwab on September 8-9, 2022, John Prann (lifelong Best friend of Aaron Clark my Brother AND now ex client because of this entire bogus witch hunt) stated, "Man these guys are really out to get you." And "these guys really don't like you". John also stated as such to my brother in conversations the two of them had about this garbage bin "INVESTIGATION". Furthermore, CBI/Jason Clark has been vetted by BOTH Interactive Brokers (custodian for CBI), and more recently Smart Advisor which conducts a vigorous background and regulatory check on all Advisors on the Smart Advisor platform. SA and IBKR both found zero discrepancies for CBI/Jason Clark, and both gave an immediate approval of CBI/Jason Clark. CBI has already opened numerous multi-million-dollar accounts through the SA platform. All of these NEW investors NEVER mentioned a single word of any compliance or trust or competence or care or fiduciary issues. NONE. Jason Gross should be relieved of all duties associated with conducting exams or investigations. Jason Gross is incompetent, dishonest, lacks integrity and impartiality, is careless, negligent, and conducts vastly inferior due diligence given the facts set before him. I/CBI/Jason Clark have complied with ALL of Jason Gross's (and DORA state of Colorado) requests for information, data, client accounts, EVERYTHING the State has asked for – ALL documented by phone calls, emails, and eyewitnesses (Anne Jones CBI EA; Hazel Smith CBI Bookkeeping and Taxes; Scott Klohs office mate, client, friend, and CBI business consultant; as well as my immediate family and largest customers Jeff Clark, Connie Clark, and Aaron Clark). Yet, CDS, DORA, and Jason Gross is still after Me/CBI/Jason Clark for more than 2 years in a meaningless, careless, negligent INVESTIGATION that has found NO WRONGDOING WHATSOEVER. **AND ALL UPHELD AS <u>TRUE</u> AND AS <u>FACT</u> IN A COURT OF LAW.** During this entire process Jason Clark/CBI has not lied, cheated, or stolen. Schwab, Steptoe Johnson (Schwab's legal counsel), FINRA, CDS, and DORA all have. This is well documented by numerous phone calls, emails, and eyewitnesses. Here is another specific example of this FACT. During the so called "first examination" John Harth admitted to "taking things to far", harassing me/Jason Clark, and knit picking trivial aspects of the examination because I/Jason Clark "got under his skin". I met with John Harth, David Swafford, and a DORA attorney at the DORA/CDS offices in Downtown Denver circa 2010 where John Harth admitted to all the aforementioned in the presence of David Swafford (who I don't think is any longer with DORA) and a DORA attorney whom I do not recall the name of. Again, my father, mother, and brother were all privy to this first examination process as well as John Harth admitting to harassing me/Jason Clark/CBI. And here we are in 2022 Jason Gross at DORA/CDS being allowed to do the same thing. DESPITE THIS MESSAGE BEING CLEARLY STATED on DORA EDO information page:

## Executive Director's Office (EDO) DORA

Welcome to the Department of Regulatory Agencies

At the Department of Regulatory Agencies (DORA), we believe in fostering a Colorado in which consumers and service providers partner, forging common successes. With a sharp focus on streamlining and modernizing processes and enhancing end-to-end customer experiences, we strive to advance an environment and regulatory framework where both businesses and consumers are treated fairly, and the economy thrives. Though the Department is diverse, our shared commitment is unwavering. Our ten divisions and over 600 employees are dedicated to preserving the integrity of the marketplace and promoting a fair and competitive business environment throughout Colorado. We are committed to quality customer service, balances and fair regulation, integrity, and respect. ***Patty Salazar, Executive Director***

**Similarly stated on the FRONT PAGE of The Colorado Division of Securities:**

**The Division of Securities exists to protect investors** and maintain confidence in the securities market, while **avoiding unreasonable burdens** on the marketplace by licensing securities professionals, enforcing securities law violations, and **helping Coloradans become more informed investors.**

This ENTIRE PROCESS/EXAMINATION/INVESTIAGTION by DORA/CDS is absolutely disgusting and WRONG. **Again, ALL of CBI clients will attest to this. Furthermore, ALL of CBI clients will attest to this: DORACDS has NOT upheld their mission, duties, or responsibilities to Colorado, Colorado investors, Jason Clark, or CBI.** This INVESTIGATION by DORA/CDS has been a vexatious almost 2-year PROCESS led By Jason Gross (DORA) and has been littered with defamation, carelessness, negligence, inadequate due diligence, false accusations, lies, untruths, incompetence, biasness, evident partiality, manifest disregard of the Law, and a total and complete disregard for Jason Clark/CBI Constitutional (5th, 14th, and 8th Amendments) Rights. DORA/CDS has NOT treated Jason Clark/CBI fairly with integrity or respect. **ALL of CBI customers will attest to this as well.** DORA/CDS INVESTIGATION has NOT been balanced or fair in interpreting securities statutes, laws, and regulations. These are not only **FINDINGS OF FACT (FINRA Arb Hearing September 8-9, 2022, DENVER, CO)**, but numerous **CBI customers** (John Prann, Aaron Clark, Jeff Clark, and Connie Clark during the FINRA arb hearing) have ALREADY stated so under oath in a court of law. In addition, these additional **CBI customers/ex customers/prospects/referrals WILL ALSO ATTEST** TO DORA/CDS gross incompetence during this EXAMINATION / INVESTIGATION: Jeff Clark, Connie Clark, Aaron Clark, John Prann, Ed Skaff, Scott Klohs, John Horodyski, Joan Maranville, Larry Aubrecht, Chris Aubrecht, Jesse Ranek, Brian Allen, John Foust, Aaron Bushong, Kermit Laughlin, Anne Jones Moffatt, and Neil Burroughs. **DORA/CDS has accomplished NOTHING, proven NOTHING, Helped NO Investors, Protected NO Investors, and Informed NO Investors. ALL OF WHICH HAVE ALREADY BEEN PROVEN AS FACT IN A COURT OF LAW (FINRA Arbitration Hearing CBI v. Schwab Sept 8-9, 2022, DENVER, CO).** ALL DORA/CDS HAS accomplished is defaming AND destroying Jason Clark/CBI/My reputation, business, mental health, physical health, AND

life's work. These egregious, incompetent, overly burdensome regulatory charges and vexatious actions by Jason Gross/DORA/CDS DIRECTLY violates my/Jason Clark/CBI 8th Amendment Constitutional rights exhibiting and/or attempting to enforce **cruel and unusual punishments!** DORA/CDS has NO LEGAL RIGHT TO DO THIS. NO MORAL RIGHT TO DO THIS. NO ETHICAL RIGHT TO DO THIS. NO EVIDENCE. NO FACTS. NOTHING. **ALL OF WHICH HAVE ALREADY BEEN PROVEN AS FACT IN A COURT OF LAW (FINRA Arb Trial September 8-9, 2022, DENVER, CO).**

## DISCOVERY QUESTIONS

1/Who, What, When, Where, and WHY? Did this process get started in the first place? Who started "false allegations" of "wired money, checks, misappropriation of funds". Who, When, What, Where, and WHY?

2/Who at DORA/CDS told Schwab "This is a for-cause examination and there is heightened concern of this advisor's activities." And based on what information? And why wasn't this conveyed to Jason Clark/CBI?

3/Ask MY CUSTOMERS what they think of this ENTIRE process?

4/Has anyone ever spoken to Zach Carter, Mike Trisler, or Andy or Ted Gill?

5/On what date was this case referred to AG office?

6/Who referred this case to the AG office?

7/Give A Specific example of how this ENTIRE Investigation **"helped"** any of CBI clients?

8/Give A Specific example of how this ENTIRE Investigation **"protected"** any of CBI clients?

9/Give A specific example of how this ENTIRE process has made CBI clients **"more informed"**?

10/Why is informing, updating, educating, and raising awareness of INDIVIDUAL INVESTOR returns a bad thing? An illegal thing? Bad for investor? Serves investor protection? The more information an investor has the better, correct?

11/Timeline of events from the start? Who told who about "wire transfers" "borrowing money" and "misappropriation" of funds from CUSTOMER ACCOUNTS as so allocated by Schwab/STJ AND learned from "DORA, CDS" in STJ/Schwab response to CBI statement of claim?

12/What gives DORA, CDS authorization to go from "routine examination" to "examination for cause" and then to "INVESTIGATION" as so stated in STJ/Schwab response to CBI statement of claim?

13/Did Jason Gross, John Harth, Jeff Eaby or anyone else at DORA, CDS know about CBI v. Schwab arbitration hearing on September 8-9, 2022?

14/ Why did Jason Gross decline to see relevant and material documents that prove CBI/Jason Clark innocence? Then, goes forward with filing a case against CBI/Jason Clark AFTER THIS FACT requesting as evidence the very same documents Jason Gross declined to view? That Document is the nearly 400 pages with 180+ specific examples that prove as FACT CBI claims of investment returns and everything on CBI web site being 100% factually accurate, correct, and mathematically sound AND has already been proven as FACT in a court of law (FINRA Arb hearing on September 8-9, 2022). Below are emails as proof. And texts showing Jason Clark breaking up the massive document in preparation for sending to Jason Gross/DORA/CDS (note being the FILE was too big to send thus Jason Clark/me broke up into 6 segments dated 9/15/2022 12.20-12.30 PM MST).

Re: CBI

From Gross - DORA, Jason

To jason@clarkbrothersinvestments.com

Date 2022-09-15 13:51

Message Body

**To protect your privacy remote resources have been blocked. Allow**

Thank you for the email. We are only looking for documents showing where the returns came from. If those returns came from Schwab, then providing the complete document(s) from Schwab that shows those returns is sufficient. As you may recall, the deficiency letter cited examples where records were not retained that showed the origins of the performance figures stated on your website.

Jason Gross, CFP®, CFE

Colorado Department of Regulatory Agencies
Division of Securities Investigator

Pronouns: He/Him/His

P 303.894.2320 | F 303.861.2126
1560 Broadway, Suite 900, Denver, CO 80202
jason.gross@state.co.us | https://securities.colorado.gov/

(PLEASE NOTE: The Colorado Division of Securities cannot provide legal or financial advice and we do not endorse or recommend any person, product, or institution.)

---

CONFIDENTIALITY NOTICE: This message is intended only for the use of the individual to whom it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not an intended recipient you are not authorized to disseminate, distribute or copy this e-mail. Please notify the sender immediately if you have received this e-mail by mistake and delete this e-mail and any attachments from your system.

On Thu, Sep 15, 2022 at 12:40 PM <jason@clarkbrothersinvestments.com> wrote:
Jason, I sent a file which I broke up into 5 segments, and it appears it
still wont send. I sent the email to you that rejected this. I have a
PAPER COPY leftover from the TRIAL that I can send. Its about 3 inches
thick, FYI. Or how would you prefer I get this document to you - which
gives 181 specific examples and is 378 pages confirming my RETURNS
calculations. Please advise, and I will do. thanks, Jason Clark
720.255.5711
Oh, in case I forget, the RETURNS on my website are FROM SCHWAB and the
SCHWAB Performance Tab page. I also have calendar year RETURNS since
inception, 13 years ago. I WILL include those as well. thanks.

Re: CBI RETURNS doc

From Gross - DORA, Jason

To jason@clarkbrothersinvestments.com

Date 2022-09-15 14:54

Message Body

**To protect your privacy remote resources have been blocked. Allow**

There was no attachment to this email. Please attach the document.

Respectfully,

Jason Gross, CFP®, CFE

Colorado Department of Regulatory Agencies
Division of Securities Investigator

Pronouns: He/Him/His

P 303.894.2320 | F 303.861.2126
1560 Broadway, Suite 900, Denver, CO 80202
jason.gross@state.co.us | https://securities.colorado.gov/

(PLEASE NOTE: The Colorado Division of Securities cannot provide legal or financial advice and we do not endorse or recommend any person, product, or institution.)

---

CONFIDENTIALITY NOTICE: This message is intended only for the use of the individual to whom it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not an intended recipient you are not authorized to disseminate, distribute or copy this e-mail. Please notify the sender immediately if you have received this e-mail by mistake and delete this e-mail and any attachments from your system.

On Thu, Sep 15, 2022 at 1:07 PM <jason@clarkbrothersinvestments.com> wrote:
see attached. ensuing email.
1. Sum page
2. Thru Today or close of trade 9/14/2022
3. Dates from web page 8/12/2022
thanks.

Clark Brother's Investments Inquiry 9.15.22

From **Gross - DORA, Jason**

To **jason@clarkbrothersinvestments.com** , **jasonscorpio69@gmail.com**

Date **2022-09-15 16:31**

Attachments

- 409 Clark Brothers Investments 9.15.22.pdf(~152 KB)Options

Message Body

To protect your privacy remote resources have been blocked. Allow

Mr. Clark

Thank you for your response to the letter issued September 6, 2022. Attached is our document request for outstanding items (copy of performance from Schwab posted on your website) along with additional requests for documents. Please confirm receipt of this email.

Respectfully,

Jason Gross, CFP®, CFE

Colorado Department of Regulatory Agencies
Division of Securities Investigator

Pronouns: He/Him/His

P 303.894.2320 | F 303.861.2126
1560 Broadway, Suite 900, Denver, CO 80202
jason.gross@state.co.us | https://securities.colorado.gov/

(PLEASE NOTE: The Colorado Division of Securities cannot provide legal or financial advice and we do not endorse or recommend any person, product, or institution.)

---

CONFIDENTIALITY NOTICE: This message is intended only for the use of the individual to whom it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not an intended recipient you are not authorized to disseminate, distribute or copy this e-mail. Please notify the sender immediately if you have received this e-mail by mistake and delete this e-mail and any attachments from your system.

CDSPart3-1.docx CDSPart3-2.docx CDSPart1.docx CDSPart2.docx CDSPart3.docx CDSPart4.docx




# REQUEST FOR DOCUMENTS

Subpoena ALL documents relating to this case and/or Jason Clark/CBI/Clark Brothers Investments to include ALL texts, emails, phone calls from, to, and between the following people and agencies and firms dating back to January 1, 2010:

## Securities Regulators Involved in Examination/Investigation of CBI/Jason Clark

Jeff Gross, Jeff Eaby, and John Harth; DORA, CDS.

Craig Ellis, SEC, Colorado.

**Attorneys at Steptoe Johnson/STJ representing Charles Schwab & Co., Inc. FINRA arbitration case #21-02439 Clark Brothers Investments vs. Charles Schwab & Co., Inc.**

Gwendolyn Prothro Renigar (CEO STJ), Robyn Crowther (First Chair for Schwab vs. CBI arb case), Leah Quadrino (Second Chair for Schwab vs. CBI arb case), Surya Kundu (Second Chair for Schwab vs. CBI arb case), Nailah Ogle (Second Chair for Schwab vs. CBI arb case), Aaron Hillman (Assistant STJ/Robyn Crowther), Andrea Navarette (Assistant STJ/Leah Quadrino).

**Employees of Charles Schwab & Co., Inc.**

Kevin H. Lewis (MD Litigation and Regulation Charles Schwab), Chris Richie (VP Legal Charles Schwab), Greg Scanlon (Schwab FINRA DR PORTAL correspondent), Bernard J. Clark (MD RIA Services Charles Schwab), Robert Miller (MD of Compliance at Schwab), Ian Muir (SVP Advisor Services, Trading & Operations at Schwab), Nigel Murtagh (MD Chief Risk Officer Charles Schwab), David Johnson (Senior Vice President - Financial Crimes Risk Management at Charles Schwab), Kara Suro (VP and the Head of Charles Schwab's External Fraud Team within the Financial Crimes Risk Management Group; Schwab Witness #1 arb hearing CBI vs. Schwab), Christian Valoria (Director Financial Crimes Risk Management Money Laundering; Schwab Witness #2 arb hearing CBI vs. Schwab, Max Levine (Director Financial Crimes Risk Management oversees RIA; Schwab Witness #3 arb hearing CBI vs. Schwab, and Lisa Matlock (Senior Investigator Financial Crimes Risk Management; Schwab Witness #4 arb hearing CBI vs. Schwab).

**FINRA Arbitrators CBI v. Charles Schwab & Co., Inc. FINRA arbitration case #21-02439.**

**Langden T. Owen, Jr.** (Lead Arbitrator), **Margaret Ann Barrington**, and **Carol L. Roslund.**

**Additional witnesses to Subpoena:** **David Swafford**, Former DORA Employee & Head Examiner in CBI 2010 Exam as well as physically present when John Harth (DORA Examiner) admitted in front of myself, John Harth, DAVID SWAFFORD, and a DORA attorney (Do not recall name) that I "got under his (John Harth) skin" and that he (John Harth) "took things a little too far" and that he (John Harth) "was being nit picky with CBI examination". **Zach Carter**, ex CBI customer and apparent whistle blower on CBI to DORA, CDS, SEC, and Schwab? This is STILL unknown as of this writing (10/25/2022) because NO ONE will provide CBI/Jason Clark with ANY discovery, documents, or witnesses.

I/Jason Clark/CBI would ask the court to subpoena ALL of these documents from Charles Schwab. During the FINRA arbitration hearing between CBI and Schwab FINRA blocked CBI through a Protective Order from receiving ANY documents, discovery, or witnesses. This is against the Law and FINRA Rules 13503 Motion to Compel Discovery, 12505 Cooperation between parties for discovery, 13512 Subpoenas for discovery when one party will not cooperate (in this case Charles Schwab/STJ), and 13513 providing discovery without the use of subpoenas. Here is the email CBI sent STJ/Schwab asking for discovery after preconference hearing when Head Arbitrator Langden Owen said that I can receive discovery. Also included in the email I sent 48 hours prior to the hearing annotating and affirming NO DISCOVERY has been given to CBI. Furthermore, in the award and judgement FINRA arbitration panel indicated that I/Jason

Clark/CBI "waived" discovery which is a blatant lie and untrue AND these emails are proof and evidence of that FACT.

**FIRST EMAIL**

RE: CBI v. Schwab arb case # 21-02439

From Crowther, Robyn

To jason@clarkbrothersinvestments.com

Cc kevin.lewis@schwab.com , Ogle, Nailah , Kundu, Surya

Date 2022-09-06 16:25

Message Body

Thank you for your response, and for your flexibility as to when the Schwab employees will be called. They will testify live, and I don't know that FINRA procedures allow them to testify as a group, so we will need to offer them one at a time. Please let me know how much time you want to spend with each witness and I will send you a schedule.

RE: CBI v. Schwab arb case # 21-02439

From Crowther, Robyn

To jason@clarkbrothersinvestments.com

Cc kevin.lewis@schwab.com , Ogle, Nailah , Kundu, Surya

Date 2022-09-06 14:03

Message Body

Dear Mr. Clark,

Following FINRA's recent rulings, I wanted to check in with you on some logistical issues relating to the hearing beginning on Thursday.

First, we remain willing to share the documents with you if you confirm that you will follow the protective order and not disclose them outside of the arbitration hearing or in other filings made with FINRA. Please let me know your position on that issue.

Second, would you let me know which witnesses you intend to call, and in which order? Any Schwab witness who you will intend to call will need to make arrangements to be at the hearing site at the correct time, so I need to coordinate with their schedules today and tomorrow.

If you would like to discuss this by phone, let me know.

Thanks,
Robyn Crowther

-----Original Message-----
From: Crowther, Robyn
Sent: Wednesday, August 24, 2022 6:04 PM
To: 'jason@clarkbrothersinvestments.com' <jason@clarkbrothersinvestments.com>
Cc: kevin.lewis@schwab.com; Ogle, Nailah <nogle@Steptoe.com>; Kundu, Surya <skundu@Steptoe.com>; Quadrino, Leah <LQuadrino@steptoe.com>
Subject: RE: CBI v. Schwab arb case # 21-02439

Hi Mr. Clark, as to your question below, we will send objections to your discovery requests that will show what we think is appropriate and what we think is not appropriate. However, I saw your filing with FINRA today and am still unclear as to whether you intend to comply with the protective order that was entered. Please let us know as that will impact what we can provide on Monday.

-----Original Message-----
From: jason@clarkbrothersinvestments.com <jason@clarkbrothersinvestments.com>
Sent: Wednesday, August 24, 2022 11:11 AM
To: Crowther, Robyn <rcrowther@Steptoe.com>
Cc: kevin.lewis@schwab.com; Ogle, Nailah <nogle@Steptoe.com>; Kundu, Surya <skundu@Steptoe.com>; Quadrino, Leah <LQuadrino@steptoe.com>
Subject: Re: CBI v. Schwab arb case # 21-02439

On 2022-08-24 11:37, Crowther, Robyn wrote:
Dear Mr. Clark,

In reviewing this email string, I am concerned about your statement to Mr. Neftin that the Chair reiterated that you do not have to sign an NDA to get discovery and documents, and that the protective order only applies to your request to call certain high-ranking Schwab officials as witnesses in this action. That is not correct. The protective order issued has the same confidentiality terms that we asked you to agree to, but they have now been imposed by the order of the Chair rather than pursuant to an agreement. If you disagree with that interpretation, please let me know at your earliest convenience so that we can ask the Chair to clarify the ruling. Schwab cannot produce confidential information to you if you are not going to comply with the order not to disseminate them, so we need to all be on the same page before we can give you the discovery you requested. If you confirm that you will abide by the terms of the protective order and not disclose confidential information, we will make our production to you by Monday.

So that there is no misunderstanding, we do not believe that you are entitled to everything you have asked for below, and will make clear what we object to when we serve our documents and response.

Some of your questions below are not appropriate, but I am going to answer some of them now because we will need to work together to get materials ready for the arbitration, and I hope that we can conduct ourselves cooperative as it will make everything go more smoothly.

Ms. Quadrino has another case she is working on where the trial date was continued, creating conflicts with the dates for the arbitration in this case. Rather than ask you to delay the hearing, we asked Ms. Kundu to step in and assist. This has nothing to do with your case, it is just a scheduling conflict that happens all the time. We work as a team, and so when we have said in the past that proposals were made to you with compromises etc., we refer to communications sent by all of us. You have all of the correspondence and you might interpret it differently than we do, but that may be some of the confusion about statements we have made regarding proposals. We are not going to debate that with you, however, as in our view the issue has been resolved by the Chair who considered your position.

I do not think it is relevant any longer, but in the interest of trying to build some trust, here is one of the picture of my office where you can see some of the water on the floor. I took this picture at 12:16am on the morning of November 16, 2021 when I had come to the office in response to an emergency in the middle of the night. It just made it difficult to finalize the response to your claim when it was due so I requested a brief extension which the panel granted. I do not intend to engage any further on this topic unless the panel requests me to, but as you have accused me of lying about it, I hope that sharing this picture will put that concern at ease.

I have removed the people who are not relevant to this discussion, who include assistants at Steptoe, the chair of my firm, FINRA administrators and other attorneys at Schwab. These are not people who can help in getting this matter prepared for arbitration. We want to work with you to get this case presented and tried. If you think it would be useful to discuss any of this by telephone, we can arrange a call.

Sincerely,

Robyn Crowther

-----Original Message-----
From: jason@clarkbrothersinvestments.com
<jason@clarkbrothersinvestments.com>
Sent: Wednesday, August 24, 2022 4:50 AM
To: Crowther, Robyn <rcrowther@Steptoe.com>; kevin.lewis@schwab.com; Ogle, Nailah <nogle@Steptoe.com>; anavarette@steptoe.com; Kundu, Surya <skundu@Steptoe.com>; Quadrino, Leah <LQuadrino@steptoe.com>; greg.scanlon@schwab.com; chris.richie@schwab.com; Hillman, Aaron <ahillman@steptoe.com>; Renigar, Gwendolyn <grenigar@steptoe.com>
Cc: Cody.Neftin@finra.org; Ericka.Jeanvil@finra.org
Subject: CBI v. Schwab arb case # 21-02439

TO: Robyn Crowther, Kevin Lewis, Nailah Ogle, Andrea Navarette, Sunya Kundu, Leah Quadrino (not on the Call?), Greg Scanlon (Schwab), Chris Richie (Schwab), Aaron Hillman (STJ), and Gwen Renigar (STJ).

See Cody Netfin email message below. I am doing as Cody (case manager for FINRA) suggested and contacting you to give CBI all discovery and documents that CBI has long ago requested. To summarize that request for discovery and documents here again is what CBI is requesting.

1. ALL case files/instances where Charles Schwab & Co. has terminated a RIA IASA under Schwab.

2. Why is Leah Quadrino suddenly not on any dockets after our Friday July 22, 2022 call?

3. Proof of flood that Robyn Crowther said occurred back in November of 2021? In accordance with FINRA rule 13207 said flood would have to have been "extraordinary circumstances." Seeing as Leah Quadrino (listed as a representative Attorney on STJ/Schwab original response to CBI statement of claim) is located in Washington DC and You/Robyn Crowther are located in Los Angeles, CA, please explain how it is possible to have a FLOOD that prevented your Firm, Steptoe Johnson, from filing STJ/Schwab response to CBI statement of claim on time?

4. Please provide ALL "proposals", "negotiations", and "compromises"

you/Robyn Crowther personally said you/Robyn Crowther made to CBI in regards to the NDA dispute CBI had with Leah Quadrino (STJ)? I have only spoken to Leah Quadrino once for less than 5 minutes on this topic on Friday July 22, 2022. I have NEVER once spoken to you/Robyn Crowther on this subject (NDA) or protective order for that matter.

5. Is Zach Carter the "mystery" customer so identified in STJ/Schwab original statement of response? If not Zach Carter, then who is this

unidentified customer?

6. Please provide ALL related documentation, transcripts, phone calls, texts, emails, and any other forms of communication for the EXAM You/STJ/Schwab said occurred with Colorado Division of Securities and/or DORA state of Colorado and CBI on October 27, 2017? Please also provide a copy of ALL the "numerous" customer complaints on CBI that occurred after this EXAM.

7. Please provide copies, proof, evidence of "wire transfers"

you/STJ/Schwab/Robyn Crowther said occurred from CBI customer accounts to me/Jason Clark/CBI.

8. Please provide copies, proof, evidence of CBI "customer loans"

between me/Jason Clark/CBI and any CBI customer.

9. Please provide copies, proof, evidence of the Federal Tax Lien on Jason Ray Clark/Jason Clark/CBI/me?

10. Please provide copies, proof, evidence of ANY money missing from ANY CBI customer accounts custodian at Charles Schwab & Co?

11. Please provide copies of ALL the CBI LPOAs (limited power of

attorneys) on ALL CBI customer accounts custodian at Charles Schwab & Co.

12. Please show me/CBI/Jason Clark the "detailed reports on wire transfers, checks, and other disbursements from client accounts" so stated by you/Robyn Crowther/STJ/Schwab in response to CBI statement of claim.

13. Provide all communication written or verbal or otherwise (phone calls, text messages, emails) between Charles Schwab & Co./any employee of Charles Schwab & Co. AND the State of Colorado Division of Securities and/or DORA to include specifically Jason Gross and Jeff Eaby (both securities examiners at DORA). Specifically, ALL communication between Schwab and DORA that led to the "This is a for cause examination and there is heightened concern of this advisor's activities." - so stated and quoted in STJ/Schwab response to CBI original statement of claim.

14. Provide ALL documents relating to or pertaining to the $200,000,000 SEC Investigation into Charles Schwab over Intelligent

Portfolio Robo Advisor fraud case, and subsequent settlement with the SEC.

Thank You, Jason R. Clark/CBI/pro se claimant, 720.255.5711

-------- Original Message --------

Subject: RE: meeting?

Date: 2022-08-23 19:14

From: "Neftin, Cody" <Cody.Neftin@finra.org>

To: "jason@clarkbrothersinvestments.com"

<jason@clarkbrothersinvestments.com>

Cc: "Jeanvil, Ericka" <Ericka.Jeanvil@finra.org>

Hi Jason,

The signed protective order is attached here for reference. This was published today after the pre-hearing conference. The protective order outlines the process for remaining discovery and handling of the confidential information. Your best bet is to contact Respondent to coordinate.

-Cody

-----Original Message-----

From: jason@clarkbrothersinvestments.com

<jason@clarkbrothersinvestments.com>

Sent: Tuesday, August 23, 2022 3:07 PM

To: Neftin, Cody <Cody.Neftin@finra.org>

Cc: Jeanvil, Ericka <Ericka.Jeanvil@finra.org>

Subject: Re: meeting?

WARNING: External Sender! Exercise caution with links, attachments and requests for login information.

Hi Cody,

no worries, went very well. Mr. Owen did reiterate that I do not have to sign an NDA to get discovery and documents. Once the protective order is issued for Mr. Schwab, Mr. Bettinger, and Mr. Bernie Clark, when do I get discovery and documents that I have already requested? Perhaps, I could also ask for your assistance and FINRA to NOT allow Schwab/STJ to wait until the night before to "dump" all discovery and documents on CBI. Again, it is my understanding from Mr. Owen during this conference call that Schwab/STJ is REQUIRED To give me discovery and documents requested and that I DO NOT have to sign an NDA to receive all documents and discovery. Thanks, Jason Clark

Confidentiality Notice:: Information contained in or attached to this email may be non-public, privileged, or confidential. Do not use, save, or copy any of that information, and do not share it with anyone else, unless you are the intended recipient. The sender has not authorized you to save, copy, use, or share any information provided to you in error.

If the sender sent you this email or any attachment by mistake, please let the sender know by replying to this email and then deleting it.

In regards to this:

So that there is no misunderstanding, we do not believe that you are entitled to everything you have asked for below, and will make clear what we object to when we serve our documents and response.

What items am I/Jason Clark/CBI entitled to? As opposed to NOT entitled to. Is it normal procedure for Attorneys on one side to dictate to the other side what items are relevant and what items are not?
I am open to discussions on these matters.

**SECOND EMAIL**

-----Original Message-----
From: jason@clarkbrothersinvestments.com <jason@clarkbrothersinvestments.com>
Sent: Tuesday, September 6, 2022 2:16 PM
To: Crowther, Robyn <rcrowther@Steptoe.com>
Cc: kevin.lewis@schwab.com; Ogle, Nailah <nogle@Steptoe.com>; Kundu, Surya <skundu@Steptoe.com>
Subject: Re: CBI v. Schwab arb case # 21-02439

ALL,

YOU (Robyn Crowther) can arrange and schedule the Schwab employees (Kara Suro, Christian

Valoria, Max Levine, Lisa Matlock) at anytime the first day, September 8, 2022. I think that is fair and reasonable, and hope you and your team agree. For times sake and best for everyone, ALL 4 of these employees can be on the "call" or "zoom" at the same time. This too is both fair and reasonable and benefits all sides including FINRA.
As for YOU, Steptoe Johnson, and Schwab NOT providing ANY discovery, documents, or witnesses (that CBI requested) AT ALL less than 48 hours prior to the start of the trial? That's first up on the docket for CBI opening statement. See You all in Denver in 2 days. Thank You, Jason, pro se claimant CBI v. Schwab arb case # 21-02439.

## WITNESS LIST & Subpoena LIST

As per CBI/Jason Clark/me rights under the Law AND so stated on page 2 paragraph 4 STATE OF COLORADO OFFICE OF ADMINISTRATIVE COURTS, Registration Number 48420.

Justification for The Court issuing Subpoenas for witnesses (and documents) on behalf of CBI/Jason Clark/myself.

Subpoenas issued to **REQUIRE** the following individuals to appear whose testimony as at the HEART of CBI case and who were PROTECTED with a PROTECTIVE ORDER BY FINRA another regulatory agency. This is documented FACT heard all throughout FINRA hearing of Clark Brothers Investments v. Charles Schwab & CO., Inc. on September 8-9, 2022. Further to this point, STJ/Schwab LIED about CBI/Jason Clark "waiving discovery". CBI/Jason Clark has numerous emails, phone calls, corroborating eye witnesses (Jeff Clark PRESENT DURING ENTIRE TRIAL, Connie Clark PRESENT DAY 1 of Trial, Aaron Clark testified on behalf of CBI/Jason Clark at Trail, John Prann testified on behalf of CBI/Jason Clark at Trail, Anne Jones testified on behalf of CBI/Jason Clark at Trail, Larry Aubrecht (Client, Friend, WEST POINT class of 1972), Paul Aubrecht (Licensed attorney), Tony Jacobs (West Point class of 1972) who WILL ALL TESTIFY on CBI/Jason Clark behalf that Schwab/STJ would not, did not, and still have not given CBI/Jason Clark any discovery, documents, or witnesses at all despite CBI numerous and extensive requests to do so; including numerous MOTIONS filed thru FINRA with no avail. And then, FINRA Head Arbitrator, Langden Owen, issues a PO PROTECTING Schwab/STJ from having to give any discovery, documents, or witnesses. This is against the Law and that is a FACT. All the Lawyers involved from STJ, Schwab, FINRA, DORA, CDS, SEC, and now AG Office now this. Yet, thus far, NONE have done anything about it. This by definition is CORRUPTION. This by definition is bias. This by definition is evident impartiality. This by definition is undue means. This by definition is manifest disregard of the law. This coupled with 19 FACT documented LIES/deceitful lawyering tactics by STJ/Schwab against a pro se claimant CBI/Jason Clark AND 7 FINRA Rules clearly broken is by definition FRAUDULANT. ALL ALSO AGAINST THE LAW and FINRA's own stated, well documented rules, guidelines, and procedures. This also meets the legal requirement for The District Court, COLORADO to vacate the FINRA award and judgement.

**Securities Regulators Involved in Examination/Investigation of CBI/Jason Clark**

Jeff Gross, Jeff Eaby, and John Harth; DORA, CDS. Craig Ellis, SEC, Colorado.

**Attorneys at Steptoe Johnson/STJ representing Charles Schwab & Co., Inc. FINRA arbitration case #21-02439 Clark Brothers Investments vs. Charles Schwab & Co., Inc.**

Gwendolyn Prothro Renigar (CEO STJ), Robyn Crowther (First Chair for Schwab vs. CBI arb case), Leah Quadrino (Second Chair for Schwab vs. CBI arb case), Surya Kundu (Second Chair for Schwab vs. CBI arb case), Nailah Ogle (Second Chair for Schwab vs. CBI arb case), Aaron Hillman (Assistant STJ/Robyn Crowther), Andrea Navarette (Assistant STJ/Leah Quadrino).

**Employees of Charles Schwab & Co., Inc.**

Kevin H. Lewis (MD Litigation and Regulation Charles Schwab), Chris Richie (VP Legal Charles Schwab), Greg Scanlon (Schwab FINRA DR PORTAL correspondent), Bernard J. Clark (MD RIA Services Charles Schwab), Robert Miller (MD of Compliance at Schwab), Ian Muir (SVP Advisor Services, Trading & Operations at Schwab), Nigel Murtagh (MD Chief Risk Officer Charles Schwab), David Johnson (Senior Vice President - Financial Crimes Risk Management at Charles Schwab), Kara Suro (VP and the Head of Charles Schwab's External Fraud Team within the Financial Crimes Risk Management Group; Schwab Witness #1 arb hearing CBI vs. Schwab), Christian Valoria (Director Financial Crimes Risk Management Money Laundering; Schwab Witness #2 arb hearing CBI vs. Schwab, Max Levine (Director Financial Crimes Risk Management oversees RIA; Schwab Witness #3 arb hearing CBI vs. Schwab, and Lisa Matlock (Senior Investigator Financial Crimes Risk Management; Schwab Witness #4 arb hearing CBI vs. Schwab).

**FINRA Arbitrators CBI v. Charles Schwab & Co., Inc. FINRA arbitration case #21-02439.**

**Langden T. Owen, Jr.** (Lead Arbitrator), **Margaret Ann Barrington**, and **Carol L. Roslund.**

**Additional witnesses to Subpoena:** **David Swafford**, Former DORA Employee & Head Examiner in CBI 2010 Exam as well as physically present when John Harth (DORA Examiner) admitted in front of myself, John Harth, DAVID SWAFFORD, and a DORA attorney (Do not recall name) that I "got under his (John Harth) skin" and that he (John Harth) "took things a little too far" and that he (John Harth) "was being nitpicky with CBI examination". **Zach Carter**, ex CBI customer and apparent whistle blower on CBI to DORA, CDS, SEC, and Schwab? This is STILL unknown as of this writing (11/5/2022) because NO ONE will provide CBI/Jason Clark with ANY discovery, documents, or witnesses.

Thank You, Jason Ray Clark, Founder Clark Brothers Investments, pro se defendant.

**ADDITIONAL EMAILS CONFIRMING EVERYTHING JASON CLARK/CBI/ME HAS SAID IS 100% FACT BASED AND EVERYTHING DORA/CDS/JASON GROSS HAS CLAIMED IS 100% WRONG. ALL OF WHICH HAS ALREADY BEEN PROVEN AS FACT IN A COURT OF LAW (FINRA Arb Case CBI v. Schwab Sept 8-9, 2022, DENVER, CO).**

EMAILS Sent between CBI/Jason Clark/me And Jason Gross DORA/CDS confirming as **FACT** DORA/CDS/Jason Gross got **EVERYTHING WRONG.** WRONG on Nathan Nance complaint,

customer file, and due care. WRONG on Performance tab charges. WRONG on retaining PERFORAMNCE tab data. WRONG on ALL Compliance issues with DORA State of Colorado. WRONG on CBI/Jason Clark/me NOT cooperating, complying, putting forth more than adequate effort to comply with ALL of Jason Gross/DORA requests. WRONG on due care, due diligence, and fiduciary duty. **ALL OF THE ABOVE ALREADY PROVEN AS FINDINGS OF FACT IN A COURT OF LAW (FINRA Arb Case CBI v. Schwab Sept 8-9, 2022, DENVER, CO) AND BACKED UP BY THESE EMAILS AS FACT.** The Summation of the FINRA Arbitration Award/Judgement states this as **FACT**: FINRA Award and Judgement issued on September 8-9, 2022, page 3/7 paragraph 5 sentence 1 states **"There is no indication, however, that any improprieties were ultimately actually found by the SEC or the CDS and no disciplinary action of any kind was brought by these agencies."** In concluding argument FINRA arbitration panel further states: **"As stated earlier in this Award, there is no evidence that Mr. Clark did anything dishonest or dishonorable."** Yet, despite **ALL OF THESE FINDINGS OF FACT IN A COURT OF LAW**, Jason Gross/DORA/CDS has **continued** down the path of defaming Jason Clark/CBI/myself, DESTROYING MY/Jason Clark/CBI business, AND ruining my/Jason Clark/CBI reputation with customers, clients, prospects, referrals, AND who knows who else. DORA/CDS/Jason Gross vexatious, incompetent, negligent, careless, reckless, unprofessional, AND in some instances INTENTIONAL vendettas will NOT go unchecked by Jason Clark/CBI/myself. The Law is on my/Jason Clark/CBI side. EMAILS are **ADDITIONAL FACTUAL DOCUMENTATION** that Jason Gross/DORA/CDS got **EVERYTHING WRONG** and the charges and claims against CBI/Jason Clark/me are vexatious, baseless, and without merit. And, in many instances, **PROVE AS FACT** Jason Gross/DORA/CDS ONLY vendetta is to "GET JASON CLARK" **(ALSO AFFIRMED AS FACT in the FINRA arb case CBI v. Schwab Sept 8-9, 2022, DENVER, CO).** TRUTH AND JUSTICE WILL PREVAIL.

**"Three things cannot be long hidden: the sun, the moon, AND THE TRUTH." Buddha**